**THE LAW OFFICES OF JOHN L. BURRIS**
JOHN L. BURRIS, Esq. (SBN 69888)
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882
john.burris@johnburrislaw.com

**THE LAW OFFICES OF JOHN L. BURRIS**
DeWITT M. LACY, Esq. (SBN 258789)
JULIA N. QUESADA, Esq. (SBN 337872)
LENA P. ANDREWS, Esq. (SBN 342471)
9701 Wilshire Blvd., Suite 1000
Beverly Hills, California 90212
Telephone: (310) 601-7070
Facsimile: (510) 839-3882
dewitt.lacy@johnburrislaw.com
julia.quesada@johnburrislaw.com
lena.andrews@johnburrislaw.com

Attorneys for
Kimone Nunis, Andre Nunis, Ludecea Nunis, Oral W. Nunis

CARL E. DOUGLAS, ESQ. (SBN: 097011)
JAMON R. HICKS, ESQ. (SBN: 232747)
***DOUGLAS / HICKS LAW, APC***
5120 W. Goldleaf Circle, Suite 140
Los Angeles, California 90056
Phone: (323) 655-6505
Fax: (323) 927-1941
carl@douglashickslaw.com
jamon@douglashickslaw.com

Attorneys for Plaintiffs,
ESTATE OF ORAL W. NUNIS, Sr., ROXIE A. NUNIS,
NAOMI NUNIS, ABIGAIL TABITHA NUNIS, JCN

//

//

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT**

**The Law Offices of John L. Burris**
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

# UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

KIMONE NUNIS, individually and as Successor-in-Interest to Decedent Oral Nunis; ORAL W. NUNIS, as Successor-in-Interest to Decedent Oral Nunis; ANDRE NUNIS, as Successor-in-Interest to Decedent Oral Nunis, and LUDECEA NUNIS, as Successor-in-Interest to Decedent Oral Nunis; and ESTATE OF ORAL W. NUNIS, SR. by and through, ROXIE A. NUNIS, individually and as successor in interest to the ESTATE, et al.,

           Plaintiffs,

      vs.

CITY OF CHULA VISTA, et al,

           Defendants.

Case No.: 3:21-cv-1627-AJB-DEB

*(Hon. Judge Anthony J. Battaglia; Hon. Magistrate Judge Daniel E. Butcher)*

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

*Filed Concurrently with the Declaration of DeWitt M. Lacy; Declarations of Michael Baden, M.D., Bennett Omalu, M.D., and William A. Harmening; Notice of Lodging.*

Date:      June 15, 2023
Time:     2:00 p.m.
Ctrm.:    4A (4th Floor
Trial Date: TBD

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT

# Table of Contents

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

ARGUMENT ............................................................................................................ 9

    A.    Defendants' Use of Force was Objectively Unreasonable. ................................ 9

    B.    Defendants Improperly Denied Medical Care to Mr. Nunis............................ 15

    C.    Plaintiffs' Monell Claim for Failure to Train Should Survive......................... 17

    D.    Defendants are not Entitled to Judgment for Violation of the Ralph Act ........ 18

    E.    Plaintiffs' Claim for Violation of the Tom Bane Act Must Survive ................ 19

    F.    Defendants Negligently Caused Mr. Nunis' Death by Asphyxiation ............... 20

    G.    Defendants are not Entitled to Summary Judgment on Plaintiffs' Negligence Claim (Gov't Code § 820, 815.2) .................................................. 21

    H.    Defendants are not Entitled to Summary Judgment as to Plaintiffs Cause of Action for Assault and Battery – Wrongful Death ............................................ 22

    I.    Judgment on Plaintiff's Claim for False Imprisonment Must be Denied ........ 23

    J.    Kimone Nunis' Claim for N.I.E.D. Should Survive Summary Judgment ........ 24

CONCLUSION........................................................................................................ 25

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

## SUPREME COURT CASE LAW

*City of Canton v. Harris*, 489 U.S. 378 (U.S. February 28, 1989) ...................................18

*City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239 (1983) ..........................16

*Graham v. Connor*, 490 U.S. 386 (1989)..........................................................................9, 10

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ..................................................3, 17, 18

*Scott v. Harris*, 550 U.S. 372 (2007)..........................................................................................9

## FEDERAL CASE LAW

*Abston v. City of Merced,* 506 Fed.Appx. 650 (9th Cir. 2013)......................................15

*Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007).......................................................................9

*Boyd v. Benton Cty*, 374 F.3d 773 (9th Cir. 2004)............................................................17

*Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013) ...........................................................19

*Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014) ...............................19

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014)..............................................13

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) .....................................................10

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) ...............14, 15

*Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528 (9th Cir. 2010) ...................................10

*Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 F. App'x 917 (9th Cir. 2015)........15, 17

*Han v. City of Folsom*, --Fed.Appx.--, 2014 WL 59731 (9th Cir. 2014)......................20

*Mackinney v. Nielsen*, 69 F.3d 1002 (9th Cir. 1995) .....................................................17

*Maddox v. City of Los Angeles,* 792 F.2d 1408 (9th Cir.1986) ..................................15

*Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003) ..........................................................14

*Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002)...................................................................10

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) .....................................................10

*Scott v. Henrich*, 39 F.3d 912, (9th Cir. 1994).................................................................13

*Tatum v. City & County of San Francisco*, 441 F.3d 1090 (9th Cir. 2006).....................15, 16, 17

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

*United States v. Reese*, 2 F.3d 870 (9th Cir. 1993) .......................................................... 19

*Zelaya v. Las Vegas Metropolitan Police Department*, 682 Fed.Appx. 565 (9th Cir. 2017) ......... 15


## CALIFORNIA CASE LAW

*Cornell v. City and Cty. of San Francisco*, 17 Cal.App.5th 766 (2017) .......................................... 19

*Fortman v. Forvaltningsbolaget Insulan AB*, 212 Cal.App.4th 830 (2013) ..................................... 24

*Gabrielle A. v. County of Orange* 10 Cal.App.5th 1268 (2017) ..................................... 18

*Hayes v. County of San Diego*, 57 Cal.4th 622 (2013) ........................................................... 20, 24

*Jones v. Kmart Corp.*, 17 Cal.4th 329 (1998) ........................................................... 19

*Scofield v. Critical Air Medicine, Inc.,* 45 Cal.App4th 990 (1996) ..................................... 23

*Thing v. La Chusa*, 48 Cal.3d 644, 647 (1989) ..................................................... 24

*Venegas v. County of Los Angeles*, 32 Cal.4th 820 (2004) ..................................................... 19

## STATUTES

Cal. Civ. Code § 51.7 ............................................................................................... 18

Cal. Civ. Code, § 52.1 .............................................................................................. 18

Cal. Gov't Code § 820 ............................................................................................. 21

Cal. Gov't Code § 815.2 ......................................................................................3, 21

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV. .............................................................................................. 1

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

# INTRODUCTION

All Plaintiffs contend Defendants' Motion for Summary Judgment or Partial Summary Judgment lacks any evidentiary support by operation of the Court's Order [Dkt.84] and therefore should be summarily denied in total.

In *arguendo*, Plaintiffs, Kimone Nunis, Ludecea Nunis, Andre Nunis, Oral W. Nunis, (hereinafter "Kimone Nunis Plaintiffs") the adult children of Decedent Oral Nunis, and Roxie Nunis, Naomi Nunis, Abigail T. Nunis, and Willie Mae Kirkland, as guardian ad litem for J.C.N. (hereinafter "Roxie Nunis Plaintiffs") oppose the Defendants' Motion for Summary Judgment. This wrongful death action arises from the brutal beating and killing of Oral Nunis during his arrest by Chula Vista Police Department officers on May 12, 2020. Plaintiffs contend there is no justification for the use of force and restraint inflicted on Decedent by Defendants City of Chula Vista, Evan Linney, Manuel Padilla, David Rivers, Brian Olson, Jordon Salvador, and Kenneth Hicks. Plaintiffs further contend undeniable evidence supports the proposition that the beating inflicted by Defendants Linney, Padilla, Rivers, Olson, Salvador, and Hicks played a significant role in the death of Decedent Oral Nunis.

The right of persons to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" has long since been protected by the Fourth Amendment to the United States Constitution. (U.S. Const. amend. IV.) Case law in the United States District Courts for the Northern, Eastern, and Central Districts of California support the denial of qualified immunity for the Defendants in this matter. Moreover, the Ninth Circuit has held force used in similar circumstances to be excessive and violative of an individual's Constitutional rights.

Respected medical professionals agree Mr. Nunis died as a result of a combination of conditions, but primarily restraint asphyxia. The testimony of Roger Clark, a retired lieutenant for the Los Angeles County Sheriff's Department and a police practices expert, supports Plaintiff's contentions the Defendants' use of knee strikes, placing weight on Mr. Nunis' back and shoulders as he lay prone in the gutter,

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

1  and applying the WRAP, a maximum restraint device, on Mr. Nunis represents a

2  significant departure from the best police practices followed in the State of California.

3  Lt. Clark's testimony further supports Plaintiff's contention that the Defendants were

4  either not adequately trained, or deliberately and purposefully disregarded minimum

5  standard police practices mandated by the California Commission on Peace Officer's

6  Standards and Training.

7      The Defendant officers clearly failed in their tactical considerations of how they

8  should have conducted a 5150 Evaluation. The Defendant officers were trained to

9  utilize very specific de-escalation techniques when contacting a mentally impaired

10 person in the field. The Defendant officers were mandated by Chula Vista Department

11 Policy to de-escalate the situation and ask the subject if they know who they are and

12 where they are. The Defendant officers were all trained that applying pressure to a

13 person's back while they are being restrained in a prone position can result in

14 asphyxiation. The Defendant officers were told WRAP was a disfavored police practice

15 and should be reserved for violent subjects who pose a serious threat to themselves or

16 others. Nonetheless, the Defendant officers ignored this training and policy mandate

17 and didn't ask Mr. Nunis a thing and instead immediately insisted on putting him in

18 handcuffs. They dog-piled him, knowing the significant and great risk of causing

19 significant injury or death to Mr. Nunis. These officers ignored the patent signals of

20 impending death and deliberately forced Mr. Nunis to lay in a prone position,

21 handcuffed behind his back, and added significant weight on his back while he was in

22 obvious need of medical attention. Such gross departures from police practice

23 standards can only be remedied by a denial of the Defendants Motion for Summary

24 Judgment and any application of qualified immunity.

25     Plaintiffs' Opposition to Defendants' Motion for Summary Judgment is based

26 on the arguments made below, on the supporting documents filed herewith and all

27 exhibits attached hereto, on the Court's file in this manner, and on such oral and/or

28 documentary evidence presented at the hearing of this motion.

# STATEMENT OF FACTS

## *Clean Bill of Health*

On the afternoon of May 12, 2020, Decedent Oral Nunis, requested that his daughter, Plaintiff Kimone Nunis (hereinafter "Kim"), take him to Sharp Hospital in Chula Vista, California, to be evaluated for chest pains, anxiety, and fatigue after experiencing several stressful life events that may have led to a decline in Mr. Nunis' mental health. (Declaration of DeWitt M. Lacy (hereinafter "LD") ¶3. All of Mr. Nunis' tests were normal and the examining physician, Dr. Erica Chun, had no concerns about his health, so she discharged Mr. Nunis. Id. (LD ¶4).

## *A Call for Help*

A few hours after Mr. Nunis and Kim returned home from Sharp, Mr. Nunis became paranoid and told Kim that he felt his life was in danger. (LD ¶5). In an upstairs bedroom, Barry Studwood ("Barry"), Kim's then fiancé, observed Mr. Nunis jump backwards in the direction of an open window. *Id.* Barry, fearing that Mr. Nunis was going to fall out of the window, grabbed Mr. Nunis to keep him from falling out of the window and pulled him to the ground by his shirt. *Id.* Kim and Barry then sat Mr. Nunis up and began talking to him. (LD ¶6). After a few minutes, Mr. Nunis calmed down. *Id.* Kim then called 911 requesting an ambulance and described that her father had attempted to jump out a window and was experiencing a mental health emergency. (LD ¶7). Defendant Evan Linney ("Defendant Linney"), the first Chula Vista officer to arrive at the scene, was dispatched to perform a 5150 evaluation with another officer. (LD ¶8). All of the Defendant Officers understood this to be a 5150 call for a mental health crisis based on the information aired over the radio. (LD ¶9).

## *"Based on My Training and Experience"*

All of the Defendant Officers, including Defendant Linney, have received training related to contacting mentally impaired persons in the field and were familiar with these policies at the time of the incident. (LD ¶10). The Defendant Officers were trained to, among other things, request back-up, de-escalate the situation, communicate

with the person in a calm manner, and not threaten the subject. Id. The Defendant Officers also received training on the Chula Vista Police Department Policy regarding 5150 Evaluations. (LD ¶11). Specifically, the Defendant Officers were mandated to first establish rapport with the subject and de-escalate the situation by asking the subject if they know who and where they are, by giving the subject their name, the agency they work for, explaining that they are there to help, and, advising the subject that they are not under arrest and are being taken to a facility for a mental health examination. Id.

Most of the Defendant Officers received training on crisis intervention, the art of de-escalation, but all were trained on the duty to intervene when they observed a fellow officer using excessive force or violating a person's civil rights, when to use reasonable force to accomplish an arrest, and the dangers of putting weight on a person's back while they are in the prone position, including the risk that the subject could have difficulty breathing in such a position. (LD ¶12). However, some Defendants, including Defendant Linney, testified that they did not receive any training at all on positional asphyxia during handcuffing until after the incident. (LD ¶13). Defendant Linney also testified that prior to the incident, he had not received any training that someone could die from being handcuffed behind the back and pressed against a hard surface like asphalt, or that placing a knee in a subject's back, face down and handcuffed could restrict the subject's breathing. (LD ¶14).

*Policy v Discretion*

When Defendant Linney arrived on the second floor of Kim's home, he immediately produced a set of handcuffs and attempted to cuff Mr. Nunis even though Mr. Nunis was calmly sitting on the floor and had not committed any crime. (LD ¶15). In direct violation of Chula Vista Police Department Policy No. 418 on 5150 evaluations, Defendant Linney never introduced himself to Mr. Nunis, he did not ask Mr. Nunis his name, how he was feeling, or if he knew where he was. (LD ¶16). Instead, the first thing Defendant Linney did was tell Mr. Nunis that he was going to

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

handcuff him, thereby escalating the situation rather than de-escalating it. *Id*. Mr. Nunis calmly and politely asked Defendant Linney not to handcuff him and told Defendant Linney that he would go with him. (LD ¶17). Defendant Linney told Mr. Nunis that he had to handcuff him because it was department policy. (LD ¶18). Defendant Linney knowingly and willingly made this statement, knowing it was an untruth because the Chula Vista Police Department ("CVPD") Policy states that handcuffing subjects during medical and mental health ("5150") calls is discretionary and left to the sole discretion of responding officer. *Id*.

Mr. Nunis, who was clearly having a mental health issue and very frightened, then ran down the stairs and out the front door. (LD ¶19). As Mr. Nunis was running to the stairs, Defendant Linney grabbed his hand in an attempt to stop him. *Id*. Barry followed Defendant Linney and Mr. Nunis outside; Kim came outside approximately one minute later. *Id*.

*A Continued Departure from Policy and Training*

Once outside, Mr. Nunis tripped and fell on the pavement and Defendant Linney jumped on top of him. (LD ¶20). Thereafter, Mr. Nunis was able to get up and ran for approximately 20 feet before Defendant Linney tackled Mr. Nunis to the ground and got on top of him again. *Id*. Defendant Linney was significantly taller, heavier, and stronger than Mr. Nunis and was wearing approximately 30 lbs. of equipment. Mr. Nunis, on the other hand, was approximately 5'5" and 145 lbs. at the time of the incident. (LD ¶21). When Officer Manuel Padilla (hereinafter "Defendant Padilla") arrived on scene shortly thereafter, Defendant Linney was fully laid out on top of Mr. Nunis. (LD ¶22).

Defendant Padilla is approximately 6'0" tall and weighed approximately 245 lbs. at the time of the incident plus an additional 25 lbs. in equipment. (LD ¶23). Defendant Padilla immediately joined Defendant Linney and pressed down on Mr. Nunis' body with 270 lbs. of force using his hands, knees, and his torso at various points. (LD ¶24). Padilla and Linney weighed over 100 lbs. more than Mr. Nunis. (LD ¶25). At no point

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

The Law Offices of John L. Burris

9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

prior to using force on Mr. Nunis did Defendant Padilla communicate with Defendant Linney to ascertain the circumstances surrounding the force; instead, he blindly followed Defendant Linney's lead. *Id*.

Defendant Linney also laid on top of Mr. Nunis' small frame, pinning him to the ground under the combined weight of Defendants Padilla and Linney in full uniform for at least five minutes. (LD ¶26). It takes only 33 pounds of pressure to compress airways, veins, and arteries. (LD ¶27). Brain death begins to occur after only four minutes of oxygen deprivation due to asphyxiation. *Id*.

Shortly thereafter, Defendant Officers David Rivers and Brian Olson (hereinafter "Defendant Rivers" and "Defendant Olson") arrived on scene. (LD ¶28). Defendant Olson immediately went hands on, pushing his hands down on Mr. Nunis' back as he lay prone on the pavement. (LD ¶29). Officer Olson is 6'8" and weighed approximately 290 lbs. at the time of the incident without equipment. *Id*. Defendants Olson and Padilla then used their hands and knees to push down on Mr. Nunis' upper back even though Mr. Nunis was not resisting, had already been secured in handcuffs, and was surrounded by at least five officers. (LD ¶30). Like Defendant Padilla, neither Defendant Olson nor Rivers communicated with the other officers regarding the circumstances giving rise to the force and blindly followed the lead of the other Defendants. *Id*.

*A Fatal WRAP*

After the other Defendant officers had arrived on scene and assisted in handcuffing Mr. Nunis, Defendant Linney shockingly called for a WRAP, a maximum restraint device, to be placed on Mr. Nunis even though Mr. Nunis was handcuffed, laid out prone on the pavement, not resisting, not a threat to himself or others, and surrounded by at least five officers. (LD ¶31). According to CVPD policy, the WRAP should only be used on combative and/or violent subjects and should not be used on a mentally ill subject unless they are being violent or have shown a potential to be violent. (LD ¶32). Mr. Nunis was not violent and at any point prior to or after the

application of the WRAP did Mr. Nunis attempt to kick, punch, or otherwise harm or threaten anyone. *Id*. Moreover, the Defendants knew that Mr. Nunis was out of breath and that the WRAP device is known to have the potential to impair a subject's ability to breathe. *Id*.

Defendants Linney, Olson, Salvador, and Rivers all assisted in applying the WRAP to Mr. Nunis. (LD ¶33). As Defendant Rivers lifted Mr. Nunis' legs into the air to apply the WRAP, Defendants Olson and Linney pushed down on Mr. Nunis' back for two minutes, further impairing his ability to breathe. *Id*.

Defendant Olson then rolled Mr. Nunis over and forced him to sit up by pressing his torso towards his legs with his full bodyweight. (LD ¶34). As Mr. Nunis was forced into a seated position, he was unable to hold his own head up; Barry described Mr. Nunis' neck as "loose as a newborn's neck." (LD ¶35). Mr. Nunis was vomiting and drooling which caused him to spit on the ground next to his legs. (LD ¶36). Mr. Nunis was not spitting at anyone nor was he attempting to do so. *Id*. Defendant Rivers observed that the spit did not look normal and described it as but did not advise the paramedics of this fact. *Id*.

Despite the fact that Mr. Nunis was struggling to breathe and was observed drooling and spitting to clear his airway, the Defendant officers put a spit sock over his' face and head, further impacting his ability to breathe. (LD ¶37). Defendant Padilla testified that he did not observe any behaviors which necessitated the use of the spit sock. *Id*. At this point, Mr. Nunis was experiencing agonal breathing and only taking approximately one breath per minute. (LD ¶38). Mr. Nunis was unable to hold his head up or speak and was heard moaning. *Id*.

*They Just Wouldn't Listen*

Contrary to CVPD policy and training, at no point during the encounter did any of the Defendants attempt to conduct a 5150 evaluation. (LD ¶39). Defendants never asked Mr. Nunis his name, they did not inquire about his mental or emotional state, whether he was injured or needed medical assistance. *Id*. They did not ask him if he

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

knew where he was and they failed to tell him that he was not under arrest as dictated by the Department's 5150 Evaluation policy. *Id*. Kim explained to Deputy David Kremer that Mr. Nunis was scared and paranoid that someone was after him and wanted to kill him, but Defendants didn't listen. (LD ¶40).

At least twice during the encounter, Mr. Nunis asked for paramedics and medical attention, but the Defendants didn't listen. (LD ¶41). Mr. Nunis then told the Defendants that he was going to heaven, but they didn't listen. *Id*. Mr. Nunis said I'm going to die twice and asked the Defendants not to let him die; but they just wouldn't listen. *Id*.

## Too Little, Too Late

Only after the WRAP and spit sock were applied was Mr. Nunis finally allowed access to the medical care he so desperately needed. (LD ¶42). By that time, however, Mr. Nunis' whole body was listing to the side, and he was not able to hold his head up. *Id*. At no point did any of the Defendant Officers advise the paramedics that they had laid on Mr. Nunis' back, pressing him into the unyielding pavement for up to five minutes even though this information was vital to ensure Mr. Nunis received proper medical care. (LD ¶43).

Just a few minutes after Mr. Nunis was placed into the back of the ambulance and before the ambulance had left the scene, paramedics aired over the radio that Mr. Nunis no longer had a pulse. (LD ¶44). Before that, Mr. Nunis was drooling, unresponsive to questions, and moaning. *Id*. The Paramedics needed to perform CPR immediately but were unable to properly do so because Mr. Nunis was still handcuffed and in the WRAP. (LD ¶45). Only after it was removed were the paramedics able to properly perform CPR. *Id*. However, the medical care provided came too late to save Mr. Nunis and he was pronounced dead shortly after arrival at Sharp Hospital. (LD ¶46).

## Death Determination

During Mr. Nunis' autopsy, necrotic neurons were found in his brain that were

**The Law Offices of John L. Burris**
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

1  caused by either a lack of blood, i.e. ischemia, or a lack of oxygen, i.e. hypoxia, getting

2  to the brain. (LD ¶47; Decl. of Bennett Omalu, ¶20). Both ischemia and hypoxia can

3  be caused by positional and/or compression asphyxia and can lead to cardiac arrest. *Id.*

4  Mr. Nunis was found to have blue fingernails at the time of the autopsy, another sign

5  of asphyxia. (LD ¶48). Mr. Nunis was also found to have food in his lungs that he

6  inhaled during the asphyxiation by the Defendants. (LD ¶49).

7       Mr. Nunis' cause of death was determined to be sudden cardiorespiratory arrest

8  while restrained in police custody. (LD ¶50). Dr. Stabley concluded that Mr. Nunis did

9  not die from excited delirium because his death did not fit the criteria for excited

10  delirium. *Id*. Mr. Nunis toxicology report indicated that he had no drugs in his system

11  which would have contributed to his death, which is typical in excited delirium cases.

12  *Id*. Dr. Stabley also found that there were no natural internal maladies, illnesses, or

13  diseases that contributed to Mr. Nunis' death. *Id*. Dr. Bennet Omalu, a well-respected

14  forensic pathologist ultimately concluded that Mr. Nunis cause of death was asphyxia

15  brain injury caused by restraint and/or compression asphyxia. (LD ¶51; Decl. of

16  Bennett Omalu, ¶19). Dr. Baden, another respected forensic pathologist, agreed that

17  Mr. Nunis' cause of death was positional asphyxia by prone back pressure, and body

18  wrapping and placement of a spit sock over his head during physical restraint by police.

19  (Decl. of Michael Baden, ¶17).

## ARGUMENT

### A. Defendants' Use of Force was Objectively Unreasonable.

22       The Supreme Court has established that an officer's use of force violates the Fourth

23  Amendment if it is excessive under objective standards of reasonableness. *Scott v. Harris*,

24  550 U.S. 372, 382–83 (2007); *Acosta v. Hill*, 504 F.3d 1323, 1324 (9th Cir. 2007). When

25  determining whether a particular use of force is "reasonable," courts must carefully

26  balance "the nature and quality of the intrusion on the individual's Fourth Amendment

27  interests" against the "countervailing governmental interests at stake." *Graham v. Connor*,

28  490 U.S. 386, 396 (1989). The Ninth Circuit applies a three-step process to determine

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT**

reasonableness in use of force cases. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Id.* (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)). Even when an officer may have been justified in using some force, "the amount [of force] actually used may be excessive." *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Glenn, supra*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396). In *Graham*, the Supreme Court noted that courts should consider such factors as (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. The most important of these factors is whether the suspect posed an immediate threat to the officer's safety or the safety of others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). In addition to the *Graham* factors, the Ninth Circuit has considered the availability of alternative methods of responding to the situation and whether warnings were given prior to the use of force. *Smith*, 394 F.3d at 701; *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

Here, Defendants rely on the interpretations of the evidence that favor their theory of the case in asserting that they are entitled to summary judgment. Plaintiff maintains that nearly every material fact that Defendants rely on is disputed and thereby does not support their motion. Before this Court can decide whether the force used by the defendant officers was appropriate, the following genuine issues of material fact need to be decided: (1) whether Mr. Nunis was actively resisting the Defendant officers after he was handcuffed; (2) whether Mr. Nunis was moving in an act of resistance when he was being pressed to the ground by the Defendant officers; (3) whether any Defendant began to strike Mr. Nunis at any time during the attempted arrest; (4) whether Mr. Nunis was trying to protect himself when Defendant Linney attempted to

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

handcuff Mr. Nunis; (5) whether Mr. Nunis posed an immediate threat to the defendant officers once he was pulled to the ground and held in a compromising position; (6) whether Mr. Nunis was actively resisting or trying to protect himself when Defendants began to apply the WRAP total restraint device; (7) whether any Defendant struck Mr. Nunis about his face and head; (8) whether Defendant Linney violated Chula Vista Police Department policy related to 5150 Evaluations; (9) whether Defendants Padilla used his body weight to pin Mr. Nunis to the ground; (10) whether Mr. Nunis was positioned face down flat on his stomach for most of the altercation with defendants; (11) whether Defendant Linney put pressure on Mr. Nunis' back while he lay face down on his stomach; (12) whether Defendant Olson put pressure on Mr. Nunis' back as he lay face down flat on his stomach; (13) whether Mr. Nunis was experiencing a medical emergency while pressure was being applied to his back; (14) whether any Defendant called for medical attention for Mr. Nunis in a reasonable time after the struggle; (15) whether Defendant Linney had reason to believe Mr. Nunis was experiencing a medical emergency at any time during the struggle; (16) whether Defendant Padilla had reason to believe Mr. Nunis was experiencing a medical emergency at any time during the struggle; (17) whether Defendant Olson had reason to believe Mr. Nunis was experiencing a medical emergency at any time during the struggle; (18) whether defendant officers promptly summoned and allowed medical care be provided to Mr. Nunis; (19) whether defendants Padilla and Linney held Mr. Nunis in a prone position with weight on his back for five (5) minutes; (20) whether Mr. Nunis ever tried to surrender during the struggle with defendant officers; (21) whether Mr. Nunis indicated he desired to be evaluated voluntarily; and (22) whether defendants were the proximate cause of Mr. Nunis' death. Due to these genuine disputes of material facts, summary judgment must be denied.

Even assuming, arguendo, that this Court reaches the "use of force" analysis under *Graham*, the facts viewed in a light most favorable to the Plaintiffs favors denial of summary judgment. More specifically, before the physical struggle, during the

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

physical struggle, and after the handcuffing of Decedent, Defendants disregarded constitutional protections of well settled law, utilized force beyond that reasonably necessary to subdue Mr. Nunis, made poor tactical decisions in investigating an alleged disturbance or 5150 evaluation, and failed to summon obviously needed medical attention that eventually lead to needless injury and death.

Both Defendants Linney and Padilla admit they were responding to a call for a 5150 evaluation that was supposed to be conducted by both officers. Defendant Linney escalated the encounter with Mr. Nunis by attempting to handcuff Mr. Nunis when he clearly had the discretion not to do so. More importantly, Chula Vista Police Department Policy 418 mandated the defendant officers shall advise the person they are taking into custody of "(a) the officer's name and agency," (b) "the fact that the person is not under criminal arrest," and that the person (c) "may take a few personal items…" Mr. Nunis even attempted to tell Defendant Linney that he would submit to a voluntary evaluation, but that he just did not desire to be handcuffed. Even if Linney's allegations were true, at best, the brief flight down the stairs did not amount to more than a misdemeanor. More simply put, there was no serious crime at issue.

Mr. Nunis was not a flight risk and was being very cooperative until Defendant Linney attempted to force Mr. Nunis into handcuffs at a time when he was noticeably calm and sitting quietly inside his daughter's home.  He was willing to submit voluntarily but just did not want to be handcuffed. There was no danger to either Linney or the public when he contacted Mr. Nunis inside his daughter's home. Mr. Nunis begged for a voluntary evaluation, "No, no, I will come with you. No handcuffs, please?" Defendants Linney knew and was trained, mandated by department policy and the California legislature to advise Mr. Nunis of his name, to let Mr. Nunis know that he wasn't there to arrest him, and to let Mr. Nunis have an opportunity to gather a couple items to take with him, but Linney took it upon himself and did it contrary to statutory mandate, department policy mandate, training, and the best practices in the industry setting in motion an unnecessary confrontation.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

More importantly, any reasonable officer should have realized they were speaking to an individual going through a mental health crisis. Although, he was an adult male, law enforcement had been forewarned of potential mental health issues by dispatch. Mr. Nunis clearly indicated the attempted handcuffing was escalating the encounter beyond the reasonable inquiry and advisement required by California statute and department policy. The responding Defendant officers all heard a call for service indicating someone may have tried to jump out of the window. More importantly, Mr. Nunis himself tried to submit to a voluntary 5150 evaluation. Linney reasonably should have recognized the tell-tale signs of mental disability and operated according to his training. He was trained not to present himself as a threat or threaten the subject with arrest. He was trained to give the subject time to consider the circumstances. He was trained to establish rapport to help avoid triggering a mentally impaired individual and escalating a matter into a violent conflict. However, Defendants Linney, Padilla, Olson, Rivers, and Salvador disregarded their training and the best practices of the industry and immediately began attempting to force Mr. Nunis into handcuffs, triggering a fearful response from Mr. Nunis, a hard working family man who just wanted to be treated with some dignity.

Even further, after Mr. Nunis was handcuffed with five uniformed and armed officers of the law around him, any danger that previously existed was clearly over. Defendants attempt to characterize Mr. Nunis as fully lucid and still offering vigorous resistance to the officers, but the body camera recordings of Defendant Officers Linney, Padilla, Olson, Rivers, and Salvador certainly offer a different perspective than the Defendants' interpretation of the happenings. Moreover, the Ninth Circuit has previously advised "in the deadly force context, we cannot 'simply accept what may be a self-serving account by the police officer.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). The body worn camera(s) ("BWC") clearly show Mr. Nunis was struggling to breathe, exhibiting ocular fixation, drooling, and very much non-verbal before at several times

during the incident. In fact, Defendant Olson says he held Mr. Nunis up in order to prevent him from falling over to his side after Mr. Nunis was handcuffed. Most of the Defendant officers contend they could not understand the grumblings and incoherent babble of Mr. Nunis during the arrest. Finally, after several minutes of physical struggle forcing Mr. Nunis to the ground and dogpiling him, after forcing Mr. Nunis into handcuffs, after binding his legs and contorting his body to fit a total restraint device called the WRAP, Mr. Nunis begins to cry out, "I'm going to heaven now." Mr. Nunis saying his last rights should be interpreted as the Defendant Officers' notice of Mr. Nunis' need for medical treatment. Yet, Defendants forced Mr. Nunis to the ground in a prone position, laid on top of him for five (5) minutes, and then forced him into compromising positions while Mr. Nunis was experiencing an obvious medical emergency and likely struggling to breathe, in part, because of regurgitated food in his lungs. No, the Defendant Officers did not tend to Mr. Nunis' well-being. They did not ask any question of him to establish rapport. They did not attempt to examine Mr. Nunis closer when they noticed Mr. Nunis spitting "a giant pile of white" abnormal looking spit to the pavement. No, the Defendant Officers put a hood over Mr. Nunis' face, so they did not have to observe him take his last breathes on this Earth.

Finally, excessive force inquiries require balancing of the amount of force applied against the need for that force under the circumstances. *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003). "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom ... summary judgment or judgment as a matter of law ... should be granted sparingly" in cases involving claims of excessive force. *Gregory*, 523 F.3d at 1106 (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003)).

A reasonable factfinder could conclude that the officers' use of body compression as a means of restraint was unreasonable and unjustified by any threat of harm or escape when Mr. Nunis weighed significantly less than the smallest Defendant,

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

was handcuffed, in a prone position, and surrounded by numerous officers. *See*, *Drummond*, 343 F.3d at 1056 (concluding that "the force allegedly employed was severe and, under the circumstances, capable of causing death or serious injury" where defendant officers allegedly "continued to press their weight on [plaintiff's] neck and torso as he lay handcuffed on the ground and begged for air"); *see also*, *Abston v. City of Merced,* 506 Fed.Appx. 650, 652-653 (9th Cir. 2013) (upholding same); *see also* *Zelaya v. Las Vegas Metropolitan Police Department*, 682 Fed.Appx. 565 (9th Cir. 2017) (holding that pinning a subject to the ground after handcuffing violates the 4th Amendment); *see also* *Slater v Deasey,* 789 F. App'x 17, 19 (9th Cir. 2019).

Furthermore, like in *Abston*, there is a genuine issue of material fact as to whether Mr. Nunis was resisting during the time that he was shackled and if so, whether that resistance was anything more than minimal. It cannot reasonably be disputed that any of Mr. Nunis' lack of communication after he was handcuffed amounted to much more than either absolute compliance and surrender or an alert to the need for prompt medical attention. In *Abston* the court reasoned that if a jury could answer either question in the negative, then the conduct would fall under the clearly established law in *Drummond*, thus qualified immunity should not be granted and summary judgment for defendants should be denied as to the compression restraint that came as a result of pinning Mr. Nunis to the ground, further restraining him and asphyxiating him by applying the WRAP, and ignoring the obvious signs of a medical emergency. As such, the level of force utilized in Mr. Nunis' arrest was overly intrusive given the circumstances of his ended attack. Summary judgment as to Plaintiff's fifth cause of action should be denied.

**B. Defendants Improperly Denied Medical Care to Mr. Nunis**

Individuals "have a Fourth Amendment right to 'objectively reasonable post-arrest medical care' until the end of the seizure." *Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 F. App'x 917, 920 (9th Cir. 2015) (citing *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006)) (holding post-arrest denial of

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

medical care during seizure is analyzed under the Fourth Amendment objectively reasonable standard); *see also Maddox v. City of Los Angeles,* 792 F.2d 1408, 1415 (9th Cir.1986) (holding officers must "seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital."). It is the duty of a governmental entity to "ensure that the medical care needed is in fact provided." *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244-45 (1983).

In *Tatum,* the Ninth Circuit held that law enforcement officers are required to obtain timely medical care when a Decedent's conduct after handcuffing, including labored breathing, lack of body control, and moaning, made it clear that they were in need of medical attention. 441 F.3d at 1099. Defendants do "not need more Ninth Circuit cases [than *Tatum*] to know that ignoring those needs would violate a suspect's constitutional rights." *See Cornejo*, 618 F. App'x at 920-21.

In this case, paramedics were called to the scene early in the incident, before Mr. Nunis began to exhibit serious signs of medical distress but were staged some distance away and were not permitted to access Mr. Nunis even though the initial call for service was for an ambulance. Moreover, the Defendant Officers all knew that their conduct as alleged herein, including but not limited to, tackling, compressing Mr. Nunis for over five minutes, leaving him in the prone position, and applying a WRAP and spit hood after an extended compression, could lead to serious medical complications. After handcuffing, it was clearly apparent to all Defendants that Mr. Nunis was in serious need of medical attention as a result of that conduct. Mr. Nunis was mumbling, moaning, and speaking incoherently for most of the encounter. What could be heard post handcuffing included requesting paramedics and saying "I'm going to die." Mr. Nunis was unable to hold his head or body up. Barry described Mr. Nunis neck as being "loose as a newborns." Moreover, Defendant Rivers observed Mr. Nunis only taking one breath every minute to a minute and a half, i.e. agonal breathing. Finally, as the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

WRAP was being applied, Mr. Nunis began vomiting and drooling. Defendant Rivers even observed that the vomit did not look normal. Yet none of the Defendants summoned medical care for Mr. Nunis and instead went on to worsen his condition by applying a spit hood. This led to Mr. Nunis aspirating on his vomit, further impairing his ability to breathe.

Despite these obvious and clear signs of medical distress, the Defendants refused to summon the staged medical care after Mr. Nunis had been handcuffed and instead continued to escalate their force. By the time paramedics were permitted to evaluate Mr. Nunis, it was too late. The Defendants failed to inform the paramedics that Mr. Nunis had been compressed for over five minutes thus the paramedics did not possess all the information vital to treatment. As a result, Mr. Nunis died.

Subject to the above, the Defendants should not be entitled to qualified immunity as *Tatum* clearly established that an individual who is exhibiting signs of medical distress, including agonal breathing and lack of body control, post handcuffing must receive immediate medical care and that a failure to timely provide that care is a violation of the constitution. In this case, Mr. Nunis was exhibiting far more than just difficulty breathing and thus the Defendants were clearly on notice that Mr. Nunis required immediate medical attention and that failure to provide immediate medical care would violate his constitutional rights. Accordingly, Defendants motion as to Plaintiffs' denial of medical care claim should be denied.

## C. Plaintiffs' Monell Claim for Failure to Train Should Survive

The Supreme Court has held that "a municipality may only be sued under section 1983 if the action that is alleged to be unconstitutional implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, or the city made a deliberate or conscious choice to fail to train its employees adequately." *Boyd v. Benton Cty*, 374 F.3d 773, 784 (9th Cir. 2004) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)) (internal citations and quotation marks omitted); *See also Mackinney v. Nielsen*, 69 F.3d 1002, 1010 (9th Cir.

1    1995)). "Inadequacy of police training may serve as the basis for § 1983 liability only
2    where the failure to train amounts to deliberate indifference to the rights of persons
3    with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388
4    (U.S. February 28, 1989)

5        Here, the Defendants were not properly trained on the dangers of positional
6    asphyxia. Several of the Defendants testified they were not trained on positional
7    asphyxia until after the incident. As compression during handcuffing is a common
8    occurrence and highly likely to lead to serious injury or death, it is most certainly
9    deliberately indifferent to fail to train, or inadequately train, officers on its dangers. If
10   the Defendants cannot recall any training on this before Mr. Nunis' death, it is clear
11   they were not adequately trained.

12       The failure to train ultimately led to Mr. Nunis' death. Accordingly, Defendants
13   Motion should be denied as to the Kim Plaintiffs' Monell claim under a failure to train
14   theory.

15   **D. Defendants are not Entitled to Judgment for Violation of the Ralph Act**

16       The Ralph Act (Cal. Civ. Code § 51.7) recognizes the right of persons to be free
17   from violence, intimidation, or threats based on discrimination. Plaintiffs need only
18   show that Defendants threatened or committed violent acts against Mr. Nunis and that
19   a motivating reason for doing so was a prohibited discriminatory motive, *or* that the
20   Defendants aided, incited, or conspired in the denial of a protected right. *Gabrielle A.*
21   *v. County of Orange* (2017) 10 Cal.App.5th 1268, 1291.

22       The civil right protected by the Ralph Act is the right to be free from violence
23   because of a person's protected characteristic such as race or disability. Defendants
24   conduct was based on Mr. Nunis' race and disability (*See* Declaration of Michael
25   Baden, ¶¶ 5–8, 16-18; Decl. of William Harmening, ¶16) Defendants escalated the
26   situation by handcuffing Mr. Nunis after he had already told Linney that he would go
27   peacefully, deploying the WRAP and spit sock. (Baden Decl. ¶¶ 6,11,1618.)
28   Defendants' aided and incited the actions of each of the other officers based on Mr.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT**

Nunis' race and disability.  (Harmening Decl., ¶¶ 7-10,12-14,18-20,24-26,30-31)

## E. Plaintiffs' Claim for Violation of the Tom Bane Act Must Survive

The Bane Act (Cal. Civ. Code, § 52.1) authorizes a civil action "against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law." (Jones v. Kmart Corp., (1998) 17 Cal.4th 329, 331. See also Venegas v. County of Los Angeles, (2004) 32 Cal.4th 820, 843 (holding generally that Bane Act liability extends only to rights violations accompanied by "threats, intimidation, or coercion").) "[A] successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1." (See Chaudhry v. City of Los Angeles, 751 F.3d 1096 (9th Cir. 2014), 1105–06 (citing Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013)); see also Cornell v. City and Cnty. of San Francisco, 17 Cal. App. 5th 766 (Ct. App. 2017).

Moreover, while the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be "transactionally independent from the constitutional violation alleged ... the Bane Act requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" Reese, 888 F.3d at 1043-1044 (citing Cornell v. City and Cty. of San Francisco, 17 Cal.App.5th 766 (2017)). When applying the specific intent standard to an excessive force violation, "a mere intention to use force that the jury ultimately finds unreasonable—that is, general criminal intent is insufficient." Reese, 888 F.3d at 1045 (citing United States v. Reese, 2 F.3d 870, 885 (9th Cir. 1993)). "Rather the jury must find that the defendants 'intended not only to use the force, but its unreasonableness, its character as 'more than necessary under the circumstances.'" Id. But it is not necessary for the defendants to have been "thinking in constitutional or legal terms at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." Id.

As stated supra, there is sufficient evidence in the present matter that a

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

reasonable jury could conclude that Defendant Linney threatening to handcuff Decedent when he was unarmed, had committed no crime, was sitting down inside the house, speaking calmly and was willing to go voluntarily, violated Decedent's Fourth Amendment rights.

Moreover, a reasonable jury could further conclude from the evidence that Defendants acted with a reckless disregard for Decedent's Fourth Amendment Rights by using far greater force than necessary when Decedent was tackled twice, Defendants used their body weight to press down on Decedent while prone, Defendants forced Decedent into a maximum restraint WRAP device without warning, even though Decedent was handcuffed, on the ground, and acting "calm," and then covered Decedent's head with a spit hood – all without ever evaluating Decedent for signs of medical distress nor without any warning. Not one Defendant Officer intervened to prevent further force from being inflicted on Decedent, nor did any other Defendant Officer communicate to Decedent that they were CVPD officers, that he was not under arrest, or that they were there to help, a duty mandated by California Welfare and Institutions Code section 5150.

Defendants' actions and omissions as described herein – despite there being no imminent threat of danger to officers or others nor any crime that was committed – is therefore indicative of Defendants' reckless disregard for Decedent's Fourth Amendment rights. Accordingly, Plaintiffs' Tom Bane Act claim must survive and Defendants' Motion for Summary Judgment should be denied.

**F. Defendants Negligently Caused Mr. Nunis' Death by Asphyxiation**

The California Supreme Court has recently decided *Hayes v. County of San Diego*, 57 Cal.4th 622 (2013) and clarified that "state negligence law...is *broader* than federal Fourth Amendment law" and that "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." *Han v. City of Folsom*, --Fed.Appx.--, 2014 WL 59731, *2 (9th

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

Cir. 2014) (overturning summary judgment on Plaintiffs' negligence claims in which trial court determined because officer's conduct did not amount to constitutional violation it necessarily did not amount to a violation of state law claims). Here again, questions of material fact preclude determination of whether the defendant officers violated Plaintiffs' state law causes of action as well.

As discussed above, Defendants' conduct violated Mr. Nunis' constitutional rights underneath the 4th Amendment. A reasonable jury could find that Defendants knew, or should have known, that violating Mr. Nunis' rights in such a manner would be likely to cause severe emotional distress. Kim Nunis Plaintiffs lost their father due to the excessive force and reckless behavior of the Defendant officers. A reasonable jury could find that Defendant officers battered/assaulted Mr. Nunis, given Mr. Nunis was attempting to surrender to the arrest, was not attacking the defendant officers, and only attempted to protect himself from several officers dog-piling on top of him, pinning him down in a prone position making it difficult for him to breathe, and then was forced into the WRAP, a maximum restraint device, gasping for his last bit of air. At the very least, a jury could find the Defendants' conduct negligent. At the worst, a jury could find the defendant officers intentionally sought to cause Mr. Nunis pain and distress. These are clearly questions of fact for a jury to determine, and thus, summary judgment should be denied as to Plaintiffs' Ninth Cause of Action.

## G. Defendants are not Entitled to Summary Judgment on Plaintiffs' Negligence Claim (Gov't Code § 820, 815.2)

Mr. Nunis' death was caused, wholly, by the actions of Defendants. Defendants owed Mr. Nunis a duty to exercise reasonable care in their interactions with him. Defendants breached their duty of care by failing to properly assess the need for handcuffs, failing to follow CVPD policy regarding the use of handcuffs; failing to conduct a 5150 evaluation, making the decision to deploy the WRAP when Mr. Nunis was already handcuffed and did not present a threat to himself or to the Defendants, negligently deploying the WRAP, failing to follow CVPD policy and the

manufacturer's guidelines regarding deployment of the WRAP, failing to check Mr. Nunis' vital signs once he was handcuffed and placed in the WRAP, failing to make sure that Mr. Nunis was provided with medical prior to being transferred to the ambulance, negligently deploying a spit sock on Mr. Nunis' head and face restricting his breathing, negligent use of police tactics, and failure to properly coordinate a plan to escort Mr. Nunis to a medical facility. (Decl. of Harmening, ¶¶ 8-10, 12-13, 15-20, 25-31.) Defendants actions were the direct cause of Mr. Nunis' injuries and a substantial factor of cause of death. (Decl. of Harmening, ¶¶ 30-31; Decl. of Baden 5-18; Declaration of Bennett Omalu, ¶¶19-23) Bennett Omalu is one of a dozen Forensic Pathologists and Neuropathologists in the country. According to Dr. Omalu, Mr. Nunis' cause of death was due to "restraint asphyxia [mechanical – positional] asphyxiation, blunt force trauma and placement of obstruction material over his face/smothering". *Id*.

## H. Defendants are not Entitled to Summary Judgment as to Plaintiffs Cause of Action for Assault and Battery – Wrongful Death

Defendants misstate the nature of Plaintiffs' assault and battery claim. This is not a Fourth Amendment claim. It is state law cause of action and Plaintiffs are not required to show excessive force or that Defendants acted unreasonably. Plaintiffs are only required to establish a harmful or offensive touching, that Mr. Nunis' was harmed by the conduct, and a reasonable person in his situation would have been offended by the touching. (CACI No. 1300)

Mr. Nunis had done nothing wrong when Defendant Linney and the other officers arrived at his home. He was not suspected of having committed a crime, he had no outstanding warrants for his arrest, and he did not pose a threat to anyone. He was calmly sitting on the floor when Linney made initial contact with him. Notwithstanding the latter, Linney's first reaction was to tell Mr. Nunis that he was going to handcuff him. Even after Mr. Nunis told Linney that he would go with him, but that he didn't want to be handcuffed, Linney grabbed at Mr. Nunis' arm causing a

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

horrible chain of events culminating in Mr. Nunis' death. Linney's escalation of the situation caused Mr. Nunis to run outside where he was tackled to the ground by Linney. (Harmening Decl., ¶¶ 7-8) Shortly thereafter, Defendant Padilla arrived on the scene and both Defendants attempted to handcuff Mr. Nunis. (Harmening Decl., ¶¶12-13) When the other Defendant officers arrived to help, Mr. Nunis who was approximately 5'4 and weighed 146 pounds, was pinned to the ground by Defendants combined weight for a significant period of time restricting Mr. Nunis' ability to breathe. (Harmening Decl., ¶¶12-13, 18-20) Once Mr. Nunis was handcuffed, Defendants deployed the WRAP and a spit sock which further restricted his ability to breathe. (Harmening Decl., ¶¶ 25-26, 31; Baden Decl. ¶¶ 6-7, 10, 14, 17-18) Mr. Nunis consented to none of this nor would a reasonable person in the same circumstances consent to such indifference and brutality. The autopsy report noted that Mr. Nunis had abrasions and bruises on his face, head, back, upper and lower extremities, and ischemic damage to brain cells. (Baden Decl., ¶ 11; Omalu Decl., ¶ 27) Defendants committed a battery upon Mr. Nunis causing his death. (Baden Decl. ¶¶12-15, 18; Decl. of Omalu 19-23) Thus, Defendants' motion for summary at to Plaintiffs' seventh cause of action should be denied.

## I. Judgment on Plaintiff's Claim for False Imprisonment Must be Denied

"The tort of false imprisonment consists of the 'nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short. *Scofield v. Critical Air Medicine, Inc.,* (1996) 45 Cal.App4th 990, 1006.

Mr. Nunis had done nothing wrong when Defendants arrived at his home. He was not suspected of having committed a crime and he did not pose a threat to anyone. Notwithstanding the latter, Linney's first reaction was to tell Mr. Nunis that he was going to handcuff him. Linney grabbed at Mr. Nunis' arm. Linney's escalation of the situation caused Mr. Nunis to run outside where he was tackled to the ground. (Harmening Decl., ¶¶ 7-8) Defendant Padilla arrived on the scene and both Defendants

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

attempted to handcuff Mr. Nunis.  (Harmening Decl., ¶¶12-13)  Mr. Nunis who was approximately 5'4 and weighed 146 pounds, was pinned to the ground by Defendants combined weight for a significant period of time.  (Harmening Decl., ¶¶12-13, 18-20) Defendants then deployed the WRAP and a spit sock. (Harmening Decl., ¶¶ 25-26-31; Baden Decl. ¶¶ 6-7, 10, 14, 17, and 18)

Defendants did not have probable cause to detain Mr. Nunis and he did not consent to the confinement. Defendants conduct was a substantial factor in causing his death. (Baden Decl. ¶¶12-15, 18; Decl. of Omalu 19-23; Decl. of Harmening, ¶¶ 30-31)

## J. Kimone Nunis' Claim for N.I.E.D. Should Survive Summary Judgment

Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. County of San Diego*, 57 Cal.4th at 628-629. In addition, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." *Id.* at 629. "In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Id*.

Plaintiffs claiming NIED must show that they: (1) are closely related to the victim; (2) were present at the scene of the incident at the time it occurred and was aware that it is causing injury to the victim; and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness. *Thing v. La Chusa*, 48 Cal.3d 644, 647 (1989). "To satisfy the second Thing requirement the plaintiff must experience a contemporaneous sensory awareness of the causal connection between the defendant's infliction of harm and the injuries suffered by the close relative." *Fortman v. Forvaltningsbolaget Insulan* AB, 212 Cal.App.4th 830, 836 (2013).

Here, it is undisputed that Kim is the biological daughter of Mr. Nunis and brings this action, in part, as co-successor-in-interest to Decedent. It is also undisputed that Kim called 911 to report Decedent's mental health crisis and was the first person

Defendant Linney contacted when he arrived on scene.

The evidence clearly shows that Kim was standing within feet of Decedent when Defendant Linney threatened to use handcuffs even though Decedent had not committed a crime, was unarmed, sitting down and inside the house, speaking calmly, and offered to go voluntarily. Kim watched as her dad, in complete fear for his life, frail, and weighing a mere 147lbs, begged for help, cried out "I'm dying," and said "I'm going to heaven." Despite Decedent already being on the ground, "calm" and fully handcuffed, Kim watched as Defendant Officers pressed their body weight onto Decedent's back while he was prone, forced Decedent into the WRAP, which Defendants testified is a "maximum restraint device," and did so without warning and asserted it was for Decedent's safety. Kim watched as Defendants covered Decedent's face with a spit hood instead of evaluating whether Decedent was in medical distress, and then claimed it was for everyone else's safety.

Kim stood by both witnessing and experiencing the entire encounter. Not one Defendant Officer intervened to prevent further force from being inflicted on Decedent, nor did any other Defendant Officer communicate to Decedent that they were CVPD officers, that he was not under arrest, or that they were there to help, a duty mandated by California Welfare and Institutions Code section 5150. Plaintiff continues to suffer severe emotional distress caused by the devastation of watching her dad fight for the last moments of his life while Defendants used excessive force against him instead of assisting her dad while his was in crisis, unarmed, had not committed any crime, and posed no credible threat to the safety of officers or others.

A reasonable jury could therefore conclude that Kim was contemporaneously aware of Defendants' infliction of unreasonable force against Decedent and the harm he suffered. Accordingly, Defendants' Motion for Summary Judgment must be denied.

## **CONCLUSION**

Based on the foregoing, Defendants Motion for Summary Judgment or Partial Judgment should be denied in its entirety.

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

1   Dated:  February 24, 2023         **THE LAW OFFICES OF JOHN L. BURRIS**

2

3                                     By: /s/ *DeWitt M. Lacy*

4                                         JOHN L. BURRIS

5                                         DeWITT M. LACY

6                                         JULIA N. QUESADA

7                                         LENA P. ANDREWS
                                          Attorneys for

8                                         Kimone Plaintiffs

9

10  Dated: February 24, 2023          **DOUGLAS/HICKS LAW, APC**

11

12

13

14                                        Carl Douglas, Esq.

15                                        Jamon Hicks, Esq.
                                          Attorneys for Roxie Nunis

16                                        Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MORTION FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT**