**DOUGLAS / HICKS LAW, APC**
Carl E. Douglas, (SBN: 97011)
Jamon R. Hicks, (SBN: 232747)
5120 W. Goldleaf Circle Suite 140
Los Angeles, CA 90056-1661
Phone: (323) 655-6505; Fax: (323) 927-1947
Email: Carl@DouglasHicksLaw.com

Attorneys for Plaintiffs,
ESTATE OF ORAL W. NUNIS, SR., by
and through, ROXIE A. NUNIS, Individually,
and as Successor in Interest to the Estate,
NAOMI NUNIS, Individually, and WILLIE
MAE KIRKLAND as *Guardian ad Litem* for
A.T.N. and J.C.N.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ORAL W. NUNIS, SR., by and through, ROXIE A. NUNIS, Individually, and As Successor in Interest to the Estate, NAOMI NUNIS, Individually, and WILLIE MAE KIRKLAND, *as Guardian ad Litem* for A.T.N. and J.C.N. | CASE NO. 3:21-cv-1627-AJB-DEB |
| | *[Hon. Anthony J. Battaglia; Magistrate Judge Daniel F. Butcher]* |
| Plaintiffs, | **DECLARATION OF WILLIAM M. HARMENING IN SUPPORT OF PLAINTIFFS OPPOSITION TO DEFENDANT CITY OF CHULA VISTA'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| CITY CHULA VISTA; DAVID ARCE, BRIAN OLSEN, DAVID KREMER, EVAN LINNEY, DAVID RIVERS, MANUEL PADILLA, JORDAN SALVADOR, KENNETH HICKS and DOES 1 through 40, inclusive, | **Date:** June 15, 2023 **Time:** 2:00 p.m. **Crtrm:** 4A (4th Floor) |
| Defendants. | |

## DECLARATION OF WILLIAM HARMENING

I, WILLIAM HARMENING, declare:

1.    I make this declaration of my own personal knowledge, except where stated on information and belief, and if called to testify in Court on these matters, I could do so competently. I am a police practices expert, who has been retained by the Plaintiffs in the above-referenced matter. I submit this declaration in support of Plaintiffs Estate of Oral W. Nunis, Sr., by and through, Roxie A. Nunis, individually, and as Administratrix of the Estate, Naomi Nunis, Abigail Tabitha Nunis, and Willie Mae Kirkland, as Guardian ad Litem for J.C.N as well as the "Kimone Nunis Plaintiffs," in opposition to Defendants' Motion for Summary Judgment or Partial Summary Judgment.

2.    Summary of Education, Training and Experience.  My qualifications as an expert witness in the area of police practices and use of force derive from two sources, one occupational, and the other academic. I was an Illinois law enforcement officer for 37, both in a patrol and investigative capacity. I am a graduate of the Illinois State Police Academy (1982), and from 2001 to my retirement in September 2018, served in the capacity of Chief Special Agent for the Illinois Securities Department. I am a former police academy instructor in Illinois and was responsible for all behavioral science instruction to Illinois police cadets completing their initial basic training. This instruction included the psychology of force, especially deadly force. Additionally, I

was a member of the Central Illinois Critical Debriefing Team and became a member after my own officer-involved shooting.

3.      Over the course of my law enforcement career I have attended many different types of training, including investigative methods, violent and property crimes investigation, and crime scene processing and analysis. My investigative methods training included techniques related to trajectory analysis, blood stain analysis, and crime scene analysis, among other subjects. I later became a police academy instructor in crime scene processing and analysis. I was also one of the first fifteen officers in the State of Illinois to receive C.I.T. training ("crisis intervention team"). Those of us who received this training were trained as trainers. Additionally, I qualified annually with my duty weapon, and periodically attended law updates on the use of force. I also participated in many different types of police training as an instructor or co-instructor, and routinely taught in an academic setting on the subject of force, particularly the psychology of force. This instruction was evidence-based using peer-reviewed research.

4.      In terms of academic qualifications, until my retirement from teaching in Spring 2019, I served as the program coordinator of the Forensic Psychology certificate program at Washington University in St. Louis, one of the Nation's top research universities. In this capacity I also served as lead instructor for the following courses:

- Introduction to Forensic Psychology (includes a comprehensive treatment of

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the use of force by the police)

- Crisis Intervention (includes a comprehensive treatment of the use of force by the police).

- Criminology

- Correctional Psychology

- Investigative Psychology

Two of these courses, Introduction to Forensic Psychology and Crisis Intervention, deal extensively with the subject of police use of force. Additionally, I have authored four peer-reviewed textbooks and a non-peer reviewed mass market book, as follows:

- The Deadly Force Script: How the Police in America Defend the use of Excessive Force (2021, ABA Publishing).

- Forensic Psychology (2015, Pearson Publishing). This widely used textbook includes an extensive treatment of the subject of force using the most current research.

- Crisis Intervention: The Criminal Justice Response to Mayhem, Chaos, and Disorder (2014, Prentice Hall). Also includes an extensive treatment of the subject of force.

- Serial Killers: The Psychosocial Development of Humanity's Worst Offenders (2014, Charles C. Thomas).

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

- The Criminal Triad: Psychosocial Development of the Criminal Personality Type (2010, Charles C. Thomas).

5. I have reviewed and/or investigated approximately 250 police use-of-force cases, and have testified in the following depositions and trials during the previous four years:

- Deposition (04/17) – Estate of Dontre Hamilton v. City of Milwaukee, Federal District Court, Eastern Division of Wisconsin, 16-CV-507.

- Deposition (8/17) – Estate of Darren Billy Wilson v. Bartow County GA, Federal District Court, Northern District of Georgia, 4:17-CV-00018.

- Deposition (12/17) – Estate of Nicholas Dyksma v. Harris County GA, Federal District Court, Southern District of Georgia.

- Deposition (05/18) – Estate of Javier Gaona v. City of Santa Maria CA, Federal District Court, Central District of California, no. 217-CV-01983.

- Deposition (5/18) – Estate of Rafael Cruz v. City of Chicago IL, Circuit Court of Cook County, no. 16 L 00823.

- Deposition (7/18) – Estate of Nicholas Thomas v. City of Smyrna GA, Federal District Court, Northern District of GA, 1:17-CV-01036.

- Deposition (7/18) – Estate of Destry Meikle v. City of Republic MO, Federal District Court, Western District of Missouri, 6:17-CV-3194-DPR.

- Deposition (7/18) – Estate of Jason Fanning v. City of St. Joseph MO, Federal District Court, Western District of Missouri, 17-06073-CV-SJ-SWH.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

- Deposition (8/18) – Estate of Jason Alderman v. City of Bakersfield CA, Federal District Court, Eastern District of California, 1:16-CV-00994-DAD-JLT.

- Deposition (09/18) – Estate of Miguel Gonzales v. Bernalillo County NM, Federal District Court, District of New Mexico, 18-CV-00125-KG-LF.

- Deposition (09/18) – Gerald Cole v. City of Indianapolis, Federal District Court, Southern District of Indiana, 1:16-cv-03081-WTL-MJD.

- Deposition (10/18) – Matthew Schantz v. Appling County GA, Federal District Court, Southern District of Georgia, 2:17-cv-157.

- Deposition (10/18) – Estate of Aaron Siler v. City of Kenosha WI, Federal District Court, Eastern District of Wisconsin, 2:17-CV-01324-DEJ.

- Deposition (11/18) – Estate of Donte Johnson v. City of Dolton IL, Federal District Court, Northern District of Illinois, 17-CV-2888.

- Deposition (12/18) – Estate of Lori Knowles v. Henry County GA, Federal District Court, Northern District of Georgia, 1:18-CV-01394-TWT.

- Deposition (01/19) – Antwon Golatte v. City of Chicago IL, Federal District Court, Northern District of Illinois, 17-CV-00929.

- Deposition (01/19) – Estate of Andre Green v. City of Indianapolis IN, Federal District Court, Southern District of Indiana, 1:17-CV-02673-JPH-TAB.

- Deposition (01/19) – Estate of Casimero Casillas v. City of Fresno CA, Federal District Court, Eastern District of California, 1:16-CV-1042-AWI-SAB.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- TRIAL (03/19) Estate of Casimero Casillas v. City of Fresno CA, Federal District Court, Eastern District of California, 1:16-CV-1042-AWI-SAB.

- Deposition (3/19) – Estate of Tommy Le v. King County WA Sheriff's Dept., Federal District Court, Western District of Washington, 2:18-CV-00055-TSZ.

- Deposition (4/19) – Estate of Donnie Robertson v. Corporal C.J. Deitz, Federal District Court, Western Division of Virginia, 5:18-CV-00067-EKD.

- TRIAL (05/19) - Estate of Dontre Johnson v. City of Dolton IL, Federal District Court, Northern District of Illinois, 17-CV-2888.

- Deposition (07/19) – Wuenschel et al. v. Columbus GA, Federal District Court, Middle District of Georgia, 4:18-CV-220-CDL.

- Deposition (07/19) – Estate of Jacai Colsen v. Prince George's County MD, Circuit Court of Prince George's County, CAL-18-19598.

- Deposition (09/19) – Estate of Donald Sneed v. Jackson County MO, Circuit Court of Jackson County, 1816-CV-25106.

- Deposition (09/19) – Estate of Hector Arreola v. City of Columbus GA, Federal District Court, Middle District of Georgia, 4:19-CV-00005-CDL.

- Deposition (10/19) – Deliah Hampton v. San Joaquin County CA, Federal District Court, Eastern Division of California, 2:16-CV-01816-MCE-AC.

- Deposition (10/19) – Tina Boyer v. Pulaski County KY, Federal District Court, Eastern District of Kentucky, 6:18-CV-00090-DLB-HLI.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Deposition (10/19) – Estate of Anthony Soderberg v. Los Angeles CA, Federal District court, Central District of California, CV18-03861 FMO (JPRx).

- Deposition (11/19) – Jason Sears v. Pulaski County KY, Federal District Court, Eastern District of KY, 6:18-CV-00234-REW-HAI.

- Deposition (12/19) – Kristine Hendrix v. City of St. Louis MO, Missouri Circuit Court, 1722- CC01430.

- Deposition (12/19) – Demontel Hendricks v. City of Griffith IN, Federal District Court, Northern District of Indiana, 1:17-CV-412-RL-JEM.

- Deposition (12/19) – Estate of Mario Guevara v. City of Colton CA, Federal District Court, Central District of California, 5:18-CV-02386-RGK (SPx).

- Deposition (06/20) – Estate of Isaiah Murrietta-Golding v. City of Fresno CA, Eastern District of California, 1:18-CV-00314-AWI SKO.

- Deposition (08/20) - Estate of Eric Logan v. South Bend IN, Federal District court, Northern district of IN, 3:19-CV-495.

- Deposition (10/20) – Estate of Ricky Starks v. Los Angeles County, Superior Court of the State of California, Central District, 19STCV38462

- Deposition (11/20) – Estate of Reuban Galindo v. City of Charlotte N.C. et al., Federal District Court, Western District of NC, 3:19-CV-491-RJC-DCK.*

- Deposition (12/20) – Rivera v. City of Chicago, Circuit Court of Cook County, 19 L 2076.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

- Deposition (02/21) – Estate of Giovann McDade v. Kent WA, Federal District Court, Western District of Washington, 2:20-771-BJR.

- Deposition (02/21) – Walker Jr. vs. Sandersonville GA

- PROBABLE CAUSE HEARING (02/21) – State of Wisconsin vs. Joseph Mensah, Milwaukee County WI.

- PROBABLE CAUSE HEARING (03/21) – State of Wisconsin vs. Joseph Mensah, Milwaukee County WI.

- Deposition (05/21) – Estate of Adam English vs. Gainesville GA.

- PRELIMINARY HEARING (06/21) – State of California vs. Ari Gold, Monterey County CA

- PRELIMINARY HEARING (10/21) – State of California vs. Ari Gold, Monterey County CA.

- TRIAL (10/21) – Estate of Kenneth French vs. City of Los Angeles, Federal District Court, Central District of CA, 5:20-cv-00416-JGB-SP.

- Deposition (11/21) – Lewis vs. G4S Security, St. Louis County Circuit Court.

- Deposition (11/21) - Mitchell vs. Scott County IA, Iowa District Court, LACE 133201.

- TRIAL (12/21) – Rice vs. City of Roy WA, Federal District Court, Tacoma WA, 20-5223 RJB

- Deposition (12/21) – Zappier vs. Hamblen County TN, Federal District Court, Eastern District of TN, 2:20-CV-221.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

- Deposition (01/22) – Dold vs. Snohomish County WA, Federal District Court, Western District of Washington, 2-20-CV-00383-RAJ.

- Deposition (02/22) – Williams vs. City of Albany NY, Federal District Court, Northern District of NY, 1:18-CV-1446 (LEK/DJS).

- Deposition (02/22) – Granton vs. City of Chicago, Cook County Circuit Court, 18 L 8034.

- Deposition (06/22) – Little vs. Morristown TN et al., Federal District Court, Eastern District of Tennessee, 2:21-cv-00047.

- Deposition (06/22) – Ball-Bey vs. City of St. Louis MO, Federal District Court, Eastern District of Missouri, 4:18-cv-01364.

- Deposition (06/22) – Salyers vs. Tacoma WA, Superior Court of the State of Washington, 21-2-07268-4.

- Deposition (06/22) – Easterly vs. Knox County TN.

- Deposition (06/22) – Hopkins vs. City of Schenectady NY, Federal District Court, Northern District of New York, 1:20-cv-0618 (TJM/CFH).

6.    In preparation for this declaration, I reviewed the following documents:

- All body cam footage from officers on-scene, including that of Agent Evan Linney and Officer Maunel Padilla.

- Audio taped 911 call and radio traffic.

- Audiotaped interviews of family member witnesses Audiotaped officer interviews.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

- Autopsy report Scene pictures/log.

- Investigative summary.

- CAD report Documents cited.

- Deposition transcripts of the Defendant officers and other depositions taken by the parties in this matter. From this review, I am aware of the following facts:

7.    On March 12, 2020, at approximately midnight, the Chula Vista Police Department ("CVPD") received a 911 call from Kimone Nunis ("Kimone") requesting an ambulance because her father, Oral Nunis, was suicidal and attempting to jump from a second story window. She further advised that her father was being restrained by her boyfriend, Barry Studwood ("Studwood"). In response to the 911 call, two officers from the CVPD, Agent Evan Linney ("Linney") and Officer Manuel Padilla ("Padilla"), were dispatched to Kimone Nunis' residence at 1323 Carmino Carmelo, Unit 154. Linney was the first to arrive and immediately was accompanied by the Kimone upstairs to a second-floor bedroom where Mr. Nunis was sitting on the floor. At this time, Mr. Nunis was calm and was not being physically restrained by Studwood. Linney approached Mr. Nunis and immediately pulled out his handcuffs. He reached for Mr. Nunis' wrist, which Mr. Nunis pulled away. Linney advised dispatch that Mr. Nunis was uncooperative, and at that point his body camera was deactivated. There was reportedly a struggle at the top of the steps and Mr. Nunis broke free and ran outside into the street where he was taken to the ground by Linney. At this time, Padilla arrived, and the two of them were able to secure Mr. Nunis in handcuffs.

Once in handcuffs, Mr. Nunis demonstrated no further resistance. Linney made the decision to place Mr. Nunis in a full body wrap, and eventually a spit mask. Once secured—by now there were multiple officers on-scene—Mr. Nunis was placed on a gurney for transport to the hospital. He became unresponsive prior to the ambulance departing and was pronounced dead at the hospital.

8.      **Contact and Physical Altercation.**

Agent Linney was the first to arrive at the residence and was escorted inside and upstairs by Kimone Nunis. The initial contact was captured on Linney's body camera. Mr. Nunis was calm and sitting on the floor. Kimone's fiancé, Barry Studwood, was kneeling between Mr. Nunis and the bedroom window. Linney immediately pulled out his handcuffs before he even introduced himself or made any attempt to build rapport with Mr. Nunis. The display of the handcuffs immediately escalated Mr. Nunis.  Mr. Nunis told Linney that he would go with him but did not want to be handcuffed. Kimone also pleaded with Linney not to apply the handcuffs. Mr. Nunis pulled his arm away when Linney grabbed his arm. At that point, Linney stepped back and advised dispatch that Mr. Nunis was uncooperative. His body cam was then deactivated.

9.      There's no apparent explanation for why Linney's body cam was deactivated when it was. There was no physical altercation at that point and Linney was standing still advising dispatch of his status. Also, at some point in the encounter the body cam did fall off Linney, however that is not uncommon during physical altercations. In most cases the body cam will continue to function. It is clear from the video that the

body cam was deactivated prior to falling. When Linney was asked during his post-incident interview what transpired after the body cam was deactivated, he refused to answer because he couldn't recall specific details of what occurred during that period. Interestingly, he was able to recall details of the altercation and "tug-o-war" at the top of the staircase before Mr. Nunis broke free and ran outside, all of which occurred after the body cam was deactivated. Aside from this inconsistency, it is clear from the body cam video—Linney's hand cannot be seen deactivating the camera—that either the camera malfunctioned and abruptly stopped recording, or the video itself was later edited to stop before the physical altercation began.

10.     When Linney initially displayed his handcuffs and grabbed Mr. Nunis' wrist, not only was Mr. Nunis' resistance predictable, but so too was his increased resistance in response to Linney's escalation of force at the top of the stairway. Linney should reasonably have known, based on his training, that Mr. Nunis was suffering from some level of mental illness, specifically, thought disorder.  Linney and Padilla were given information by dispatch that the nature of the call was an involuntary commitment ("5150") and that Mr. Nunis was trying to jump out of a two-story window. Police officers in California receive significant training on the issue of mental illness, including the proper way to respond to a situation where an individual is demonstrating such behaviors. California P.O.S.T. Learning  Domain 37 specifically describes the symptoms and behaviors indicative of a  thought

disorder (i.e., schizophrenia).[1] They include:

- Bizarre delusional thinking

- Hallucinations

- Incoherent, disconnected thoughts and speech

- Expression of irrational fear

- Deteriorated self-care

- Poor reasoning

- Strange and erratic behaviors

The standard points out, *"When frightened, a person with this disorder may act out with even more bizarre or paranoid behavior."* This training, as well as the more advanced 40-hour Crisis Intervention Team ("C.I.T.") training that all California officers eventually complete,[2] teaches officers to know and expect the following:

- A thought-disordered suspect will almost always demonstrate high levels of paranoia.

- They will respond negatively to being physically touched and will resist any attempt at restraint.

11.    **Excited Delirium/ Sudden Death**

---

[1] Learning Domain 37, Chapter 4:8.
[2] Bureau of Justice Assistance: Effective Community Responses to Mental Health Crises: A National Curriculum for Law Enforcement Based on best practices from CIT programs Nationwide (Instructor Guide).

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Excited delirium has been defined as *"a state of extreme mental and physiological excitement, characterized by extreme agitation, hyperthermia, epiphoria, exceptional strength and endurance without apparent fatigue."[3]* Simply put, it is a condition in which the suspect being restrained escalates from resistance to panicked escape. They become impervious to pain and will increase their physical exertion as the officers increase their efforts to restrain them. It leads to a deadly cycle where the officers' use of force increases the suspect's level of resistance, which in turn increases the officers' level of force even more, and so on.[4]

12.   Linney, and later both he and Padilla, had two decision points in this case where their training, had it been followed, could have prevented the deadly outcome. The first was before Linney ever displayed his handcuffs and laid his hands on Mr. Nunis. Linney should reasonably have known that Mr. Nunis would resist, and that it would be difficult, if not impossible to get him restrained by himself. All training suggests that when restraining an individual who may resist in this manner, it must be done quickly and with an overwhelming amount of appropriate force. A prolonged physical altercation must be avoided. Linney had every opportunity to attempt to communicate with Mr. Nunis without escalating him. He could have simply talked to him and asked how he could help. He could have explained what he was doing and how best to accomplish it. He could have explained the use of handcuffs before he ever pulled

---

[3] Morrison, A., & Sadler, D. (2001). Death of a Psychiatric Patient during Physical Restraint. Excited Delirium — A Case Report. Medicine, Science and the Law, 41(1), 46–50. https://doi.org/10.1177/002580240104100109
[4] While there is no consensus among the medical community regarding the use of "excited delirium" as a medical diagnosis, it is universally used in police training to represent a series of symptoms, as described.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

them out, or the use of soft restraints if he were to be transported by an ambulance. Communication is always the key, and in this case, Mr. Nunis was calm and non-aggressive, which would have facilitated effective communication. Instead, Linney chose the worst possible course by grabbing his arm to handcuff him without any explanation. Again, his resistance was predictable, and given his training, Linney should have known this.

13.     The second decision point was after Mr. Nunis was on the ground and it became obvious that they would be unable to get him restrained without significant physical exertion. At that point, the officers should have released their pressure on Mr. Nunis and attempted to de-escalate the situation. What is surprising is that at one point Mr. Nunis and the officers stopped what they were doing and Mr. Nunis began speaking to his daughter as she comforted him. The officers should have recognized his distress at this point. Instead, after momentarily catching their breath, they returned to their efforts to get Mr. Nunis handcuffed while he resisted. Based on their training, and with no other officers yet assisting, they should have reasonably known that the combined risk factors of Mr. Nunis' age, his mental condition, the amount of time he was in a prone position, the onset of excited delirium, and applying their own weight to keep him pinned on the ground, all increased the possibility of sudden death if their efforts continued.

14.     In the autopsy report authored by Robert Stabley, San Diego County Medical Examiner, he wrote, "*Based on the information given, it is possible*

-16-

*the decedent had some type of undiagnosed psychological disorder that altered his mental state enough to agitate him to the point of an excited delirium-type scenario  where he would be susceptible to sudden cardiac arrythmia during the post-excitement phase of his heightened or altered sensorium.*"[5]

15.    **Compressional/ Positional Asphyxia.**

The law enforcement community in the U.S. has long been aware of the dangers of applying  weight to an individual's neck, head, or back while they are lying face down on the ground. One  police training entity defined *compressional asphyxiation* as follows:

> "*Compressional asphyxia is a preventable danger. With sufficient time and weight on the upper body, the suspect's ability to breathe is so limited that suffocation is  possible. Like an anaconda snake killing its prey, every time the suspect breathes out, the body weight of the officers prevents the suspect from reinflating his lungs fully—eventually the lung capacity is so limited it cannot support life. If enough weight is kept on the upper torso, oxygen levels become critical, and the body dies.*"[6]

16.    There is NO police training that instructs officers that it is appropriate to apply significant weight  to a suspect's back, head, or neck with their knee or their hand for a significant amount of time.  As early as 1996, the FBI was alerting police trainers

---

[5] Nunis autopsy report, page 2.

[6] Williams, G.T. (2013). *A new idea in safely restraining the proned handcuffed prisoner.* Cutting Edge Training. Accessed   at   http://www.cuttingedgetraining.org/?tag=/positional+asphyxia.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to the dangers of compressional/ positional asphyxia, and providing direction for the proper instruction of police officers:

> *"Instructors must stress vigilance in monitoring the subject's condition. The process of hypoxia is insidious, and subjects might not exhibit any clear symptoms before they simply stop breathing. Generally, it takes several minutes for significant hypoxia to occur, but it can happen more quickly if the subject has been violently active and is already out of breath. If the subject experiences extreme difficulty breathing or stops breathing altogether, officers must take steps to resuscitate the subject and obtain medical care immediately."[7]*

17.   All police officers in California receive training on the issue of compressional/positional asphyxia.  Officers not only receive training on the dangers of asphyxiation during and after restraint but  are also trained in proper handcuffing and restraint techniques specifically designed to avoid this  deadly outcome. California P.O.S.T. has established standards that instruct officers to use one of  four control positions—back mount, top mount, side control, and guard.[8] In none of these  techniques does the officer(s) restrict the head, compress the neck, or apply significant body  weight to the subject's back. This standard further states that *"if the peace officer is unable to  establish or maintain control in a ground position, the peace officer should attempt to move to a  standing position of advantage which  would allow the peace officer  access to  other force  options."*

---

[7] Reay, D.T, MD (1996). *Suspect restraint and sudden death,* FBI Law Enforcement Bulletin, May 1996.
[8] Learning Domain 33, Chapter 8:3-4.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

18.    Throughout the encounter, even when other officers arrived to help, Mr. Nunis was inappropriately and dangerously pinned to the ground for a significant period of time and in a manner that violated the officers' training and the California P.O.S.T. standards guiding that training. Exhibit No. 1 below shows two still images from Padilla's body cam footage. In the first, Padilla himself is pinning Mr. Nunis to the ground by placing his hand on his chest, and thus restricting his ability to inhale. And in the second image, by then four minutes later, the officers have Mr. Nunis rolled onto his stomach and an unknown officer is applying his weight to Mr. Nunis' back. It is important to consider that at this point Mr. Nunis had committed no crime and had expressed his willingness to go to the hospital before Linney attempted to handcuff him.



*Exhibit no. 1: Still images from Padilla body cam.*

19.    In terms of CVPD policy, policy No. 303 (De-escalation) requires CVPD officers to use de-escalation techniques "*whenever reasonably possible and appropriate, before resorting to force and to reduce the need for force*." The policy goes on to list many of the de-escalation techniques and alternatives, and further advises officers to consider if non-compliance by an individual may be related to

behavioral crisis or mental impairment, among other conditions and circumstances. De-escalation, as officers are trained to know and understand, includes acting in a manner that does not unnecessarily agitate and escalate a person who is calm. Clearly in this case, Linney did not even consider de-escalation when he immediately displayed his handcuffs and grabbed M r . Nunis' wrist without any explanation at all.

20.    Given the above analysis, it is my opinion that Agent Linney, and later Officer Padilla, both violated their training and CVPD policy by failing to recognize that the nature of the call demanded that de-escalation be their primary focus and consideration. Further, both officers violated their training by failing to recognize the risk of Mr. Nunis' sudden death by engaging in a prolonged struggle and by pinning him to the ground in a prone position for a significant amount of time while they attempted to handcuff him.

21.    Another factor to consider is Linney's own statement and the reasons he gave for immediately attempting to handcuff Mr. Nunis. Detective Bruzee, who interviewed Linney, wrote the following in his investigative report:

> "*Based on everything he had heard on the radio while enroute, coupled with what he observed since arriving on scene, Agent Linney believed a crime occurred and the suspect was a threat to his own life. Agent Linney determined it best to detain the suspect in handcuffs for everyone's safety*."[9]

---

[9] Bruzee report, page 16.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

2

3

4

*"Agent Linney believed in addition to the assault which he believed occurred before he arrived, the suspect was also in violation of 148(a)(1) PC – Resisting, Delaying, or Obstructing a Peace Officer."*[10]

5

6

7

8

9

10

It seems clear that Linney added to his narrative the belief that Mr. Nunis had committed a crime to bolster his decision to immediately apply the handcuffs, but in doing so, another issue is raised. If Linney attempted to apply the handcuffs for this reason, then he elevated the contact to that of an investigative detention under *Terry v. Ohio*.[11] Police officers are trained to know and understand that to detain someone to

11

12

13

14

15

16

17

18

19

20

further investigate a crime, the officer must have an articulable reasonable suspicion that a crime has been or is about to be committed. Linney had zero evidence to support a suspicion that an assault had occurred. There was nothing said during the 911 call nor in the radio traffic between the dispatcher and the officers that an assault had occurred. Also, the fact that Mr. Nunis may have resisted or obstructed is irrelevant since clearly, Linney had his handcuffs in hand and was reaching for Mr. Nunis' wrist before any resisting or obstructing occurred.

21

22

23

24

25

22.    If Agent Linney attempted to apply the handcuffs because he believed Mr. Nunis had committed an assault or some other crime, then he was attempting to unlawfully detain Mr. Nunis without any evidence to support a reasonable suspicion that a crime had been committed or was about to be committed by Mr. Nunis.

26

27

28

[10]Ibid.

[11] Ibid.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

23.    When Linney first attempted to apply the handcuffs, he advised Mr. Nunis that he was required to do so.[12] This was not true. Unlike many police departments in the U.S., the policies of the CVPD make handcuffing discretionary and leave the decision to do so up to the individual officer. The policy states:

"*Although recommended for most arrest situations, handcuffing is discretionary and not an absolute requirement of the Department. Officers should consider handcuffing any person they reasonably believe warrants that degree of restraint. However, officers should not conclude that in order to avoid risk every person should be handcuffed, regardless of the circumstances.*"[13]

24.    So, regarding the initial attempt to apply handcuffs, Linney provided two reasons for attempting to do so—to protect Mr. Nunis and everyone else from harm, and because he believed a crime had been committed. If the former, then Linney's training should have informed him that the need to avoid agitating Mr. Nunis and to keep the situation de-escalated greatly outweighed any danger Linney may have perceived, especially with Mr. Nunis sitting calmly on the floor and agreeing to go to the hospital. And if the latter, then applying handcuffs amounted to an unlawful detention without a reasonable suspicion of a crime.

## 25.    Use of The Wrap Restraint.

During the encounter, once Mr. Nunis was handcuffed, and after he had entered an

---

[12] In his deposition of September 19, 2022, Detective Dustin Bruzee admitted that Linney had discretion whether or not to handcuff Nunis.
[13] CVPD Policy 306.4.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

agitated state of delirium, both a full body restraint and a spit mask were applied. Regarding the full body wrap, it is not without controversy. A number of people in California have died while restrained with the Wrap, including the following:

1) Earl McNeil (2018): A 40-year-old man suffering from mental illness who was placed in the wrap and a spit hood after spitting at police in National City, CA. He became unresponsive a short time later, was resuscitated, and died two weeks later. The Medical Examiner determined that McNeil died of brain damage caused by respiratory arrest.

2) Dujuan Armstrong (2018): A 23-year-old man who died after Alameda County Sheriff's deputies at the Santa Rita jail, after a prolonged struggle, placed Armstrong in the Wrap and two spit hoods. The Medical Examiner determined that the cause of death was "Mechanical Asphyxiation." Alameda County has since discontinued using the Wrap.

3) Jacob Bauer (2018): A 38-year-old man suffering from mental illness who was placed in the Wrap and a spit hood by Pleasanton CA officers after a prolonged struggle with multiple officers, and after being Tasered multiple times. It took officers over 4 minutes to apply the Wrap, during which time medical personnel were not allowed to treat Bauer. Jacob died before the ambulance even left the scene. The Medical Examiner found that a contributing cause of death was "probable mechanical asphyxia while being placed in the restraint device."[14]

---

[14] I served as the plaintiff's expert in this matter.

4)   James Greer (2014): A 46-year-old-man who was placed in the Wrap by Hayward  CA  officers and died after a struggle and Taser deployment during an attempted field sobriety  test. Seven minutes passed before medical personnel were allowed to treat Greer. The  Medical Examiner determined that the cause of death was "PCP intoxication associated  with physical exertion."

5)   Eugene Jimerson (2015): A 42-year-old man suffering from mental illness and  severe  tachycardia at a local shopping center in Hayward CA. Jimerson was arrested for a minor  drug offense and taking to the Hayward City Jail. He was sweating profusely and talking  nonsensically. Before transferring him to the Santa Rita Jail, Jimerson was placed in the  Wrap. He died in the back of the squad car.

This sampling of cases points to the danger posed by the Wrap. By itself, perhaps it is a device  with some efficacy. However, when combined with mental illness, physical exertion, excited  delirium, and the individual's age and weight, it can be deadly because it can so easily restrict  breathing. Furthermore, it is my experience that the Wrap is burdensome to apply and prevents  immediate medical care. Regarding the use of the device in this matter, I note the following:

• The use of the Wrap on Mr. Nunis was a violation of CVPD policy 306.7 which states in-part, *"Leg restraints such as The Wrap may be used to restrain the legs of an assaultive or  physically resistant person when it is reasonable to do so during the course of detention,  arrest, or transportation."* The policy (306.7(d)) further states that *"Medical assistance  shall be obtained for any person exhibiting*

*signs of physical distress or injury while in any leg restraint device. In order to assist in providing appropriate medical aid, the officer should remove the person from the restraint device upon placement on a gurney or similar device equipped with a suitable alternate restraint system, or whenever it is reasonably safe to do so."*

By the time the officers began to apply the Wrap, Mr. Nunis was in handcuffs and no longer physically struggling. At no time did he assault the officers while he was resisting their attempts to handcuff him. It is shocking indeed that even after Mr. Nunis quit resisting, they continued to pin him to the ground, as shown in Exhibit No. 2, and his breathing is labored.[15] As long as he was remaining calm, the use of the Wrap should not have been considered and Nunis should have been lifted out of a prone position. By the time he was placed on the gurney, Mr. Nunis was no longer talking or moving and appeared unresponsive with his head forward. No one appears to even check his pulse or his physical condition. They kept him in the Wrap while on the gurney.



*Figure 2: Officers continuing to pin Nunis to the ground.*

---

[15] It is sad that on the video a number of the officers talk about being out of breath and needing to stand, yet none of them even considered Nunis' breathing.

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

- It is clear from Officer Padilla's body cam video that the officers applying the Wrap were not proficient at doing so. It took over 4 minutes to get the device on, and during their attempt to do so, apparently applied it improperly. At 6:20 in Officer Padilla's video, there is a discussion about the Wrap. The following comments are heard:

> *"It's supposed to be lower."*
>
> *"Does it need to be pulled*
> *back?"*
>
> *"It's too high on the back."*

The total time from Mr. Nunis being handcuffed to being placed on the gurney was approximately 7 minutes. That was 7 minutes without medical care, even when paramedics were posted nearby.

- The officers violated the guidelines established by the manufacturer of The Wrap, Safe Restraints, Inc. Specifically, the device's user's guide warns against officers applying pressure to an individual's back or upper torso in a manner that reduces their ability to breathe, and to establish a system of monitoring to ensure the health and safety of the person being restrained.[16] As discussed above, Mr. Nunis was kept in a prone position for a significant period of time with officers applying pressure to his back. During this time, it was apparent that his breathing was labored. Furthermore, it is the responsibility of a supervisor on-scene to closely monitor the situation and to provide direction. It is clear that no one monitored

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Mr. Nunis' health and safety. Medical personnel were not even allowed to approach until after Mr. Nunis was in the Wrap. Mr. Nunis was not a violent offender. He was an older man battling acute mental illness. Medical personnel should have been allowed to immediately approach and monitor Mr. Nunis' condition. A supervisor, had one been monitoring, should have directed the officers not to apply the wrap and to immediately lift Mr. Nunis from a prone position to facilitate his breathing recovery.

26.    The use of the Wrap was inappropriately used given Mr. Nunis' age, the nature of the call, his obvious labored breathing, and the fact that he was in handcuffs and no longer struggling. There was no legitimate reason to potentially restrict his breathing further by applying the device. Further, there was no apparent supervision of Mr. Nunis' restraint and medical staff were inappropriately kept at a distance for a significant period a time while Mr. Nunis' condition worsened.

27.    **Chula Vista Police Department Training**

On September 22, 2022, Dontre Kendricks, the person most knowledgeable ("PMK") regarding CVPD policies and training, was deposed. In reviewing the deposition transcript, I noted the following issues:

• When asked why he believes the body wrap manufacturer includes in their user's manual that it is critical the amount of time the person being restrained is held face-down in a prone position, Kendricks responded, "*I'm not sure why they put that in there. All I can tell you is what I train*" (pg. 187). He then went on to say,

"*When we place a subject face down in a prone position, we try to get the wrap on as quick as possible to get them into a recovery position so that we can monitor their breathing, their airway, and their circulation as quick as possible, as I stated earlier*" (pg. 188). This passage demonstrates a very dangerous shortcoming about the CVPD's use of the Wrap, especially given that Kendricks is a CVPD certified instructor in its use. First, any instructor should be well aware of why it is critical to minimize the time that a person is kept in a face-down prone position, that being the dangers associated with hypoxia and asphyxiation. Also, Kendricks seems to suggest that the monitoring a person's breathing comes after restraining and moving the person to a recovery position. There is nothing further from the truth. The person's breathing must be monitored throughout the encounter, and if their breathing is labored or they say they cannot breathe, then steps must be taken immediately to move that person to a recovery position. Even then, they must be sure that the recovery position, such as in a seated position, does not itself restrict the person's breathing.

• Kendricks was asked to define "respiratory fatigue". He described it as someone who is having a hard time breathing. Again, Kendricks here demonstrates a lack of understanding. There is a dangerous misconception in law enforcement that as long as someone is talking, then they are not being asphyxiated. Actually, they are not being "choked." But very few asphyxiation cases involve choking. They result from the victim not being able to take in enough oxygen to

-28-

maintain life ("hypoxia"). This condition will  not always manifest itself in overt breathing difficulties. This is absolutely critical  information that any instructor must share with their students.

• Kendricks admitted that no single officer was coordinating the application of the Wrap.  He suggested that all the officers were working in unison and that the Wrap's application  was somehow related to "muscle memory" (pgs. 197-99). First of all, there is no  muscle memory involved in applying the Wrap. Officers receive training one time, hardly enough  to develop muscle memory. It was obvious that nothing was coming automatically to the  officers, nor that they were working in unison, especially given the amount of time it took  to apply and the fact that they applied it incorrectly at first. Kendricks attempted to  explain away the improper application by stating "*Whenever a person applies a Wrap to  an individual who is violent or has the potential to be violent, they have to make  adjustments on the Wrap as they are applying it*" (pg. 199). In this case, Mr. Nunis was not  violent at all at that point, and was never violent toward anyone other than himself. Furthermore, someone who is only "potentially" violent does not cause officers to apply  the Wrap incorrectly.

• Shockingly, when Kendricks was asked what officers should do if they determine that  someone in the Wrap is having difficulty breathing, his answer was that they should call  medics (pg. 204). What if medics are miles away? The proper answer is that they should take  whatever steps necessary to relieve

-29-

respiratory distress <u>immediately</u>, including removing the Wrap. If this is part of the Wrap training that CVPD officers receive, then it is a very dangerous deficiency in the training.

28.    It is clear from Kendricks' responses that he has a limited knowledge about the dangers of the Wrap, positional/compressional asphyxiation, and sudden death syndrome. If Kendricks is the PMK about these issues, and in fact is the person who provided the training, then it demonstrates a serious deficiency in the CVPD training program and may ultimately have contributed to Mr. Nunis' death.

29.    Kendricks was also asked about CVPD's training on mental illness and the various crises that related to that issue. He demonstrated his knowledge of thought disorder and was aware of the potential for paranoia and other negative reactions to the police. But he incorrectly argued that no proper crisis response could begin until the situation is made safe. He equated Agent Linney's attempt to handcuff Mr. Nunis before he even introduced himself as carrying out that requirement. Kendricks demonstrated a lack of understand that crisis response and making the situation safe are inextricably linked. One does not necessarily follow the other. Making the situation safe includes making it safe for the person in crisis! And that involves taking steps to build rapport and avoid escalating the person in crisis. Kendricks did not appear to understand basic crisis response, especially when the person in crisis is a non-criminal offender. Even when Kendricks was asked if Mr. Nunis could have simply accompanied her father to the hospital without handcuffs (he was not under

arrest and was calm) he responded that he could not speculate. He admitted that he was aware of no law preventing Mr. Nunis' daughter from taking her father to the hospital in a POV or in the back of Linney's squad car without handcuffs.

30.    Sometimes in law enforcement the difference between life and death is a single act that may appear insignificant on its face. In this case, that act was Agent Linney pulling out his handcuffs and reaching for Mr. Nunis' wrist without even introducing himself or making any effort to establish rapport. That act set off a chain of events that led to Mr. Nunis' death. Linney should have reasonably anticipated the potential outcome given Nunis' mental condition and age, and immediately shift to de-escalation to avoid agitating him further. But as is so often the case in law enforcement, once Mr. Nunis began to resist, rather than stopping and attempting to de-escalate, Linney escalated his use of physical force in response, which in turn only escalated Nunis' resistance further. The deadly cycle of force-resistance was begun, and the potential for sudden death, something Linney was trained to know and understand, was greatly increased.

31.    Even when Mr. Nunis was finally secured in handcuffs, the point at which his resistance ceased, Linney himself made the decision to apply the Wrap. In doing so he violated CVPD policy and the manufacturer's guidelines. The use of the device was unnecessary and inappropriate and may have only restricted further his already labored breathing. Making matters worse, there was no apparent on-scene supervisor monitoring Mr. Nunis' condition. Had the situation been properly

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

supervised, The Wrap never would have been used and medical care would have been immediate. Instead, Mr. Nunis was kept pinned to the ground in a prone position for a deadly number of minutes while medical personnel were kept at a distance. Sadly, the death of Mr. Nunis was  completely avoidable.


   I hereby declare under penalty of perjury pursuant to the laws of the State of California, that the foregoing is true and correct.  Executed this 22nd day, of February 2023 at Unionville, Tennessee.


_____

WILLIAM M. HARMENING, Declarant

DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT "A"

# William M. Harmening

5036 Fox Hunt Drive
Zachary, LA 70791
(217) 503-7283
harmening59@gmail.com

Since 2014 I have been providing expert witness services in the areas of police practices and use of force. Additionally, as a former Jail Administrator, I provide these services as they relate to the correctional setting as well. I am a 37-year law enforcement officer in Illinois. Twenty-three of those years were spent in a command/ supervisory position. I retired in September 2018.

**PUBLICATIONS**

Harmening, W. (2018). *Psychocriminology: The Psychological Roots of Crime and Deviance*. Springfield, IL: Charles C. Thomas Publishers.
(Currently being drafted. A 2018 publication is anticipated)

Harmening, W., and Gamez, A. (2015). *Forensic Psychology*. Columbus OH: Pearson Publishing (***Includes a chapter on police use of force, including the psychology of force. This is a peer reviewed textbook that includes the latest research on the subject of deadly force***)

Harmening, W. (2014). Serial Killers: Psychological Development of Humanity's worst Offenders. Springfield, IL: Charles C. Thomas Publishers.

Harmening, W. (2012). *Crisis Intervention: The Criminal Justice Response to Chaos, Mayhem, and Disorder*. Columbus OH: Prentice Hall
(***Includes a chapter on police use of force. This is a peer reviewed textbook that includes the latest research on police practices and the use of force***)

Harmening, W. (2010). *The Criminal Triad: Psychosocial Development of the Criminal Personality Type*. Springfield IL: Charles C. Thomas Publishers

**SELECTED PRESENTATIONS**

*Development of the Criminal Personality Type*. Delivered to the British Criminological Society, University of Wales, Swansea (April, 2011).

*Adolescent Identity Formation and its Role in Juvenile Delinquency*. Delivered to faculty at the Adler School of Professional Psychology, Chicago IL (June, 2010).

*Police Trauma Syndrome: Causes and Intervention*. Delivered at the Chicago Police Academy (February, 2010).

*American Greed*, CNBC (national television appearance), aired May 30, 2013. A second episode aired April 9, 2014.

**EDUCATION**

PhD, International Psychology (not currently active) – Chicago School of Professional Psychology. Eighteen hours completed.

M.A. Psychology – University of Illinois at Springfield, Springfield IL. Degree awarded May, 1994. Title of thesis: *Using the 16PF to develop a desirability scale for police officer selection.*

B.A. Liberal Arts – Western Illinois University, Macomb IL. Degree awarded May 1983.

A.A. Liberal Arts – Lincoln Land Community College, Springfield IL. Degree awarded May 1980.

**LICENSES AND INVESTIGATIVE SKILLS**

Trajectory analysis using the Sirchie LTF100 Laser System
Taser Evidence Recovery and Analysis, Axon Corp. (2018)

Certified Illinois Police Officer since 1982
Licensed Polygraph examiner (IL, MO, IN)
Member, Critical Incident Debriefing Team
Certified in Forensic Hypnosis
CIT/ Project ECHO Instructor
Certified expert witness in state and federal court on the subject of Investment fraud
Licensed polygraph instructor (special topics: Psychology)
Graduate of Illinois State Police Academy/ Basic Law Enforcement Training (1982)
Graduate of American Internal Institute of Polygraph (2011)
Coordinator/ Instructor – Lincoln Land Police Training Center, Springfield IL
***In this position, I provided all state mandated behavioral science instruction to approximately300 Illinois police cadets in multiple basic training classes. This instruction included the subject of the use of force, specifically the psychology of force as it relates both to the officer and the suspect.***
North American Securities Administrators Association (NASAA), Washing D.C.
Committee member: National Enforcement & Training Committee

**TEACHING EXPERIENCE**

Washington University in St. Louis – 2014 to the present (Adjunct)

- Introduction to forensic Psychology (***includes a block of instruction on the use of force by the police***)
- Introduction to Criminology

Crisis Intervention (***Includes a block of instruction on the use of force by the police***)
- Correctional Psychology
- Psychology of Policing

Roosevelt University (Criminal Justice) – From 2009 to the present (Adjunct).

- Criminal justice Ethics (***Includes an extensive treatment of the subject of force***)
- Criminology
- Advanced Criminology
- Introduction to Criminal Justice
- Introduction to Policing (***Includes instruction on the use of force by the police***)
- Serial Killers

Adler School of Professional Psychology (Forensic & Police Psychology) – 2009/2010

- Principles of Criminal Behavior (Chicago Police Academy)
- Biopsychosocial Basis of Behavior I and II

Chicago School of Professional Psychology (Forensic Psychology) – 2010 to the present

- Research in Forensic Psychology
- Crisis Intervention
- Mental Health Law

Lincoln Land Community College – 2006 to 2011

- Investigative Techniques
- Criminology
- Crime, Justice, and Social Diversity
- Introduction to Criminal Justice
- Introduction to Child Development
- Human Development
- Introduction to Psychology

Benedictine University in Springfield (2006-2013)

- Principles of Criminal Behavior
- Introduction to Forensic Psychology

**PROGRAM DEVELOPMENT**

Washington University (2014 – present)

- Developed a forensic psychology certificate program for the University. It will eventually become an undergraduate degree program (***the program includes an extensive treatment of the subject of force by the police***).

Adler School of Professional Psychology (2008)

- Developed and implemented Forensic specialization with the M.A. Counseling Psychology program. This included designing 5 new core courses and drafting all required IBHE submissions.

- Developed and completed IBHE submissions for an online M.A. in Forensic Psychology and an M.A. in Police Psychology. Included the design of approximately 20 new course offerings.

Roosevelt University (2009)

- One of five members of the criminal justice advisory council tasked with redesigning Roosevelt's criminal justice degree program.

Benedictine University Springfield (2006)

- Developed new criminal justice degree program.

**EMPLOYMENT HISTORY**

10/01 – 09/18: Chief Special Agent, Illinois Securities Department (Ret.)

In this position I supervised a staff of ten special agents who investigate allegations of investment related fraud in Illinois. I maintained offices in both Springfield and Chicago, and carried a personal caseload in addition to my supervisory responsibilities. Most of our investigations included complex financial analysis of multi-million dollar investment schemes. I have also testified as an expert witness in the area of securities fraud multiple times.

04/98 – 10/01: Deputy Chief of Investigations, Illinois Attorney General

I transferred to this position to oversee the implementation of Illinois' first statewide high tech crimes task force. In this grant-funded position I supervised the investigative activities of a cadre of police investigators and computer

forensics specialists. I supervised the establishment of Illinois' first regional computer forensics lab. Cases included child pornography, online fraud, unlawful intrusions, and extortion. **Certified as a police instructor through the Illinois Law Enforcement Training & Standards Board.**

08/93 – 04/98: Investigator, Illinois Securities Department

Investigated violations of state and federal securities statutes. This work required many appearances before state and federal grand juries, and complex testimony in numerous trials. Personally investigated cases involving an aggregate of over $150 million in fraud. Received numerous awards for my work.

08/81 – 05/85 Deputy Sheriff, Menard County Sheriff's Department
12/90 – 08/93

Routine patrol and investigative activities. In my last position with the department I served as Chief Deputy Sheriff. During my time with the department I attended numerous police training courses and seminars offered through our local mobile training unit. These courses included, but were not limited to:

- **Investigative Methods** (covered all investigative methods for crimes against persons and property).
- **Use of Force Law Updates** (annual)
- **Crime Scene Analysis**
- **Crime Scene Photography**
- **CIT Instructor Training** (this was a predecessor program to the current CIT. I was a member of the first team in downstate Illinois)

Between 1985-90 I worked as a state certified counselor, working with adult and adolescent drug addicts and alcoholics at the "Hour House" in Charleston, IL, and later managing a Federal Bureau of Prisons halfway house program at "Triangle Center" in Springfield, IL. I did this until my re-entry back into law enforcement.

DASA Certified – Adult & Adolescent Substance Abuse
Currently qualified for licensure, LCPC