UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ORAL W. NUNIS, SR. by and through, ROXIE A. NUNIS, individually and as successor in interest to the ESTATE, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>CITY OF CHULA VISTA, et al.,<br><br>                              Defendants | Case No.:  21-cv-01627-AJB-DEB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Doc. No. 79)** |

This is a civil rights action against the City of Chula Vista and its police officers arising out of an incident alleged to have caused Oral W. Nunis, Sr.'s ("the decedent" or "Nunis") death. There are two sets of plaintiffs in this case. One set are the Estate of Oral W. Nunis, Sr., the decedent's wife: Roxie A. Nunis, the decedent's adult child: Naomi Nunis, and the decedent's minor children: Abigail Nunis and Jabez Nunis, suing through their grandmother and guardian ad litem, Willie Mae Kirkland (collectively, "Roxie Plaintiffs"). The other are the decedent's oldest children: Kimone Nunis ("Kimone"),

Ludecea Nunis ("Ludecea"), Andre Nunis, and Oral W. Nunis, Jr. (collectively, "Kimone Plaintiffs"). The defendants are the City of Chula Vista ("City"), Evan Linney, Manuel Padilla, David Rivers, Brian Olson, Jordan Salvador ("Salvador"), David Arce, Denny Kremer, and Kenneth Hicks (collectively "Defendants").

Before the Court is Defendants' motion for summary judgment. (Doc. No. 79.) The motion is fully briefed. (Doc. Nos. 85, 88.) The Court finds the motion suitable for determination without oral argument, and **HEREBY VACATES** the motion hearing scheduled for June 15, 2023. *See* S.D. Cal. L. Civ. R. 7.1.d.1. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

## I.   BACKGROUND

In the late evening of March 12, 2020, Kimone called 911 to obtain mental health assistance for her father Nunis, who while at her apartment, became paranoid, and attempted to jump through the home's second story bedroom window. Kimone's partner Barry Studwood ("Studwood"), who was also at the home, grabbed Nunis by his shirt to keep him from falling out the window and held him down on the bedroom floor while he and Kimone spoke to him and calmed him down.

During the 911 call, Kimone requested an ambulance for her father, explained there were no weapons in the house, and that her father was scared and attempted to jump through a window. She also explained that she took her father to the emergency room earlier that day but was discharged. Nunis had requested Kimone take her to the hospital because he was experiencing chest pain, anxiety, and fatigue. After evaluating Nunis, the examining physician did not find it necessary to admit him into the hospital and prescribed him anxiety medication.

Agent Linney was dispatched for a 5150 mental distress call to Kimone's residence and was the first officer to arrive on scene. While driving to the residence, he (as did the other officers who later came to the scene) heard updates from the 911 dispatcher informing him that Nunis is being restrained by family members after attempting to jump out of a

window. The dispatcher also relayed that Nunis is 5 feet 5 inches tall, weighs 140 pounds, and may be confused. Agent Linney arrived at the resident just after midnight.

Kimone escorted Agent Linney into her home and up the stairs where Nunis and Studwood were. When Agent Linney first encountered Nunis, he was sitting quietly on the floor with Studwood. Agent Linney did not introduce himself, immediately took out handcuffs, and attempted to cuff Nunis. Kimone asked Agent Linney not to handcuff her father, but he responded it must be done for safety reasons. Nunis also pleaded not to be handcuffed and communicated that he would accompany Agent Linney without handcuffs. Agent Linney told Nunis he was not in any trouble and proceeded to grab Nunis' arm. Nunis repeatedly pleaded with Agent Linney: "No sir, no handcuff, please . . . I'll be coming . . . no handcuff, please, I'm gonna go with you." Agent Linney insisted that handcuffing was the policy and radioed to his fellow officers that Nunis is uncooperative and refusing to go into handcuffs. Agent Linney's body worn camera ("BWC") stopped operating about 10 seconds later.

At some point during Agent Linney's attempt to handcuff Nunis, Nunis stood up and ran down the stairs and outside the home. Agent Linney radioed to the other officers that Nunis was "fighting and running away." Agent Linney chased after Nunis, tackled him "hard" to the ground where he landed face first on the asphalt. Agent Linney is 5 feet 10 inches tall, and weighed about 230 pounds. According to Agent Linney, during this time, he struggled with Nunis, who had grabbed his neck and back and was actively resisting his handcuffing attempts.

Officer Padilla was the second officer to arrive on the scene and assisted Agent Linney in handcuffing Nunis. Officer Padilla's BWC shows him turning Nunis over onto his stomach and pressing his face and chest down to ground, while Nunis called out for his daughter. Officer Padilla's BWC stopped operating about 3 seconds later and began operating again at some point, depicting Nunis on his back, being consoled by Kimone, and stating "You guys are not supposed to do that. Okay, Kim. May the good Lord bless

you and I'll be going to heaven." Officer Padilla thereafter placed his hand on Nunis' chest, and Nunis let out an incoherent yell. Officer Padilla is 6 feet tall and weighed about 265 pounds. While Officer Padilla and Agent Linney were handcuffing Nunis, they placed him back on his stomach with his face to the ground. Agent Linney had his knees on Nunis' legs, and Officer Padilla had his arm on Nunis' back. Agent Linney thereafter radioed to his fellow officers that he had Nunis in handcuffs.

Officers Olson and Rivers were the next officers to arrive on the scene. Agent Linney ordered the officers to get the "WRAP", a maximum restraint device used for violent or potentially violent individuals, out of his vehicle. Officer Rivers retrieved the WRAP, while Officer Olson provided support to Agent Linney and Officer Padilla. According to Officer Olson, when he arrived on the scene, there did not appear to be any struggle. His BWC shows Officer Padilla pressing down on Nunis' back with both hands at some points and then kneeling between Nunis' shoulder and neck at another point. Officer Olson also pinned Nunis down by placing his hands on Nunis' hips at one point and his upper back at another point. Officer Olson is 6 feet 8 inches tall, and weighed about 290 pounds. At least three officers were pressing Nunis down to the ground while others attempted to apply the WRAP on Nunis. During this time, Nunis reached into his pocket for his medicine bottle, asked for the paramedics, repeatedly called out to Kimone, referenced money he saved, and asked for his other daughter Ludecea. At this time, Officers Salvador and Kremer had also arrived on the scene.

While the officers were applying the WRAP and fastening the device, Nunis told them, "No, no, no. Not like that. No. No. That's Bad. . . . That's very bad. . . . This is not right way. This is not right way. . . . No. No." He then suddenly stopped speaking and began to spit. Officer Olson then placed a spit hood over his head. The video depicts Nunis' body appearing to go limp and requiring the officers to hold him in place. About a minute later, the medics were signaled to approach the scene. The officers placed Nunis on the gurney, and the medics brought him to their ambulance.

The paramedic observed Nunis moaning, believed he was breathing normally, and did not find him to be in respiratory distress. A few minutes later, Nunis began to drool, was unresponsive, and had no pulse. The paramedic called the police officers back to remove the WRAP so they could administer CPR on Nunis. The paramedics performed CPR but to no avail. They then transported Nunis to the hospital where he was pronounced dead.

The operative complaint is the First Amended Consolidated Complaint ("FACC"), to which Defendants filed a consolidated Answer. (Doc. Nos. 55. 56.) The FACC alleges causes of action for excessive force, denial of medical care, interference with familial relationship, and municipal liability pursuant to 42 U.S.C. § 1983, as well as false imprisonment, assault, battery, negligence, intentional and negligent infliction of emotional distress, and the Bane and Ralph Acts pursuant to California law. (Doc. No. 55.)

The Court previously denied Defendants' motion for judgment on the pleadings on Plaintiffs' Bane Act claim but granted their request to strike Plaintiffs' negligence claim insofar as it contained allegations of negligent investigation, hiring, and supervision. (Doc. No. 82.) The instant Order on Defendants' pending motion for summary judgment follows.

## II.   LEGAL STANDARD

Federal Rules of Civil Procedure 56 governs motions for summary judgment. Summary judgment permits a court to enter judgment on factually unsupported claims, *see Celotex Corp. v. Catrett*, 477 U.S. 319, 327 (1986), and may also be used on affirmative defenses. *Dam v. Gen'l. Elec. Co.*, 265 F.2d 612, 614 (9th Cir. 1958). Granting summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex,* 477 U.S. at 322, 324. The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med. Inc.,* 343 F.3d 1107, 1112 (9th Cir. 2003). However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. *Id.; Surrell v. Cal. Water Serv. Co.,* 518 F.3d 1097, 1103 (9th Cir. 2008). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to survive summary judgment." *Anderson*, 477 U.S. at 252. A party opposing summary judgment must come forward with "significant probative evidence tending to support its claim that material, triable issues of fact remain." *Sanchez v. Vild*, 891 F.2d 240, 242 (1989).

## III.   DISCUSSION

Defendants move for summary judgment in their favor on the entirety of Plaintiffs' FACC. Specifically, they argue they are entitled to judgment on Plaintiffs' federal claims, state law claims, and punitive damages claim. The Court considers these arguments in turn.

### A. Federal Claims[1]

Beginning with the federal claims, Defendants seek summary judgment on the Kimone Plaintiffs' Section 1983 claims of excessive force, denial of medical care, interference with familial relationship, and municipal liability. Section 1983 provides that "every person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . or other proper proceeding for redress." 42 U.S.C. § 1983. To establish liability under § 1983, a

---

[1] The federal claims in the FACC are raised only by the Kimone Plaintiffs. References to "Plaintiffs" in this section thus refer only to the Kimone Plaintiffs.

plaintiff must demonstrate the violation of a right secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person acting under color of state law. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

### 1) Excessive Force

Plaintiffs claim Defendants violated Nunis' Fourth Amendment right to be free from excessive force. Defendants assert they are entitled to summary judgment on Plaintiffs' excessive force claim because: (a) the defendant officers used objectively reasonable force against Nunis, and (b) the force used against Nunis was not the proximate cause of his death.

### a. Objectively Reasonable Force

"In assessing a claim of excessive force, courts ask 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To determine whether the force used was objectively reasonable, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham*, 490 U.S. at 396. The reasonableness determination "requires careful attention to the facts and circumstances of each particular case." *Id.*

Factors relevant to the determination include, but are not limited to, the following *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Ninth Circuit has expressed that "the most important *Graham* factor is whether the [individual] posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (internal quotation marks omitted).

"Other factors, in addition to the three *Graham* factors, may be pertinent in deciding whether a use of force was reasonable under the totality of the circumstances." *S.R. Nehad*

7

*v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019). The Supreme Court has noted that considerations such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; [and] any effort made by the officer to temper or to limit the amount of force" may also bear on the excessive force inquiry. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and its calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97. Nonetheless, "it is equally true that even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Moreover, the Ninth Circuit has held on many occasions that because the aforementioned balancing "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," motions for "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.*

Here, applying *Graham* and considering factors pertinent to the particular facts of this case, the Court finds a reasonable jury could conclude that the use of force against Nunis was not objectively reasonable, and thus, excessive. To begin, the nature of the intrusion was, under the circumstances, severe: in all, Nunis a small-framed, 140-pound man experiencing mental distress was tackled "hard" to the ground, handcuffed, pinned down to the ground by three officers considerably larger in height and weight for several minutes, placed in a maximum restraint device, covered with a spit hood, sustained abrasions and bruises to his head and body, and passed away shortly after the incident. While Defendants maintain they, at all times, monitored Nunis' breathing and applied only a low-level of force against him to secure the situation, such contentions are subject to credibility determinations, as well as resolution of disputed facts (e.g., the nature and level

of Nunis' resistance, the risk for violence, the amount of weight pressed upon Nunis, and the length of time the officers pinned him in prone position), and the drawing of inferences—all of which must, for purposes of this motion, be made in Plaintiffs' favor. *See Santos*, 287 F.3d at 853.

Additionally, the three countervailing *Graham* factors provide little support for the government's interest in the degree of force used in this case. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) ("Force, even if less than deadly, is not to be deployed lightly. To put it in terms of the test we apply: the degree of force used by the police is permissible only when a strong government interest compels the employment of such force." (alterations omitted)). First, there was no crime at issue when Agent Linney arrived on the scene. Agent Linney acknowledged in his deposition that he was responding to a mental health call for Nunis, and Chula Vista Police Department ("Department") Policy makes clear that "mental health issues, mental health crises and unusual behavior alone are not criminal offenses." (Doc. Nos. 79-3 at 304; 85-14 at 3.) Even assuming Nunis had delayed Agent Linney in the performance of his duty by refusing to be handcuffed for his mental health evaluation, the offense is not, under the circumstances, a serious one.

Second, the Court acknowledges that Agent Linney testified that he decided to handcuff Nunis "based on his erratic and aggressive and violent behavior" as reported by the 911 dispatcher. (Doc. No. 79-3 at 285.) But "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Moreover, Agent Linney admitted, that at the time he arrived on the scene, Nunis was simply sitting on the ground, and there was nothing about Nunis' physicality that intimidated him. (*Id.* at 268, 305). Additionally, Kimone's and Studwood's testimony indicate that, by the time Agent Linney arrived, Nunis was not a significant or immediate threat to anyone. Nunis had calmed down, was away from the window through which he

had attempted to jump, was seated on the floor near Kimone and Studwood, and had no weapons. (Doc. No. 79-3 at 30, 32, 78, 306.) The video evidence, viewed in the light most favorable to Plaintiffs, supports their testimony. (Doc. No. 80, Exh. U at 3:50.) Third, although Nunis did resist Agent Linney's demands to be handcuffed and ran out of the home, he did so only after Agent Linney ignored his willingness to submit to custody without handcuffs. (*Id.* at 4:04–4:35 (Nunis telling Agent Linney, "I will come with you, no, no, no handcuffs please. . . . No, handcuff, I'll be coming. . . No handcuff, please[].").)

Further instructive, the Ninth Circuit has held that "a detainee's mental illness must be reflected in any assessment of the government's interest in the use of force." *Drummond*, 343 F.3d at 1058. Agent Linney admitted he was aware of Nunis' mental health crisis, and case law makes clear that "the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Drummond*, 343 F.3d at 1058 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1283–84 (9th Cir. 2001)).

Defendants argue that Department policy provides Agent Linney discretion to use handcuffs in responding to the mental health call. The existence of such discretion, however, does not obviate the need to examine whether the exercise of that discretion was reasonable under the circumstances. Furthermore, the Department's crisis intervention policy specifically instructs officers responding to a mental health call to, among other things, use conflict resolution and de-escalation techniques to stabilize the incident as appropriate; take into account the person's mental and emotional state and potential inability to appreciate the consequences of his or her action or inaction; and if circumstances reasonably permit, consider and employ alternatives to force. (Doc. No. 85-14 at 3.) Yet, despite Nunis' clear and repeated request not to be handcuffed and willingness to go with Agent Linney, Agent Linney insisted on placing Nunis in handcuffs—setting in motion an unfortunate and seemingly avoidable chain of events. *See,*

*e.g.*, *S.R. Nehad*, 929 F.3d at 1135 (finding that because there was time to determine alternative tactics prior to shooting, "a reasonable factfinder could conclude that any sense of urgency was of [the officer's] own making").

There being evidence that Nunis was seated, unarmed, exhibited no acts of aggression, and communicated his willingness to cooperate with Agent Linney, a reasonable jury could conclude there was not a strong government interest in employing force in this case. *See Drummond*, 343 F.3d at 1058 ("Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.").

A reasonable factfinder could also conclude that Agent Linney unnecessarily created the need to use force—another factor bearing on the reasonableness of the force employed. *See Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) ("The parties 'relative culpability' i.e.*,* which party created the dangerous situation and which party is more innocent, may also be considered."). While the Court recognizes that some degree of physical restraint may have been necessary to prevent Nunis from injuring himself, the factual record, viewed in Plaintiffs' favor, reflects no justification for the degree of force used here. *See Kingsley*, 576 U.S. at 397 (highlighting that "the relationship between the need for the use of force and the amount of force used" may bear on the reasonableness of the force used). For example, there is evidence that Agent Linney acted hastily despite it being apparent that the underlying emergency of Nunis attempting to jump out of the window was subdued, ignored Nunis' willingness to cooperate, and forced him into handcuffs. (Doc. No. 80, Exh. U at 4:04.) What is more, even when Nunis was already in handcuffs, pinned down in prone position by two additional officers (one weighing 265 pounds, and the other 290 pounds), and did not appear to be resisting—Agent Linney still ordered Nunis be placed in a maximum restraint device. (*Id.* at 9:19.)

To be sure, Agent Linney testified his decision to order the WRAP was based on his initial struggle with Nunis, which according to him, involved Nunis grabbing his neck and back to evade being placed in handcuffs. (Doc. No. 79-3 at 283–84.) There is, however, no witness or video evidence to corroborate this. Agent Linney's BWC stopped operating seconds after he insisted on putting Nunis into handcuffs. (Doc. No. Exh. 80, Exh. U at 4:04–4:45.) No other officer testified to any act of aggression by Nunis, and the video evidence depicts none. These circumstances create factual disputes and put into question officer credibility—both of which must be left to a jury for determination. Resolving factual disputes in Plaintiffs' favor, as the Court must for purposes of this motion, the Court finds a reasonable jury could find there was a substantial gap between the need for the use of force against Nunis and the amount the officers applied.

There is also little to no evidence that the officers made any effort "to temper or to limit the amount of force." *Kingsley*, 576 U.S. at 397. To the contrary, as previously mentioned, the record shows that even after Nunis was handcuffed, face down with an officer's fist against his back, and making little to no movements, the officers intensified the force applied by placing Nunis into a maximum restraint device meant for violent individuals and covered his head with a spit hood. (Doc. No. 80, Exh. U at 9:19.) Officer Olson, for instance, testified that when he arrived at the scene, Nunis was handcuffed and "[t]here did not appear to be any kind of struggle going on." (Doc. No. 86-3 at 20.) Further undermining the necessity of the amount of force used, the video shows Kimone and Studwood observing the incident and expressing disbelief at the officers' actions, stating "This isn't real" and "I don't appreciate that," and asking the officers: "Why is he on the ground like that?"; "You're gonna strap him down? . . . Can someone explain something to me, please? . . . Just tell me what's going on"; and to take the spit hood off of Nunis' head. (Doc. No. 80, Exh. U at 10:20, 10:46, 14:29.)

And while Defendants maintain they were monitoring Nunis' breathing and observed no signs of medical distress, a reasonable factfinder could find, viewing the

21-cv-01627-AJB-DEB

evidence in the light most favorable to Plaintiffs, that the officers acted unreasonably in interpreting Nunis' pleas to his daughter, repeated calls for the paramedics, reaching into his pocket for his medicine bottle, and spitting up after trying to communicate to the officers that their WRAP placement was "bad" and "not right way" as acts of resistance instead of medical distress. (*Id.* at 8:28–8:40, 9:55–10:30, 12:02–12:29, 13:03–14:35.); *See also* (Doc. No. 86-5 at 103 (Safety considerations in the WRAP manual informing users to seek immediate medical attention if a restrained person complains of or exhibits medical concerns, including "Sudden quiet or inactivity" and "Vomiting").)

Based on the foregoing, the Court finds it evident that here, the jury must determine not only whether the officers were justified in using force at all, but if so, whether the degree of force actually used was reasonable. Answering those questions necessarily entail making credibility determinations and resolving factual disputes regarding the events that transpired—tasks reserved to the province of a jury. Upon careful attention to the facts and circumstances in this case, the Court finds that viewing the evidence in the light most favorable to Plaintiffs, a jury could conclude that forcing a relatively passive and mentally distressed individual into handcuffs by tackling and pinning him down in prone position for several minutes and thereafter applying a maximum restraint device and spit hood over his head while he asked for paramedics, was excessive. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on this basis.

### b. Causation

"In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "To meet this causation requirement, the plaintiff must establish both causation in-fact and proximate causation." *Id.* This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *see also Stevenson v. Koskey*, 877 F.2d 1435, 1438 (9th Cir. 1989) (noting that federal courts turn to common

13

law of torts for causation in civil rights cases). "The proximate cause question asks whether the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury." *Mendez v. Cty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018).

Defendants argue that nothing the officers did during the incident was a proximate cause of Nunis' death, nor did they have any knowledge that Nunis was experiencing medical distress or that he would abruptly have a medical emergency 7 to 8 minutes later. In support, Defendants point to deposition testimony from Dr. Robert Stabley, the medical examiner who performed Nunis' autopsy and found that Nunis' cause of death was cardiac arrest resulting from him being "engaged in too much physical exertion with preexisting psychological and physiological conditions." (Doc. No. 79-4 at 124.) He also testified, however, that he could not completely rule out the officer's conduct as playing a role in Nunis' death because there is a gap in the video that he could not review. (*Id.* at 125.)

Moreover, Plaintiffs provided competing evidence on causation. According to Dr. Bennet Omalu, Plaintiffs' forensic pathology and neuropathology expert, Nunis did not, as the autopsy report states, die as a result of cardiac arrest, but rather, due to "Asphyxial Brain Injury" resulting from "Restraint Asphyxia [Mechanical-Positional Asphyxiation, Blunt Force Trauma and Placement of Obstructive Material Over Face/ Smothering]". (Doc. No. 85-1 at 10.) In Dr. Omalu's view, restraint asphyxiation caused Nunis to suffer a permanent brain injury and death. (*Id.* at 15.) He also opined that the restraint asphyxiation, infliction of pain, and distress during the incident caused Nunis to suffer myocardial infarction, which aggravated his brain injury and made death more imminent. (*Id.*) In addition, Dr. Omalu reviewed Nunis' medical records and concluded that prior to the police encounter, "he was not dying from any disease or intoxication and was not expected to die." (*Id.*)

Based on the foregoing, there is evidence upon which a jury could discount Defendants' position on causation and reasonably find that the officers' use of force—

14

including tackling Nunis, pressing their collective weight on Nunis' back, shoulder, and legs and pinning him in prone position for a period of time, placing him in a maximum restraint device, and covering his head with a spit hood as he was uncontrollably drooling—foreseeably resulted in Nunis' death less than 10 minutes later. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds a jury could conclude that the officers' conduct "is closely enough tied to the injury that it makes sense to hold the defendant[s] legally responsible for the injury." *Mendez*, 897 F.3d at 1076. Their actions are not "so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014). Moreover, Plaintiffs' police practices expert provided evidence from which the jury could determine that the officers knew or reasonably should have known of the serious risks involved in their conduct. (*See, e.g.*, (Doc. No. 85-3, Police Practices Expert Report at 12–32.) Accordingly, the Court **DENIES** Defendants' motion for summary judgment on this basis.

* * *

In sum, having rejected Defendants' arguments that there is no evidence from which a jury can conclude that the officers' used excessive force against Nunis and proximately caused his death, the Court **DENIES** Defendants' motion for summary judgment on Plaintiffs' excessive force claim.

### 2) Denial of Medical Care

Plaintiffs also claim that Defendants violated Nunis' Fourth Amendment by denying Nunis the medical care he needed. "Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986).

Defendants contend that because there is no dispute that Agent Linney radioed for medical aid, and medical aid was ultimately provided, the officers fulfilled their Fourth

Amendment duty to summon medical care. While it is true that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment," *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006), a jury could determine, based on the particular circumstances of this case, that medical assistance was not promptly summoned, but rather, unnecessarily and unreasonably delayed.

The Court does not ignore the undisputed evidence that medical professionals were timely staged near the incident and awaiting the officers' commands. The officers, however, did not permit the medical professionals to provide care until after they applied the maximum restraint device and spit hood on Nunis. And as earlier discussed, there are factual disputes over whether the additional restraints were necessary after Nunis was handcuffed and appeared to be subdued. There are also factual questions as to whether the officers' unreasonably interpreted Nunis' squirming, calls to his daughter, repeated request for paramedics, groaning, expressing that he "will be going to heaven," reaching for his pill bottle, informing the officers that the WRAP was "bad" and "not right way", sudden quietness, inability to hold his head and body up, and spitting up as resistance—as opposed to signs of medical distress. There is also evidence that the officers knew or should have known about the safety considerations when applying the WRAP, including to "seek immediate medical attention" if the restrained person "complains of or exhibits any medical concerns" such as "[s]udden quiet or inactivity" and "[v]omiting". (Doc. No. 86-5, WRAP Safety Consideration at 103.)

While Defendants argue that Nunis was not exhibiting signs of a medical emergency until after he was transferred to the paramedics, that factual determination is for the jury to decide. Viewing the evidence in the light most favorable to Plaintiffs and resolving factual disputes in their favor, a reasonable jury could find that the officers did not behave reasonably in ignoring Nunis' medical distress and unnecessarily delaying the medical care

21-cv-01627-AJB-DEB

owed to him. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claim for denial of medical care.

### 3)  Interference with Familial Relationship

Defendants next challenge Plaintiffs' claim for interference with a parent-child relationship under the Fourteenth Amendment. The Fourteenth Amendment protects "the liberty interest in the companionship and society" between a parent and child. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *accord Tan Lam v. City of Los Banos*, 976 F.3d 986, 1003 (9th Cir. 2020). An officer interferes with the right to familial association if he engages in conduct that "shocks the conscience." *Wilkinson*, 610 F.3d at 554. "In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation by the officer is practical.'" *Id.* (alterations and citation omitted).

Defendants contend they are entitled to judgment as a matter of law on Plaintiffs' claim for interference with familial relationship because Plaintiffs have not shown that the officers engaged in conduct that shocks the conscience. Because Plaintiffs did not oppose Defendants' arguments to this effect, the Court finds this claim abandoned. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (holding that a plaintiff abandoned claims by not raising them in opposition to the defendant's motion for summary judgment); *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (same). Accordingly, the Court finds that Plaintiffs have waived their Fourteenth Amendment claim for the right to familial relationship, and thus **GRANTS** Defendant's motion for summary judgment on this cause of action.

### 4)  Municipal Liability

Defendants also challenge Plaintiffs' claim for municipal liability pursuant to a failure to train theory. A local government's failure to train its employees on their duty to avoid violating citizens' rights may, "[i]n limited circumstances," rise to the level of an official government policy for purposes of § 1983 liability. *Connick v. Thompson*, 563 U.S.

51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* "Inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (internal alterations and quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, (1997)).

Plaintiffs argue they can prevail on their failure to train claim because some officers testified that they were not trained on the dangers of "positional asphyxia." (Doc. No. 85 at 23.) However, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390. Moreover, even though certain officers may not specifically recall the term "positional asphyxia," deposition testimony from the City's person most knowledgeable on the Department's policies and training shows that the officers were trained on the risk of placing a person in prone position and the need to place the person in a recovery position "so that they can breathe and we can monitor their vitals." (Doc. No. 79-4 at 178.) Plaintiffs identify no other evidence to show that the City's training was inadequate. *See Canton*, 489 U.S. at 389 ("In resolving the issue of a city's liability, the focus must be on adequacy of the training program[.]"). *See also Anderson*, 477 U.S. at 252. ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to survive summary judgment.").

21-cv-01627-AJB-DEB

Moreover, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *Canton*, 489 U.S. at 389. Plaintiffs have failed to identify evidence showing a pattern of similar constitutional violations to demonstrate deliberate indifference for purposes of failure to train, nor have they presented any argument or evidence that this case falls within the narrow range of cases where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. Because there is insufficient evidence to raise a genuine issue of material fact as to the adequacy of the City's training program and its deliberate indifference to constitutional rights, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' failure to train claim.

\* \* \*

For the reasons stated above, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' federal section 1983 claims for interference with familial relationship and municipal liability, and **DENIES** it with respect to the section 1983 claims for excessive force and denial of medical care.

Lastly, the Court **DENIES** Defendants' motion for summary judgment on Plaintiffs' request for punitive damages against the officers. Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citation omitted). As explained earlier, there are disputes of material fact as to the reasonableness of the officers' action. *See supra* § III.A.1.a. Depending on how the jury determines the facts in this case, including whether the escalation of force was necessary and whether the officers ignored signs of medical distress, a reasonable juror could also conclude that one or more of the officers acted with reckless disregard to the Nunis' Fourth Amendment rights.

### B. State Claims

Turning to Defendants' challenges to Plaintiffs state law causes of action, Defendants contend they are entitled to summary judgment on Plaintiffs' claims for violations of the Ralph and Bane Acts, negligence, assault, battery, false imprisonment, and intentional and negligent infliction of emotional distress.

#### 1) Ralph Act

The Roxie Plaintiffs assert a violation of the Ralph Civil Rights Act. Section 51.7 of the Ralph Act "provides that all persons within California have the right to be free from any violence, or intimidation by threat of violence, committed against the person on account of race." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1167 (N.D. Cal. 2009), *amended in part*, No. C 05-02935 MEJ, 2009 WL 10736653 (N.D. Cal. Sept. 8, 2009) (citing Cal. Civ. Code § 51.7(a)). The elements of a Ralph Act claim are: "(1) the defendant threatened or committed violent acts against the plaintiff; (2) the defendant was motivated by his perception of plaintiff's race; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Id.* (citing *Austin B. v. Escondido Union Sch. Dist.,* 149 Cal. App. 4th 860, 880–81 (2007)).

Defendants argue that the Roxie Plaintiffs have failed to demonstrate a genuine dispute of fact as to whether Defendants' conduct was motivated by racial animus. The Court agrees. The record is devoid of any race-related comments or other evidence from which a reasonable juror could conclude that race was a motivating factor in Defendants' conduct. Because there is no evidence to support that Defendants' actions were motivated by their perception of Nunis' race, Plaintiffs cannot prove their § 51.7 claim. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on the Roxie Plaintiffs' Ralph Act claim.[2]

---

[2] The Roxie Plaintiffs argued in their opposition brief that their Ralph Act claim was based not only on Nunis' race, but also on his disability. The Court agrees with Defendants that because the FACC contains no allegations of a Ralph Act claim based on disability, their attempt to raise it in response to a summary judgment motion is unavailing. *See Navajo*

### 2) Bane Act

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation or coercion." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citation and internal quotation marks omitted). The essence of a Bane Act claim is that the defendant, by improper means, "tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin*, 149 Cal. App. 4th at 883. The Bane Act requires proof of specific intent to violate a person's constitutional rights, but "it is not necessary for the defendants to have been "thinking in constitutional *or legal terms* at the time of the incidents." *Reese*, 888 F.3d at 1045 (emphasis in original). "[A] reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." *Id.*

Defendants assert that Plaintiffs lack necessary evidence to show that the officers acted with specific intent to violate Nunis' constitutional rights. The Court disagrees and finds Plaintiffs have presented evidence from which a reasonable jury could find that the officers recklessly disregarded Nunis' constitutional rights to be free from excessive force and to medical care.

The record contains evidence that, if viewed in the light most favorable to Plaintiffs, could support a finding that the officers recklessly disregarded Nunis' Fourth Amendment rights when Agent Linney forced Nunis into handcuffs despite his clear and respectful request not to be handcuffed and willingness to voluntarily come with Agent Linney. The jury could also reasonably infer reckless disregard from Agent Linney's radio description of Nunis running away from him as Nunis being uncooperative and fighting—causing the

---

*Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[Where] the complaint does not include the necessary factual allegations to state a claim, raising such a claim in a summary judgment motion is insufficient to present a claim to the district court.").

21-cv-01627-AJB-DEB

responding officers to misinterpret the force necessary to control the situation. A reasonable jury could further conclude from the evidence that the officers recklessly disregarded Nunis' Fourth Amendment rights when they—despite there being no crime committed or imminent danger to the safety of the officers or others—escalated the force necessary to take custody of Nunis for his mental health evaluation and ignored signs of medical distress. *See supra* § III.A.1.a.

Accepting the evidence in the light most favorable to Plaintiffs, the Court cannot conclude that no reasonable jury could find that the officers had a reckless disregard for, and thus the specific intent to violate, Nunis' constitutional rights. *See Reese*, 888 F.3d at 1045. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on Plaintiffs' Bane Act Claim.

### 3) Negligence

To establish negligence, "a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (internal alteration and citation omitted). Peace officers have "a duty to act reasonably" when using force, and "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Id.* The California Supreme Court has clarified that state negligence law "is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id.* at 639; *accord Han v. City of Folsom*, 551 F. App'x 923, 926 (9th Cir. 2014).

Defendants argue they are entitled to summary judgment on Plaintiffs' claim for negligence based on similar grounds it raised in challenging Plaintiffs' Fourth Amendment excessive force claim—namely, that the officers' use of force was reasonable under the circumstances and that no evidence demonstrates that the officers' actions caused Nunis' death.

First, the Court has found there are genuine issues of material fact as to the reasonableness of the officers' use of force, *see supra* § III.A.1, and incorporates those findings and analysis here. Considering those findings, Plaintiffs' police practices expert's opinion on the standard of care, and state negligence law being broader than Fourth Amendment law, the Court rejects Defendants' argument that no jury can find that the officers breached their duty to act reasonably for purposes of negligence liability. *See Hayes*, 57 Cal. 4th at 629.

Second, Defendants contend that Plaintiffs lack evidence of causation. In response, Plaintiffs point to reports produced by their medical experts. (Doc. Nos. 85-1–85-3.) For example, Dr. Omalu, found based on his review of the officers' conduct and Nunis' medical history, and conducting a differential diagnosis, that Nunis' cause of death was "Asphyxia Brain Injury due to Restraint Asphyxiation." (Doc. No. 85-1 at 10.) Dr. Michael M. Baden, another forensic pathologist, also found that Nunis' cause of death was "Positional asphyxia by prone back pressure, body wrapping and placement of a spit sock over his head during physical restraint by police." (Doc. No. 85-2 at 6, ¶ 18.) Defendants' passing challenge to the experts' reports as improper legal conclusions falls short of a *Daubert* Challenge or Rule 702 analysis and is thus unpersuasive.

Accordingly, for the reasons stated, the Court **DENIES** Defendant's motion for summary judgment on Plaintiffs' negligence claim.[3]

### 4) Battery and Assault

Plaintiffs allege causes of action for battery and the Kimone Plaintiffs further allege an assault claim. Defendants' only argument in support of their request for summary judgment on Plaintiffs' battery and assault claims is the same argument the Court previously rejected—that is, that no reasonable juror could find that the officers used

---

[3] For completeness, the Court reiterates that it has previously struck Plaintiffs' negligence cause of action insofar as they allege direct liability against the City for negligent hiring or supervision, for which there is no legally recognized basis. (Doc. No. 82 at 8–10.)

21-cv-01627-AJB-DEB

1   excessive force against Nunis. *See supra* § III.A.1.a. The Court has rejected that argument

2   and thus **DENIES** Defendants' motion for summary judgment on these claims for the same

3   reasons.

4         **5) False Imprisonment**

5         The Roxie Plaintiffs assert a false imprisonment claim against Defendants. "Under

6   California law, false arrest, or false imprisonment, is 'the unlawful violation of the personal

7   liberty of another.'" *Tekle v. United States*, 511 F.3d 839, 854 (9th Cir. 2007) (quoting Cal.

8   Penal Code § 236). The elements of a false imprisonment claim are: "'(1) the

9   nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3)

10  for an appreciable period of time, however brief.'" *Id.* (quoting *Easton v. Sutter Coast*

11  *Hosp.*, 80 Cal. App. 4th 485, 496 (2000)).

12       Defendants contend that the Roxie Plaintiffs cannot establish that the officers acted

13  without lawful privilege because they were appropriately detaining Nunis pursuant to a

14  5150 call. The Court agrees. California Welfare and Institutions Code Section 5150 "allows

15  peace officers in California upon probable cause to take into custody for evaluation or

16  treatment, for up to 72 hours, a person who is a danger to himself or others due to a mental

17  health disorder." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 943 (9th Cir. 2017)

18  (citing Cal. Welf. & Inst. Code § 5150(a)). There is no dispute that the officers were

19  responding to a 5150 call, initiated by Kimone in response to Nunis attempting to jump out

20  of a second story window. The Roxie Plaintiffs have not disputed otherwise. The record

21  thus compels the sole conclusion that the officers had probable cause to detain Nunis for a

22  mental health evaluation pursuant to Section 5150. Consequently, the officers cannot be

23  held liable for false imprisonment. *See* Cal. Welf. & Inst. Code § 5278 (individual

24  authorized to detain person pursuant to Section 5150 "shall not be held either criminally or

25  civilly liable for exercising this authority in accordance with the law"). Accordingly, the

26  Court **GRANTS** Defendants' motion for summary judgment on the Roxie Plaintiffs' false

27  imprisonment claim.

28

### 6)  Intentional and Negligent Infliction of Emotional Distress

Defendants challenge the Kimone Plaintiffs' claims for intentional and negligent infliction of emotional distress. The Kimone Plaintiffs, however, chose to defend only their negligent infliction of emotional distress claim. The Court thus finds the intentional infliction of emotional distress claim abandoned and **GRANTS** Defendants' motion for summary judgment on that claim. *See Shakur*, 514 F.3d at 892 (holding a plaintiff abandoned claims by not raising them in opposition to summary judgment motion); *Jenkins,* 398 F.3d at 1095 n.4 (same).

Turning to Kimone's negligent infliction of emotional distress ("NIED") claim, California courts apply the "traditional [negligence] elements of duty, breach of duty, causation, and damages" to NIED claims. *Burgess v. Superior Ct.*, 2 Cal. 4th 1064, 1072 (1992). Defendants contend that Kimone has not presented evidence of a duty owed to her. In support, Defendants argue that she has no evidence that Defendants assumed a duty in which her emotional state was an object, had an independent duty to her, or a special relationship. The argument is unavailing.

"California courts recognize two categories of liability for negligent infliction of emotional distress: 'bystander' liability and 'direct victim' liability." *Turek v. Stanford Univ. Med. Ctr.*, No. C 12-00444 WHA, 2013 WL 4866331, at *2 (N.D. Cal. Sept. 12, 2013) (quoting *Burgess,* 2 Cal.4th at 1072). "The two are distinguished by the source of a defendant's duty to a plaintiff." *Id.*

Here, the requirements Defendants espouse relate to a direct liability theory of recovery for NIED, which Kimone does not raise here. *See Burgess*, 2 Cal. 4th at 1073 (explaining that direct liability applies in "cases in which damages for serious emotional distress are sought as a result of a breach of duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two" (internal quotation marks omitted)). Rather, Kimone seeks to hold Defendants liable for NIED on a bystander theory of liability.

21-cv-01627-AJB-DEB

"[B]ystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another." *Burgess*, 2 Cal. 4th at 1073. "In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." *Thing v. La Chusa*, 48 Cal. 3d 644, 647 (1989).

In responding to Defendants' challenge to her NIED claim, Kimone referenced bystander liability case law and provided arguments in support of the elements thereof. Kimone argued that she is closely related to Nunis as his daughter, she was present at the time the officers used forced against Nunis and aware that the officers were causing injury to her father, and she suffered emotional distress from witnessing the officers' use of escalating force against her father. Defendants offered no challenge to Kimone's assertion of bystander liability. There being no dispute as to the applicability of bystander liability as a viable NIED theory of recovery for Kimone, the Court **DENIES** Defendants' motion for summary judgment on Kimone's NIED claim.

\* \* \*

In sum, with respect to the state law claims, the Court **GRANTS** Defendants' motion for summary judgment as to the Ralph Act, false imprisonment, and intentional infliction of emotional distress claims, and **DENIES** it as to the Bane Act, negligence, battery, assault, and negligent infliction of emotional distress claims.[4]

---

[4] Defendants specifically request, for the first time in their reply brief, that Defendant Hicks be granted summary judgment in his favor on all claims against him because "there is no evidence that Hicks made any contact with Nunis during the subject evidence, nor do Plaintiffs make any argument that Hicks' only conduct during the incident (supervising the application of the WRAP device) was wrongful." (Doc. No. 88 at 12.) Because Defendants' opening brief contained no such particular request and Plaintiffs were not afforded an opportunity to defend their theory of liability against Defendant Hicks, the Court deems it

26

21-cv-01627-AJB-DEB

## IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Defendants' motion for summary judgment is **GRANTED** as to the causes of action for interference with familial relationship, municipal liability, Ralph Act, false imprisonment, and intentional infliction of emotional distress.

- Defendants' motion for summary judgment is **DENIED** as to the remaining causes of action—namely, excessive force, denial of medical care, Bane Act, negligence, battery, assault, and negligent infliction of emotional distress.

- Defendants' motion for summary judgment on Plaintiffs' request for punitive damages is **DENIED**.

- The parties are reminded of their Final Pretrial Conference on <u>July 13, 2023</u> and the deadlines for submissions relating thereto as set for in the Court's May 1, 2023 Order. (Doc. No. 91.)

**IT IS SO ORDERED**.

Dated:  June 9, 2023

Hon. Anthony J. Battaglia
United States District Judge

---

inappropriate to consider Defendants' late request. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")

21-cv-01627-AJB-DEB