# EXHIBIT A

| From: | Carl Douglas |
|---|---|
| To: | Sain_Tony; Karen Rogan; Richard Copeland |
| Cc: | DeWitt; Julia Quesada; Cameron Stewart; Lena Andrews; Kristen Devezin; Betty Sykes; Medina_Christina; Arellano_Liz; McLaughlin_Abigail; Bakken_Tori; Xiomara Serrano |
| Subject: | [EXT] RE: Nunis (PC) Mediation Scheduling w/ Mediator Copeland - Confidential Settlement Communication |
| Date: | Monday, July 31, 2023 8:56:33 PM |
| Attachments: | image003.png |
| | image004.png |



Counsel,

Consistent with conversations held during the recent Pretrial Conference, please be advised that the Roxie Nunis Plaintiffs intend to offer the expert witness testimony of forensic pathologist Dr. Michael Badem, as well as forensic neuropathologist, Dr. Bennet Omalu. Each will offer relevant testimony explaining their theories of responsibility for Mr. Nunis' death and the reasons for their opinions. Their opinions will echo their deposition testimony. While they both may ultimately conclude that the actions of the Defendants were a substantial factor in causing Ms. Nunis' death, they will not be presenting cumulative testimony concerning the breadth and scope of the opinions for their conclusions.

The Roxie Nunis Plaintiffs will be offering the police practices testimony of William Harmening supporting their claim that the Defendants' actions, which were contrary to their training, best practices and experience, were a substantial factor leading to Mr. Nunis' death. The claims and causes of action these Plaintiffs are prosecuting are not the same as the Kimone Nunis Plaintiffs, who have chosen to offer the testimony of a separate police practices expert.

When the Roxie Nunis Plaintiffs are presenting their police practices expert testimony in trial, they will be mindful to avoid offering cumulative testimony to that being offered by the co-Plaintiffs. The mere fact that the expert witness testimony of more than one police practice expert is being offered, by different parties, does not mean, in and of itself, that one of the experts must be excluded from testifying in trial. Each lawyer has the right and obligation to present what they feel is the best expert witness capable of conveying their theory of the case to the jury. Although the two Plaintiff firms share the ultimate goal of proving the Defendants' responsibility for Mr. Nunis death, we do not share strategy or approach. We each have our independent thoughts and theories on how to best present this joint case to the jury. While mindful of offering objectionably cumulative testimony in trial, there is no obligation for the Plaintiffs to limit who they will call in trial, six months before trial begins, out of some unexplained general concern that the independent testimony of separately retained experts will unfairly prejudice the Defendants.

The Roxie Nuni Plaintiffs will defend their right to offer independent expert witness testimony on this subject consistent with the briefing schedule ordered by the court.

Best,

Carl E. Douglas
*DOUGLAS / HICKS LAW*
5120 W. Goldleaf Circle, Suite 140
Los Angeles, CA. 90056-1661
(Phone) (323) 655-6505
(Fax)    (323) 927-1941
www.douglashickslaw.com



CONFIDENTIALITY NOTICE:

This message and its attachments are sent by an attorney and may contain information and/or attachments that is/are confidential and protected by privilege from disclosure. As such, this message is intended only for the confidential use of the intended recipient(s). If you are not the intended recipient, or if privileged/protected materials have been inadvertently sent to you, you are prohibited from printing, copying, forwarding or saving this message or its attachments. In such an event, please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately. All rights in this message's contents and/or attachments are reserved. This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. Thank you for your cooperation in preserving our firm's/clients' confidentiality and privilege interests.

# EXHIBIT B

**THE LAW OFFICES OF JOHN L. BURRIS**
JOHN L. BURRIS, Esq. (SBN 69888)
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile:  (510) 839-3882
john.burris@johnburrislaw.com

**THE LAW OFFICES OF JOHN L. BURRIS**
DeWITT M. LACY, Esq. (SBN 258789)
JULIA N. QUESADA, Esq. (SBN 337872)
LENA P. ANDREWS, Esq. (SBN 342471)
9701 Wilshire Blvd., Suite 1000
Beverly Hills, California 90212
Telephone: (310) 601-7070
Facsimile:  (510) 839-3882
dewitt.lacy@johnburrislaw.com
julia.quesada@johnburrislaw.com
lena.andrews@johnburrislaw.com

Attorneys for Plaintiffs
Kimone Nunis, Oral W. Nunis, Andre Nunis and Ludecea Nunis

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ORAL W. NUNIS, SR., et al.,<br><br>                    Plaintiffs.<br><br>vs.<br><br>City of Chula Vista, et al.<br><br>                    Defendants. | Case No.: 3:21-cv-1627-AJB-DEB<br><br>*(Hon. Judge Anthony J. Battaglia; Hon. Magistrate Judge Daniel E. Butcher)*<br><br>**DISCLOSURE OF EXPERT WITNESSES BY KIMONE NUNIS PLAINTIFFS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)** |

Plaintiffs Kimone Nunis, Oral W. Nunis, Andre Nunis, and Ludecea Nunis hereby submit Plaintiffs disclosure regarding designation of experts and related witness information. Plaintiffs anticipate using and/or intend to offer the following experts' witness opinion and related evidence.

# I. <u>RETAINED EXPERTS</u>

1. **Dr. Bennet Omalu**, Autopsy and Anatomic Pathology, Clinical Pathology, and Toxicology, Forensic Pathology, The Fountains, 3031 West March Lane, #323, Stockton, CA 95219. Dr. Omalu's curriculum vitae ("CV"), testimony list, fee schedule and expert report are attached as Exhibit "A" to these disclosures. Dr. Omalu's fee for deposition testimony is $1000.00 (three-hour minimum). Plaintiffs anticipate that Dr. Omalu's expert testimony is expected to address issues regarding Mr. Nunis' injuries and cause of death.

2. **Lieutenant Roger Clark**, Police Procedures Consultant, Inc., 10207 Molino Road. Santee, CA 92071. Lieutenant Clark's curriculum vitae ("CV"), testimony list, fee schedule and expert report will be provided as a supplement to these disclosures. Plaintiffs anticipiate that Lieutenant Clark will offer expert testimony regarding the police practices of the City of Chula Vista Police Department.

The Law Offices of John L. Burris
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

## II. <u>NON-RETAINED EXPERT WITNESSES — TREATING MEDICAL PROVIDERS</u>

Pursuant to Federal Rules of Procedure 26(a)(2)(A) and (C), Plaintiffs designate the following medical providers that evaluated and treated Decedent Oral Nunis. Said witnesses may be called to offer opinions or expert testimony at trial but have not been employed to do so.

1. **Dr. Erica P. Chun.,** Sharp Chula Vista Medical Center. Dr. Chun is expected to testify that she evaluated and treated Decedent Oral Nunis on March 12, 2020.

2. **Dr. Joyce Chung,** Sharp Chula Vista Medical Center. Dr. Chun is expected to testify that she evaluated and treated Decedent Oral Nunis on or about March 13, 2020.

## III. <u>RESERVATION OF RIGHTS</u>

Plaintiffs reserve the right to call additional expert witnesses for purposes of rebuttal or impeachment, if necessary, as provided for under the Federal Rules of Civil Procedure, including at the time of trial. In addition, Plaintiffs reserve the right to amend, or delete from this disclosure of expert witnesses as provided by law, including but not limited to a supplemental disclosure of expert witnesses.

**The Law Offices of John L. Burris**
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

Dated:  September 30, 2022          **THE LAW OFFICES OF JOHN L. BURRIS**


By: /s/ *DeWitt M. Lacy*
        DeWITT M. LACY
        JOHN L. BURRIS
        JULIA N. QUESADA
        LENA P. ANDREWS
        Attorneys for Kimone Nunis
        Plaintiffs

**The Law Offices of John L. Burris**
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212

**DISCLOSURE OF EXPERT WITNESSES BY KIMONE NUNIS PLAINTIFFS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(2)**

1 | **CARL E. DOUGLAS, ESQ. (SBN: 097011)**
2 | JAMON R. HICKS, ESQ. (SBN: 232747)
   | AJA M. MANN, ESQ.  (SBN: 244221)
3 | ***DOUGLAS / HICKS LAW, APC***
4 | 5120 W. Goldleaf Circle, Suite 140
   | Los Angeles, California 90056
5 | Phone: (323) 655-6505
   | Fax: (323) 927-1941
6 | Carl@douglashickslaw.com
7 | Jamon@douglashickslaw.com
   | Aja@douglashickslaw.com
8 |
9 | Attorneys for Plaintiffs,
   | ESTATE OF ORAL W. NUNIS, SR., by
10 | and through, ROXIE A. NUNIS, Individually,
11 | and as Successor In Interest to the ESTATE, and
   | NAOMI NUNIS, Individually,
12 | and WILLIE MAE KIRKLAND as Guardian
13 | *ad Litem* for ABIGAIL TABITHA NUNIS and J.C.N.

14 | **UNITED STATES DISTRICT COURT FOR THE**

15 | **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF ORAL W. NUNIS, SR. by and Through, ROXIE A. NUNIS, Individually, and as Successor In Interest to the ESTATE, NAOMI NUNIS, Individually, and WILLIE MAE KIRKLAND as Guardian *ad Litem* for ABIGAIL TABITHA NUNIS and J.C.N. | Case No.: 21-cv-1627-AJB-DEB  **PLAINTIFFS' DESIGNATION OF EXPERT WITNESS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 26 (a)(2)(A)**  Judge: Anthony J. Battaglia |
| *Plaintiffs*, vs. | |
| CITY OF CHULA VISTA, and DOES 1 through 40, inclusive, | FPTC: April 6, 2023 Trial Date: None Set |
| *Defendant*s. | |

*DOUGLAS / HICKS LAW, APC*
5120 W. Goldleaf Circle, Suite 140
Los Angeles, California 90056
(323) 655-6505

1

# DESIGNATION OF EXPERT WITNESS

Pursuant to the Federal Rules of Civil Procedure 26(a)(2)(A),  Plaintiffs, Estate of Oral W. Nunis, Sr. by and through, Roxie A. Nunis, individually, and as Successor in Interest to the Estate, and Naomi Nunis, individually, and Willie Mae Kirkland, as Guardian at Litem for Abigail Tabitha Nunis and Jezbez Caleb Nunis, (collectively "Plaintiffs"),  hereby submit their Designation of  Expert Witnesses pursuant to Rule 26 (a)(2)(A) of the Federal Rules of Civil Procedure.  The plaintiffs reserves the right to amend or supplement this disclosure.  The following persons will or may be called to provide expert testimony or present evidence on behalf of the Plaintiffs at the trial of the above-referenced case:

1. **Bennet I Omalu M.D.,** MBA, MPH, CPE, DABP-AP,CP,FP,NP
The Fountains
3031 W. March Lane, Suite# 323
Stockton, CA 95219

Dr. Omalu's Rule 26 report, Curriculum Vitae, Fee Schedule, and list of prior sworn testimony are collectively attached hereto as Exhibit "A".

2. **Michael M. Baden, MD.**
15 West 53rd St.
New York, NY 10019

Dr. Michael M. Baden's Rule 26 report, Curriculum Vitae, Fee Schedule, and list of prior sworn testimony are collectively attached hereto as Exhibit "B".

3. **William M. Harmening**
2058 Halls Mill Road
Unionville, TN 37180

William M. Harmening's Rule 26 report, Curriculum Vitae, Fee Schedule, and list of prior sworn testimony are collectively attached hereto as Exhibit "C".

*DOUGLAS / HICKS LAW, APC*
5120 W. Goldleaf Circle, Suite 140
Los Angeles, California 90056
(323) 655-6505

PLAINTIFF'S DESIGNATION OF EXPERT WITNESS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 26 (a)( 2)(A)

4. **Michael L. Jones**
   Digital Evidence Legal Videos Services
   12115 Magnolia Blvd PMB No. 166
   North Hollywood, CA 91607

Michael L. Jones' Rule 26 report, Curriculum Vitae, Fee Schedule, and list of prior sworn testimony are collectively attached hereto as Exhibit "D".

DATED: September 30, 2022          **DOUGLAS / HICKS LAW, APC**

By: 

CARL DOUGLAS
Attorneys for Plaintiffs,
ESTATE OF ORAL W. NUNIS, SR, et al.

*DOUGLAS / HICKS LAW, APC*
5120 W. Goldleaf Circle, Suite 140
Los Angeles, California 90056
(323) 655-6505

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF ORAL W. NUNIS, SR. BY AND THROUGH ROXIE A. NUNIS, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO THE ESTATE, ET AL., | ) ) ) ) ) | |
| PLAINTIFFS, | ) ) | |
| VS. | ) | CASE NO. 21-CV-1627-AJB-DEB |
| CITY OF CHULA VISTA, ET AL., | ) ) | |
| DEFENDANTS. | ) ) | |

DEPOSITION OF MICHAEL BADEN, M.D.

TAKEN ON

FRIDAY, JANUARY 13, 2023

MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4                                    )
   ESTATE OF ORAL W. NUNIS, SR. BY   )
5  AND THROUGH ROXIE A. NUNIS,       )
   INDIVIDUALLY AND AS SUCCESSOR IN  )
6  INTEREST TO THE ESTATE, ET AL.,   )
                                     )
7              PLAINTIFFS,           )
                                     )
8       VS.                          )  CASE NO. 21-CV-1627
                                     )           AJB-DEB
9  CITY OF CHULA VISTA, ET AL.,      )
                                     )
10             DEFENDANTS.           )
   _____)

11

12

13

14

15            DEPOSITION OF MICHAEL BADEN, M.D., taken on behalf

16  of the Defendants, utilizing ZOOM Video platform to host all

17  participants from their respective locations, commencing at

18  10:07 A.M., Friday, January 13, 2023, before Melinda S.

19  Womelsdorf, Certified Shorthand Reporter, License No. 13124,

20  for the State of California, pursuant to Notice.

21

22

23

24

25

                                                            2

1   APPEARANCES:

2

3   For the Plaintiffs, KIMONE NUNIS, ORAL NUNIS, ANDRE
    NUNIS AND LUDECEA NUNIS:

4

        THE LAW OFFICES OF JOHN L. BURRIS
5       BY:  DEWITT LACY, ESQ.
        7677 Oakport Street, Suite 1120
6       Oakland, California 94621
        (510) 839-5200
7       dewitt.lacy@johnburrislaw.com
        (Appearing via ZOOM Video Conference)
8

    For the Plaintiffs, ESTATE OF ORAL W. NUNIS, SR., BY AND
9   THROUGH ROXIE A. NUNIS, INDIVIDUALLY, AND AS SUCCESSOR
    IN INTEREST TO THE ESTATE, AND NAOMI NUNIS,
10  INDIVIDUALLY, ABIGAIL TABITHA NUNIS, INDIVIDUALLY, AND
    WILLIE MAE KIRKLAND AS GUARDIAN AD LITEM FOR AND J.C.N.:

11

        DOUGLAS/HICKS LAW
12      BY:  CARL DOUGLAS, ESQ.
        5120 W. Goldleaf Circle, Suite 140
13      Los Angeles, California 90056
        (323) 655-6506
14      carl@douglashickslaw.com
        (Appearing via ZOOM Video Conference)
15

    For the Defendants, CITY OF CHULA VISTA, EVAN LINNEY,
16  MANUEL PADILLA, DAVID RIVERS, BRIAN OLSON, JORDAN
    SALVADOR, DAVID ARCE, DENNY KREMER, AND KENNETH HICKS:
17

        LEWIS BRISBOIS BISGAARD & SMITH, LLP
18      BY:  TONY SAIN, ESQ.
        633 West 5th Street, Suite 4000
19      Los Angeles, California 90071
        (213) 250-1800
20      Tony.Sain@lewisbrisbois.com
        (Appearing via ZOOM Video Conference)
21

    Also Present:
22

23      Roxie Nunis

24

25

                                                    3

1                    I N D E X

2   WITNESS

3   MICHAEL BADEN, M.D.
                                          PAGE
4
           Examination by Mr. Sain          5
5

6                  E X H I B I T S

7

8   NUMBER              DESCRIPTION        PAGE

9    1 - Notice of Deposition               5

10   2 - Plaintiff's Expert Designations    6

11   3A - Dr. Baden's expert report, dated 09/27/22   31

12   3B - Dr. Baden's supplemental report, dated   31
          10/2022
13
     4 - Dr. Baden's Curriculum Vitae      23
14
     5 - Dr. Baden's notes                 46
15

16

17

18

19

20

21

22

23

24

25

                                                      4

1               SAN BERNARDINO, CALIFORNIA

2               FRIDAY, JANUARY 13, 2023

3                 AT 10:07 A.M.

4

5               MICHAEL BADEN, M.D.,

6          Having been first duly sworn, was

7          examined and testified as follows:

8

9                  EXAMINATION

10

11  BY MR. SAIN:

12     Q   Good morning from my end of the country, good

13  afternoon from your end of the country.

14         Doctor, would you please state and spell your

15  full name?

16     A   Michael, M-I-C-H-A-E-L, Meyer, M-E-Y-E-R,

17  B-A -- Baden, B-A-D-E-N.

18     Q   Thank you, sir.

19         As a preliminary matter we'll be attaching as

20  Exhibit 1 to this deposition the Notice of Deposition,

21  including the request for production.

22        (Exhibit 1 was marked for identification

23         by the Certified Shorthand Reporter and

24         a copy is attached hereto.)

25

                       5

1      Q     Do you recall --

2      MR. DOUGLAS:  It wasn't --

3 BY MR. SAIN:

4      Q     -- sending them to Mr. Douglas?

5      MR. DOUGLAS:  You sent it to my office, sir.

6      THE WITNESS:  Yeah.  No, I don't recall that.

7 BY MR. SAIN:

8      Q     All right.  We'll come back, we're having a

9 technical difficulty.  As soon as I can pull those up

10 I'll ask you some questions about that so we're going to

11 have to come back to that.

12      MR. DOUGLAS:  Your office sent some documents to my

13 office responsive to the notice and we forwarded those

14 on to Mr. Sain.

15      THE WITNESS:  Thank you.

16 BY MR. SAIN:

17      Q     What is your current profession?

18      A     Forensic pathology.

19      Q     And what are your board certifications?

20      A     In pathology, in anatomic pathology, clinical

21 pathology and forensic pathology.

22      Q     And how long have you had those board

23 certifications?

24      A     Since 1966.

25      Q     Do they all remain valid?

                                                      15

 1      A    Yes.

 2      Q    Other than anatomic pathology, clinical

 3  pathology and forensic pathology, are you board

 4  certified in any other medical specialty?

 5      A    No.

 6      Q    How many in-person autopsy exams have you

 7  performed during your career?

 8      A    More than 20,000.

 9      Q    How many of those in-person autopsy exams

10  involved you finding asphyxia as a cause of death?

11      A    Maybe hundreds, maybe close to a thousand over

12  the decades.

13      Q    You got it.  Just under a thousand?

14      A    I say approximately.  I have no -- upwards

15  almost a thousand, I think.

16      Q    Fair enough.

17           So if I ask you some seemingly obvious

18  questions, I think we can guess the answers but I have

19  to ask it anyway since this is our first time together.

20           Have you ever been a law enforcement officer?

21      A    No.

22      Q    Have you ever attended a police academy?

23      A    Whoops.  I should back up on that.  I was the

24  chief forensic pathologist for the New York State Police

25  for 25 years, and had certain law enforcement parts of

                                                        16

1      A    No.

2      Q    Let's move into some basics in forensic

3  pathology.  These are all things I think you may agree

4  with but we'll find out.

5           Would you agree that in order for a forensic

6  pathologist to state a medical or scientific opinion

7  there has to be sufficient evidence to support that

8  opinion by a probability of 50 percent or more?

9      MR. DOUGLAS:  Objection.  Incomplete hypothetical.

10  But you can answer.

11      THE WITNESS:  What -- I didn't hear the percentage.

12  BY MR. SAIN:

13      Q    50 percent or more?

14      A    Yes.

15      Q    In forensic pathology would you agree that the

16  term "homicide" means death at the hands of another or

17  when someone directly or indirectly contributes to the

18  death of another person?

19      A    Yes.

20      Q    Would you agree that in forensic pathology

21  when a death is classified as a homicide, that does not

22  necessarily mean that the person was murdered; correct?

23      A    Correct, yes.

24      Q    Would you agree that in forensic pathology the

25  standard anatomic position is a fictional position

26

1  depicting a human being standing on a level plane with
2  their arms down at their sides, palms facing forward?
3      A    Yes.
4      Q    Would you agree that references to the
5  anatomic position such as downward, upward, left to
6  right, and so forth, are not meant to depict how a
7  decedent was positioned out in the real world; correct?
8      A    Yes.
9      Q    Would you agree that in medicine the term
10 "prone" describes a person who has the front or ventral
11 surface of a body facing downward, lying with the chest
12 and stomach position downward.  Would you agree that
13 that is what prone means?
14     A    Yes.
15     Q    In other words, when a person is laying flat
16 on their chest and stomach they are prone; is that
17 right?
18     A    Yes.
19     Q    By contrast in medicine the term "supine"
20 means a person who is laying on their back with their
21 face upward; correct?
22     A    Yes.
23     Q    Have you yourself ever been placed in the Safe
24 Restraints WRAP device?
25     A    No.

27

1      Q     Have you yourself ever worn a spit hood like
2  the one used during our incident?
3      A     Yes.
4      Q     How many times?
5      A     About a half dozen times.
6      Q     That is a mesh hood; correct?
7      A     Yes.  A mesh or partially mesh.
8      Q     Do you believe that having the history of a
9  decedent is important in order to determine the cause
10 and mechanism of death for that decedent?
11     MR. DOUGLAS:  Vague, incomplete hypothetical, calls
12 for speculation.  You can answer.
13     THE WITNESS:  Did you say important?
14 BY MR. SAIN:
15     Q     Yes, sir.
16     A     Yeah, it's important, but not absolutely
17 necessary.  Right.
18     Q     Fair enough.
19           Do you agree that in order to determine the
20 facts and circumstances that resulted in a cause of
21 death, that one of the data points that you would expect
22 the pathologist to evaluate is the data collected from
23 the autopsy?
24     A     Yes.
25     Q     In terms of the forensic pathological process,

28

1   would you agree that one of the fundamental data points

2   a forensic pathologist uses to determine things like

3   cause of death, manner of death or mechanism of death,

4   is the medical evidence collected during the autopsy

5   exam itself?

6        A    It's important, yes.

7        Q    Would you agree that in your experience for

8   medical examiners and forensic pathologists who conduct

9   autopsies, almost all of the time all of the injuries,

10  wounds, defects or abnormalities that were observed

11  during the autopsy exam, were documented either in the

12  examiner's autopsy report or in their autopsy photos?

13       A    As much as possible, yes.

14       Q    Would you agree that the most reliable method

15  for a forensic pathologist to obtain that autopsy data

16  is to perform the autopsy exam himself or herself?

17       A    No, I wouldn't agree with that.

18       Q    Fair enough.

19            Let's just check with the court reporter.  Do

20  we have Exhibit 3 now for you all so we can show it to

21  the witness?

22       THE MONITOR:  Yes, I have it.

23  BY MR. SAIN:

24       Q    Okay.  So if we can show Exhibit 3, the one

25  dated September 27, 2022, I can do some quick questions

                                                    29

1   reports, physical evidence, tangible evidence, is

2   everything that you relied upon documented or listed in

3   your reports which we've marked collectively as 3?

4        A    I tried to include what I've looked at without

5   necessarily going into each individual paper, page that

6   was involved, but I collectively attempted to include

7   whatever I have reviewed in preparation of my reports.

8        Q    Okay.  So everything that you reviewed in

9   preparation of your reports is listed in one of these

10  two reports, Exhibit 3?

11       A    Yes.

12       MR. DOUGLAS:  Objection, that misstates his

13  testimony.  You can answer, Doctor.

14       THE WITNESS:  Yes, but for example, I haven't

15  enumerated every video or every deposition I've reviewed

16  to put those in general form.

17  BY MR. SAIN:

18       Q    Okay.  Among the materials that you reviewed

19  prior to forming your opinions in this case, did that

20  include the deposition of medical examiner

21  Robert Stabley?

22       A    I believe so.  I get -- if the person did the

23  autopsy, yes.

24       Q    Okay.  Among the documents that you reviewed

25  in preparation of your opinions in this case, did that

                                                          33

1    include the body worn camera video of Agent Linney?

2        A    I'm sorry, there's some noise here.  Agent

3    which?

4        Q    Linney, sir.

5        A    Yeah, yes.

6        Q    Among the documents you reviewed prior to

7    forming your opinions in this case, did that include the

8    body worn camera video of Officer Padilla?

9        A    Yes.

10       Q    Among those documents you reviewed prior to

11   forming your opinions, did that include the body worn

12   camera video of Officer Olson?

13       A    Yes.

14       Q    Did such also include the review of the body

15   worn camera video of Officer Rivers?

16       A    Yes.

17       Q    Did such also include the review of the body

18   worn camera video of Officer Salvador?

19       A    Yes.

20       Q    Did your review prior to forming your opinions

21   in this case, also include the review of the deposition

22   of Agent Linney?

23       A    Yes.

24       Q    Did such review also include reviewing the

25   deposition of Officer Padilla?

                                                        34

1      A     Yes.

2      Q     Did such review also include reviewing the

3  deposition of Officer Olson?

4      A     Yes.

5      Q     Did such review also include reviewing the

6  deposition of Officer Rivers?

7      A     I think so.  I'm not sure.

8      Q     Fair enough.

9            Did such review also include reviewing the

10 deposition of Officer Salvador?

11     A     Yes.

12     Q     Did such review also include reviewing the

13 deposition of Kimone Nunis?

14     A     No.

15     Q     Did such review also include reviewing the

16 deposition of Barry Studwood?

17     A     No.

18     Q     Did such review also involve reviewing the

19 deposition of Ludecea Nunis?

20     A     No.

21     Q     Did such review also involve reviewing the

22 deposition of Paramedic Osorio, O-S-O-R-I-O?

23     A     Yes.

24     Q     Did such review also include reviewing the

25 deposition of EMT Ryall, R-Y-A-L-L, Simpson?

35

```
 1        A    No.
 2        Q    Let me ask you some fairly obvious questions
 3   and I think I know where we're going to go, but I have
 4   to put my marker.
 5             Were you present at the scene of the incident
 6   on the incident date of March 13, 2020?
 7        A    No.
 8        Q    So would it be accurate to say that in terms
 9   of being an in-person, live witness, you were never a
10   witness on or about March 13, 2020 to any of the events
11   involving Oral Nunis, Sr. and any law enforcement
12   officers; is that true?
13        A    Yes.
14        Q    Yes, that's true?
15        A    Yes, that's true.
16        Q    Thank you.
17             Have you ever conducted any inspection of the
18   incident location in Chula Vista?
19        A    No.
20        Q    Did you yourself conduct any in-person
21   physical autopsy examinations of Oral Nunis, Sr.?
22        A    No.
23        Q    Did you yourself conduct any in-person
24   inspection of any nonbiological evidence such as any
25   restraint devices, handcuffs, WRAP devices, spit socks
```

36

1    involved in this incident or anything like that?

2         A    No.

3         Q    Did you yourself ever conduct any in-person

4    inspection of any biological physical evidence such as

5    any tissue slides, blood samples, DNA or other bodily

6    parts, organs or substances?

7         A    No.

8         Q    Is it your understanding that you have been

9    designated as a witness to testify on the credibility of

10   various incident witnesses?

11        A    No.  That's not my role.

12        Q    Thank you, sir.

13             So I've read both your initial report, Exhibit

14   3A, and your supplemental report, Exhibit 3B.  And I've

15   been trying something and if I get this wrong you shoot

16   me down, okay, I'm just going take a whack at it.  I'm

17   going to try to summarize what it sounds like your

18   opinions are, okay?  And if you think it's a fair

19   summary you say yes, it's a fair summary; if you don't

20   think that's right you say no, and then I'm going to ask

21   you for details.

22             Totally fine either way, okay?

23        A    Yes.

24        Q    But having reviewed your opinions, would it be

25   a fair summary of the opinions you formed in this case

                                                      37

1   that number one, the cause of death for Oral Nunis was

2   positional asphyxia as a result of officer restraint in

3   the prone position in the WRAP device and by use of the

4   spit hood; and number two, the manner of death for this

5   case should have been listed as a homicide.

6           Is that a fair summary of the medical opinions

7   you formed in this case?

8       MR. DOUGLAS:  Objection to the phrase fair summary.

9   You can answer, Doctor.

10      THE WITNESS:  Yes.

11  BY MR. SAIN:

12      Q    Now, you said that -- I'm going to ask you for

13  details in just a bit, but you also said that you have

14  formed some opinions that are not included in your

15  report regarding excited delirium and the validity of

16  certain peer-reviewed papers.

17          Do you recall saying that earlier today?

18      A    Yes.  I said that in response to a question

19  from you.

20      Q    Could you tell me what those opinions are?

21      A    I -- I think that excited delirium is an

22  example of junk science, and although it's been embraced

23  by papers in the emergency medicine community, that it

24  is not based on any proper scientific science or

25  research, period.

                                                        38

1    what questions are going to be asked of me.

2         Q    Right.  And we're not talking about future

3    questions, we're talking about today, where you are --

4         A    Yes, yes.

5         Q    Okay.  So in terms of the opinions you formed

6    up to right now, up to today, up to completion of your

7    report and me asking you what your opinions are in this

8    case, other than what has been stated on the record so

9    far today, have you formed any other opinions, any other

10   medical opinions in connection with this case?

11        A    Yeah, one other opinion which has to do with

12   issues of pain and suffering.

13             (Audio disruption.)

14        THE REPORTER:  Can we go off the record, Counsel?

15        MR. SAIN:  I think Mr. Lacy just needs to mute.

16   BY MR. SAIN:

17        Q    You were saying about pain and suffering,

18   please go ahead.

19        A    That -- that -- that I -- that I have an

20   opinion that might be pertinent that he did -- that

21   Mr. Nunis did suffer considerable pain and suffering,

22   physical pain, mental suffering, for a number of minutes

23   before he lost consciousness.

24        MR. DOUGLAS:  Abracadabra.

25

                                                          40

1       Q     Okay.  So did you review the emergency room

2    records for Mr. Nunis from after his encounter with the

3    police?

4       A     I believe so.  We reviewed some records

5    because he died -- was pronounced dead very shortly

6    after he arrived.  I don't remember if it was the

7    hospital record or some other form.

8       Q     Do you recall -- and if you don't recall if

9    this is true or if you don't think it's true, you let me

10   know.  Okay?

11            But do you recall that the emergency room lab

12   results for Mr. Nunis after his encounter with the

13   police showed a hemoglobin of 9.4?

14       A    I believe so, yes.

15       Q    What is the medical significance of that

16   hemoglobin level for Mr. Nunis after his encounter with

17   the police?

18       A    It reflects that I believe he was anemic, but

19   that did not have any affect on his cause of death.

20       Q    Thank you, sir.

21            Is anemia a condition in which the blood is

22   deficient in red blood cells?

23       A    Yes.

24       Q    And would you agree that anemia is not

25   something that can be caused by others?

49

1      A     Oh, it is caused by others if there's injury

2   to a person who bleeds and loses red blood cells.

3      Q     Fair enough.

4            But you agree that Mr. Nunis' anemia played no

5   role in his cause of death?

6      A     That's correct.

7      Q     In your review of the medical records from

8   after his encounter with law enforcement, do you recall

9   him having an elevated glucose, sodium or potassium

10  level?

11     A     I don't recall specifically those.

12     Q     That's fair, Doctor.

13           In your review of the medical records from

14  after Mr. Nunis' encounter with law enforcement, do you

15  recall him having an elevated lactic acid level?

16     A     Yes.

17     Q     That was at -- measured at 26; correct?

18     A     Yes.

19     Q     Do you recall based on your review of the

20  medical records from after the police encounter, what

21  Mr. Nunis' pH measurement was?

22     A     I don't recall.

23     Q     Do you recall that pH measurement being

24  elevated?

25     A     I do not.

50

```
1        Q    All right.  That's fair, Doctor.
2             Would you agree that based on the medical
3   records from March 2020, Mr. Nunis suffered from
4   hypertension?
5        A    He had a history of hypertension, yes.  Okay.
6   Period.
7        Q    Okay.  Thank you, Doctor.
8             Would you agree that hypertension, if we put
9   it in laypeople speak, is essentially high blood
10  pressure?
11       A    Yes.
12       Q    You're aware that the only person who has
13  conducted an in-person autopsy exam of Mr. Nunis was
14  Dr. Robert Stabley; correct?
15       A    Yes.
16       Q    You're aware that Dr. Stabley has testified
17  that except for rib fractures to the sternum, which he
18  found to be consistent with CPR resuscitation, there
19  were no fractures anywhere in Mr. Nunis' body, are you
20  aware of that?
21       A    Yes.
22       Q    Do you agree with that?
23       A    Yes.
24       Q    So you would agree that Mr. Nunis' neck was
25  never broken; correct?
```

51

1     A     Yes.

2     Q     He had no skull fractures; correct?

3     A     Yes.

4     Q     Based on your review of the evidence in this

5  case, did Mr. Nunis have any hemorrhages on his scalp or

6  skull?

7     A     He -- he had one small area of some scalp

8  hemorrhage as I recall.

9     Q     An abrasion?

10    A     It was an abrasion, yes.

11    Q     Okay.

12    MR. DOUGLAS:   Abracadabra.   Abracadabra, please.

13  BY MR. SAIN:

14    Q     Other than an abrasion on his scalp, did

15  Mr. Nunis have any hemorrhages on his scalp or skull?

16    A     I -- I don't -- I don't believe so.   I believe

17  that there were no such injury to the head.

18    Q     Fair enough.

19          What is an epidural exudate, E-X-U-D-A-T-E?

20    A     It would be fluid that's on top of the dura

21  between the skull in the -- in the cranial cavity, in

22  the skull beneath the skull bones and on top of the

23  dura, which is the thick lining around the brain.

24    Q     Based on your review of the evidence in this

25  case, would you agree that Mr. Nunis had no epidural

52

1    exudates?

2        A    I agree, yes.

3        Q    Based on your review of the evidence in this

4    case, would you agree that Mr. Nunis had no epidural

5    hemorrhages?

6        A    Yes.

7        Q    Is that another way of saying that he had no

8    bleeding or leakage around his spine or brain?

9        A    Well, that -- part of that, but that would be

10   incorporated in -- it's a small area of the brain we're

11   talking about and the spine that there weren't any such

12   hemorrhages there.

13       Q    Okay.  Would you agree that based on the

14   evidence in this case, Mr. Nunis had no subdural

15   hemorrhages?

16       A    Yes.

17       Q    Would you agree that based on the evidence in

18   this case, Mr. Nunis had no subdural exudates?

19       A    Yes.

20       Q    Would you agree that based on your review of

21   the evidence in this case, Mr. Nunis had no subarachnoid

22   hemorrhages?

23       A    Yes.

24       Q    Would you agree that based on your review of

25   the evidence in this case, Mr. Nunis had no subarachnoid

53

1    exudates?

2        A    Yes.

3        Q    So is that another way of saying that -- is

4    that another way of saying that there was no bleeding or

5    leakage around his brain or spinal cord?

6        A    Yes.

7        Q    Do you agree that based on your review of the

8    evidence in this case, there were no parenchymal --

9    which I may be mispronouncing, P-A-R-E-N-C-H-Y-M-A-L.

10   Would you agree there were no parenchymal hemorrhages

11   around Mr. Nunis' brain or in Mr. Nunis' brain?

12       A    Yes.

13       Q    What is a parenchymal hemorrhage?

14       A    It refers to a hemorrhage within the substance

15   of the brain.  Parenchyma for all the organs refers to

16   the substance of the organ, so there's parenchyma in the

17   liver, parenchyma in the brain.  But what you related is

18   there's no hemorrhage around or in the brain.

19       Q    Thank you, sir.

20            What is necrosis?

21       A    Death.

22       Q    Would you agree based on your review of the

23   evidence in this case, there was no necrosis in

24   Mr. Nunis' brain?

25       A    Yeah, there's no necrosis, but there is

                                                          54

1   neuropathologist?

2       A    I did.

3       Q    Would you agree that based on her testimony

4   she has stated that she cannot say what caused any

5   oxygen-related injury to Mr. Nunis' brain?

6       A    Yes, she said there was -- there were

7   oxygen-related injury but she could not say what the

8   cause -- what it was due to, yes.

9       Q    Based on your review of the evidence in this

10  case, would you agree that in terms of blunt force

11  trauma injuries found on Mr. Nunis' body, the blunt

12  force trauma injuries on his head, his torso, his upper

13  extremities, his lower extremities, would you agree that

14  those were all abrasions?

15      MR. DOUGLAS:  Objection.  Calls for speculation, no

16  foundation, incomplete hypothetical.  You can answer.

17      THE WITNESS:  I believe so, yes.

18  BY MR. SAIN:

19      Q    An abrasion is a fancy word for a scrape;

20  right?

21      A    A scrape or in this instance deep scrapes that

22  could be caused -- could be referred to as partial

23  lacerations, too.  But it was scrapes of the skin, yes.

24      Q    A scrape to the skin does not affect a

25  person's breathing; true?

56

1       A     That's correct.

2       Q     What are petechiae?

3       A     We got there.  Petechiae are little

4    hemorrhages due to rupture of capillaries usually seen

5    on the skin, could happen in any organ.  But most

6    commonly seen in the whites of the eye, little tiny

7    blood spots due to capillary rupture.

8       Q     Based on the evidence -- strike that.

9             Based on your review of the evidence in this

10   case, there were no petechiae found in Mr. Nunis' eyes;

11   true?

12      A     Yes.

13      Q     Based on your review of the evidence in case,

14   there were no petechiae found on or around Mr. Nunis'

15   neck; true?

16      A     Yes.

17      Q     Based on your review of the evidence in this

18   case, there were no petechiae found anywhere above the

19   waist line for Mr. Nunis; correct?

20      A     Yes.

21      Q     Based on your review of the evidence in this

22   case, there were no petechiae found anywhere on

23   Mr. Nunis' body; correct?

24      A     Yes.

25      Q     What I said is correct?

                                                      57

1        THE WITNESS:  No.

2   BY MR. SAIN:

3        Q    So if someone were to say to you that a

4   recovering position involves sitting a patient up or

5   laying them on their side or putting them on the back,

6   that's not something you would be able to opine on; is

7   that correct?

8        MR. DOUGLAS:  Misstates testimony.  That misstates

9   testimony, no foundation.  You can answer, Doctor.

10       THE WITNESS:  Again, I am familiar with those

11  positions.  You can call them what you will, but yeah,

12  sometimes a person is put on their sides, sometimes --

13  well, is often suggested in restraint situations.

14  BY MR. SAIN:

15       Q    So if I use the term recovery position, would

16  you agree that police officers are often recommended at

17  some point during a restraint to move a subject into an

18  on-the-side, on-the-back or seated position?

19       A    Yeah -- they are instructed to take them out

20  of the dangerous position, take them out of the prone

21  pressure position.  Anyway you want to do it, stop

22  pressing on his back.

23       Q    Based on your review of the evidence in this

24  case, isn't it true that once Mr. Nunis was in the WRAP

25  device, completely in the WRAP device, he was in a

                                                    62

1    seated position?

2         A    Yes.

3         Q    Based on your review of the paramedic and EMT

4    testimony in this case, are you aware that they have

5    testified that when Mr. Nunis went from breathing

6    normally to stopping breathing, it was an abrupt change?

7         MR. DOUGLAS:  That misstates testimony, no

8    foundation.  But you can answer if you know, Doctor.

9         MR. SAIN:  It really doesn't, but go ahead.

10        MR. DOUGLAS:  Now you're doing the same thing.

11        MR. SAIN:  Counsel.

12        MR. DOUGLAS:  I'm not your child, Counsel, you have

13   your own kid.  Don't treat me like a child.

14        MR. SAIN:  Then stop acting like a child,

15   Mr. Douglas.

16   BY MR. SAIN:

17        Q    So my question stands.  Do you need it read

18   back?

19        A    Could you?  Yes, please.

20        MR. DOUGLAS:  And my objections stand.

21             (The record was read.)

22        THE WITNESS:  Yes.

23   BY MR. SAIN:

24        Q    Is there any evidence that you reviewed to

25   contradict the paramedic and EMT testimony on that fact?

63

1   evidence.  You can answer, Doctor.  Argumentative as

2   well.  You can answer, Doctor.

3       THE WITNESS:  I thought you were talking about

4   another case.  Could you repeat -- the previous

5   question, I thought you referred to another case.

6       MR. DOUGLAS:  He's talking about this case, Doctor.

7   BY MR. SAIN:

8       Q    I'll re-ask both questions for you, Doctor --

9       A    Yes, please.

10      Q    -- because we need to get the answers, though.

11           Are you aware that the Roxie Nunis plaintiffs

12   in this case have also retained as a forensic

13   pathologist, Dr. Bennet Omalu?

14      A    Yes.  That -- that I am familiar with.

15      Q    All right.  Is there any reason that the

16   Roxie Nunis plaintiffs would need to retain a second

17   forensic pathologist if they've already retained you?

18      A    Yes.

19      MR. DOUGLAS:  Again, argumentative.  But you can

20   answer, Doctor.  Same objections.  You can answer,

21   Doctor.

22      THE WITNESS:  Yes, the -- they want to check to see

23   A, if my opinion is supported or not supported on one

24   end, but the other end is Dr. Omalu in addition to being

25   a forensic pathologist is a neuropathologist, forensic

79

 1  neuropathologist and can certainly -- knows more about

 2  the brain than I do.

 3       MR. SAIN:  Fair enough.

 4       MR. DOUGLAS:  Abracadabra.

 5  BY MR. SAIN:

 6       Q   Have you reviewed any of the reports prepared

 7  in this case by Dr. Omalu?

 8       MR. DOUGLAS:  Omalu.

 9       MR. SAIN:  Yeah, I keep saying that wrong, sorry.

10  BY MR. SAIN:

11       Q   Have you reviewed any of the reports prepared

12  in this case by Dr. Omalu?

13       A   Yes.

14       Q   Is there anything in any of Dr. Omalu's

15  reports that you disagree with?

16       A   I -- as I recall, I agree with his -- most of

17  his report.  I think my opinion about conscious pain and

18  suffering doesn't extend out much as Dr. Omalu's does.

19  That -- that little area that I may disagree with him.

20       Q   Okay.  So other than some disagreement about

21  the extent of conscious pain and suffering experienced

22  by doctor -- or excuse me, experienced by Mr. Nunis,

23  would it be fair to say that you have no disagreements

24  with any of the opinions formed by Dr. Omalu in this

25  case?

                                                      80

1      MR. DOUGLAS:  That is vague.  That is ambiguous.

2  That is, without letting him know what each of the

3  opinions are that you are referencing.  That's a

4  harassing and unfair and argumentative gotcha question

5  as well.  That assumes facts not in evidence because

6  he's not sure of which of the opinions you are

7  referencing since you're choosing not to show him the

8  reports.  You can answer, Doctor, if you can.

9      THE WITNESS:  Yeah, I'd have to know what -- what

10  opinions we're talking about.  He has a lot of opinions

11  in his report.  And I'd have to know what -- which

12  opinions we're talking about.

13  BY MR. SAIN:

14      Q    Doctor, just one question ago I asked you if

15  there were any opinions in any of Dr. Omalu's reports

16  that you disagree with and the only one you said that

17  you disagree with was the extent of pain and suffering.

18  That's what you just said a few minutes ago; right?

19      A    That's the only one I remember I said.  I just

20  remembered that one point that -- but I -- he has many

21  opinions.  Some I agree with, some I have no opinion

22  about because he goes into things in more detail than --

23  than my knowledge.  And I would have to go over -- I did

24  not go over his report to -- to draw out every opinion

25  that Dr. Omalu has.  So I just -- I don't know, there

81

NORMAN SCHALL & ASSOCIATES
(800) 734-8838

1  are many opinions in the report.  In general I certainly

2  agree with his cause of death.  The cause of death that

3  he had is the main opinion that I was reviewing.  Other

4  opinions, I'd have to know each opinion that you're

5  concerned with.

6      Q    Would it be accurate to say that as you sit

7  here today, there's no opinion that Dr. Omalu, no

8  medical opinion, no forensic pathology opinion that

9  Dr. Omalu stated in either of his reports other than the

10 extent of conscious pain and suffering that stands out

11 in your mind where you thought when you read it, I don't

12 agree with that?

13     MR. DOUGLAS:  That assumes facts not in evidence,

14 no foundation, incomplete hypothetical, unfair and

15 argumentative question without giving the doctor the

16 benefit of showing him the report to make sure he can

17 refresh his recollection as to what opinions you're

18 referencing.  But you can answer, Doctor.

19     THE WITNESS:  Yeah, I would have to review the one

20 report, you said multiple, plural reports.  If there's

21 more, I read one report and I would have to review it

22 again to answer that question.  I didn't take note of

23 all the -- each and every opinion he has.  He's a

24 professional person, has a right to his opinions and I

25 have to mine.  The one that -- that I remembered was --

                                                        82

1  was the one I mentioned but I would have -- I would have

2  to review Dr. Omalu's report or reports to be able to

3  answer that question properly.

4  BY MR. SAIN:

5      Q    Okay.  You said earlier that you agree that in

6  general when it comes to causation of death, you agree

7  with Dr. Omalu's opinions as stated in his report;

8  correct?

9      A    Well, the one opinion, the cause -- the cause

10  of death, yeah, I agree with.  As I recall with -- he

11  words it a little differently than I would, but with the

12  basic opinion.  As I recall, now I have to -- I would

13  have to even look at that a little more carefully, but

14  the basic opinion that the death was due to Mr. --

15  Mr. Nunis' inability to breathe, I would agree with.

16  Whereas, I'd have to review it to see what -- what

17  additional opinions Dr. Omalu has.

18      Q    Okay.

19      MR. SAIN:  Thank you, Doctor.  I have no further

20  questions.

21      MR. DOUGLAS:  No questions.  A copy, please,

22  Ms. Reporter.

23          Thank you very much.  Thank you, Doctor.

24      MR. SAIN:  Wait.  Mr. Lacey, does Mr. Lacey have

25  any questions?

83

1              Hearing none, we'll take that as a no and we

2    can go off the record.

3

4              (Deposition concluded at 12:03 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

84

1  State of California   )
                        )  SS.
2  County of_____)

3

4           I, Michael Baden, M.D., say I have read the

5  foregoing deposition and declare under penalty of

6  perjury that my answers as indicated are true and

7  correct.

8

9

10 _____
            (DATE)
11

12

13

14                          _____
                                  (SIGNATURE)
15

16

17

18

19

20

21

22

23

24

25

                                                    85

```
 1   State of California      )
                              )  SS.
 2   County of San Bernardino )

 3

 4              I, MELINDA WOMELSDORF, Certified Shorthand

 5   Reporter, License No. 13124, for the State of

 6   California, do hereby certify:

 7              That, prior to being examined, the witness

 8   named in the foregoing deposition, to wit, Michael

 9   Baden, M.D., was by me duly sworn to testify the truth,

10   the whole truth and nothing but the truth;

11              That said deposition was taken down by me

12   in shorthand at the time and place therein named and

13   thereafter reduced to computer-aided transcription under

14   my direction;

15              That the foregoing transcript, as typed, is

16   a true record of the said proceedings.

17              I further certify that I am not interested

18   in the event of the action.

19              Witness my hand this 30th day of January,

20   2023.

21

22

23              _____
                MELINDA WOMELSDORF, CSR. NO. 13124
24

25
```

# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ORAL W. NUNIS, SR. by ) and through, ROXIE A. NUNIS, ) individually and as ) Administratrix of the ESTATE, ) and NAOMI NUNIS, Individually, ) ABIGAIL TABITHA NUNIS, ) Individually, and WILLIE MAE ) KIRKLAND as Guardian ad Litem ) for J.C.N., Kimone Nunis, Oral ) W. Nunis, Andre Nunis and ) Ludecea Nunis, as Successors- ) in-Interest to Decedent Oral ) W. Nunis, ) )       Plaintiffs, ) ) vs. ) ) CITY OF CHULA VISTA, DAVID ) ARCE, BRIAN OLSEN, DAVID ) KREMER, EVAN LINNEY, DAVID ) RIVERS, MANUAL PADILLA, JORDAN ) SALVADOR, KENNETH HICKS and ) DOES 1-90, Inclusive, ) )       Defendants. ) ———————————————————————————) | Case No. 21-cv-1627-AJB-DEB Pages 1-137 |

VIDEOTAPED DEPOSITION OF BENNET OMALU, M.D.

TAKEN ON

FRIDAY, JANUARY 6, 2023

REPORTED BY:
JO DILLINGHAM BREWER, CSR NO. 9707

```
 1                 UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  ESTATE OF ORAL W. NUNIS, SR. by )  Case No. 21-cv-1627-AJB-DEB
    and through, ROXIE A. NUNIS,   )
 5  individually and as            )  Pages 1-137
    Administratrix of the ESTATE,  )
 6  and NAOMI NUNIS, Individually,  )
    ABIGAIL TABITHA NUNIS,         )
 7  Individually, and WILLIE MAE   )
    KIRKLAND as Guardian ad Litem  )
 8  for J.C.N., Kimone Nunis, Oral )
    W. Nunis, Andre Nunis and      )
 9  Ludecea Nunis, as Successors-  )
    in-Interest to Decedent Oral   )
10  W. Nunis,                      )
                                   )
11             Plaintiffs,         )
                                   )
12  vs.                            )
                                   )
13  CITY OF CHULA VISTA, DAVID     )
    ARCE, BRIAN OLSEN, DAVID       )
14  KREMER, EVAN LINNEY, DAVID     )
    RIVERS, MANUAL PADILLA, JORDAN )
15  SALVADOR, KENNETH HICKS and    )
    DOES 1-90, Inclusive,          )
16                                 )
               Defendants.         )
17  _____)

18

19          Videotaped deposition of BENNET OMALU, M.D., taken on

20  behalf of the defendants, at Lewis Brisbois Bisgaard & Smith,

21  2020 W. El Camino Avenue, Suite 700, Sierra Conference Room,

22  Sacramento, California 95833, commencing at 12:07 and

23  recommencing at 1:01 p.m. on Friday, January 6, 2023, before

24  Jo Dillingham Brewer, CSR No. 9707.

25                        ---oOo---
```

2

1    <u>Appearances</u>:

2

3    FOR THE PLAINTIFFS KIMONE NUNIS, individually and as
     Successor-in-Interest to Decedent Oral Nunis; ORAL W. NUNIS, as
4    Successor-in-Interest to Decedent Oral Nunis; ANDRE NUNIS, as
     successor-in-nterest to Decedent, Oral Nunis, and LUDECEA
5    NUNIS, as Successor-in-Interest to Decedent Oral Nunis:

6           THE LAW OFFICES OF JOHN L. BURRIS
            BY:  DEWITT M. LACY, ATTORNEY AT LAW
7           Airport Corporate Centre
            9701 Wilshire Boulevard, Suite 1000
8           Beverly Hills, California 90210
            (310) 601-7070
9           dewitt.lacy@johnburrislaw.com
            julia.quesada@johnburrislaw.com
10

11   FOR THE PLAINTIFFS ESTATE OF ORAL W. NUNIS, SR., by and
     through, ROXIE A. NUNIS, Individually, and as
12   Successor-in-Interest to the ESTATE, and NAOMI NUNIS,
     Individually, ABIGAIL TABITHA NUNIS, Individually, and WILLIE
13   MAE KIRKLAND as Guardian Ad Litem for and J.C.N.:

14          (Appearing via Zoom video conferencing)

15          DOUGLAS / HICKS LAW APC
            BY:   CARL E. DOUGLAS, ATTORNEY AT LAW
16            NOEL ARREOLA, ATTORNEY AT LAW
            5120 W. Goldleaf Circle, Suite 140
17          Los Angeles, California 90056-1661
            (323) 655-6505
18          carl@douglashickslaw.com

19
     FOR THE DEFENDANTS CITY OF CHULA VISTA, EVAN LINNEY, MANUEL
20   PADILLA, DAVID RIVERS, BRIAN OLSON, JORDAN SALVADOR, and
     KENNETH HICKS:
21
            LEWIS BRISBOIS BISGAARD & SMITH LLP
22          BY:  TONY M. SAIN, ATTORNEY AT LAW
            633 West 5th Street, Suite 4000
23          Los Angeles, California 90071
            (213) 250-1800
24          tony.sain@lewisbrisbois.com

25

3

```
 1    APPEARANCES (Continued):

 2

 3    Also present:  Jennifer Chorazyczewski, Videographer

 4                   Julia M. Quesada, Attorney at Law
                     The Law Offices of John L. Burris
 5
                     Jamal McClerkin
 6

 7    Also present: (Appearing via Zoom video conferencing)

 8                   Roxie A. Nunis

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                       I N D E X

 2

 3   Witness

 4

 5   BENNET OMALU, M.D.                              Page

 6           Examination by Mr. Sain                 10

 7

 8

 9                     E X H I B I T S

10

11   Defendants' No.                                 Page

12   1  Notice of Deposition                         8
        (9 pages)
13
     2  Plaintiffs' Rebuttal Expert                  9
14      Designation (11 pages)

15   3  Report dated 9/27/2022; rebuttal             10
        report dated 10/14/2022
16      (61 pages)

17   4  Curriculum Vitae and Bibliography            11
        of Bennet I. Omalu, MD, MBA, MPH,
18      CPE, DABP-AP,CP,FP,NP (87 pages)

19

20                         MARKED QUESTIONS

21                         Page 65, line 9

22                         Page 106, line 1

23                         Page 130, line 16

24                         Page 131, line 5

25                         Page 131, line 9
```

5

1                         I N D E X (Continued)

2
                              MARKED QUESTIONS
3
                           Page 131, line 22
4
                           Page 132, line 7
5
                           Page 132, line 17
6
                           Page 133, line 1
7
                           Page 133, line  12
8

9                             ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1          SACRAMENTO, CALIFORNIA

2          FRIDAY, JANUARY 6, 2023

3               12:07 P.M.

4               ---oOo---

5          THE VIDEOGRAPHER:  Good morning -- or good

6     afternoon.  We're on the video record at 12:07 p.m.

7          I am Jennifer Chorazyczewski from Best Evidence.

8     This is a matter pending before the United States District

9     Court, Southern District of California in the case captioned

10    Estate of Oral W. Nunis, Sr. versus City of Chula Vista; case

11    No. 21-cv-1627-AJB-DEB.

12          This is the beginning of Media No. 1 of the

13    deposition of Bennet Omalu, M.D. on January 6, 2023.  This

14    deposition is being held at 2020 West El Camino Ave. in

15    Sacramento, California.

16          Counsel would you please identify yourselves and

17    who you represent, starting with the questioning attorney?

18          MR. SAIN:  This is Tony Sain on behalf of

19    defendant, noticing party, the City of Chula Vista and the

20    defendant officers.

21          MR. LACY:  DeWitt Lacy appearing on behalf of the

22    Kimone Nunis plaintiffs.

23          Also present, but not appearing, is Julia Quesada.

24          MR. DOUGLAS:  Good afternoon.  Carl Douglas and

25    Noel Arreola on behalf of the Roxie Nunis plaintiffs.

7

1          BENNET OMALU, M.D.,

2        HAVING BEEN PLACED UNDER OATH,

3      WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                  ---oOo---

13:01    5          EXAMINATION BY MR. SAIN

6          MR. SAIN:  Q.  Sir, would you spell your name for

7    the record, please?

8          A.  Bennet Omalu, B-E-N-N-E-T, Omalu, O-M-A-L-U.

9          Q.  Thank you, sir.

13:02    10          As a preliminary matter, I gave you an opportunity

11    off the record to review two reports:  Your report dated

12    September 27th, 2022 and your rebuttal report dated October

13    14th, 2022, which I've collectively marked as Exhibit 3.

14                              (Defendants' Exhibit 3

13:02    15                              marked for identification.)

16          MR. SAIN:  Q.  Are these true and correct copies of

17    the reports that you prepared in this case?

18          A.  Yes.

19          Q.  And do these reports contain all of the opinions

13:02    20    that you have formed to date in this case?

21          A.  Yes.

22          Q.  And I also had the opportunity to show you this

23    document, which we've marked as Exhibit 4.

24          Is that a true and correct copy of your curriculum

13:02    25    vitae, your CV, as it was as of the date provided thereon?

10

1          Q.   Thank you, sir.

2               According to your C- -- strike that.

3               You're familiar with the term "board certified" as

4     it pertains to medicine; is that correct?

13:13   5          A.   Yes.

6          Q.   What does that term mean?

7          A.   Board certification is equivalent to a doctorate

8     degree, a Ph.D., in a subspecialty of medicine.

9          Q.   In order for a physician to become board certified

13:13  10     in some medical specialty, they have to take an exam and be

11     certified by a board of their peers; is that correct?

12          A.   You have to first receive a certified training,

13     become certified as board eligible before you seek for the

14     examination, yes.

13:14  15          Q.   And as far as medical specialties or

16     subspecialties, you are currently board certified in anatomic

17     pathology, clinical pathology, forensic pathology,

18     neuropathology and medical management, slash, physician

19     executive; is that correct?

13:14  20          A.   Yes.

21          Q.   Other than those five I just stated, do you have

22     any other board certifications that in any way pertain to

23     medicine?

24          A.   No, sir.

13:14  25          Q.   And how long have you been board certified in each

20

1          A.   And it's a homicide.  Cardiologists don't provide

2     cause and manner of death in homicide or violent death.  The

3     law does not allow that in the state of California.

4          Q.   So is it your opinion that it would be improper

13:24   5     to -- for a cardiologist to render such an opinion?

6          A.   It is outside the standard of practice.

7          Q.   Okay.  Are you aware that plaintiffs' retained

8     cardiology expert, Dr. Alon Steinberg, has opined on the cause

9     of death in this case?

13:24   10          A.   That is what I'm saying.  He should not be involved

11     in a case like this to opine on cause of death.  It's like me

12     opining on, um -- on how to perform cardiothoracic surgery.

13     And I -- I -- I strongly believe that experts should stay

14     within their jurisdictions of expertise.  It is extremely

13:24   15     arrogant to do otherwise.

16          Q.   Fair enough.

17               Let's switch to some terminology.  These are all

18     things that I believe we've talked about before, but let's put

19     them in this record as well.

13:24   20               "Yes" or "no"?  You agree that in order for a

21     forensic pathologist like you to state a medical or scientific

22     opinion in a case about what has happened, there has to be

23     sufficient evidence to support that opinion by a probability of

24     50 percent or more?

13:25   25               Do you agree with that?

28

1          A.   Generally speaking, yes, sir.

2          Q.   In forensic pathology, the term "homicide" means

3    death at the hands of another or when somebody directly or

4    indirectly contributes to the death of another person.

13:25    5          Do you agree with that?

6          A.   Yes, sir.

7          Q.   In forensic pathology, when a death is classified

8    as a homicide, that does not necessarily mean that the person

9    was murdered.

13:25    10          Do you agree with that?

11          A.   Yes, in moderate legal terminology.   "Homicide" is

12    more a of medical terminology.

13          Q.   Do you agree that the term -- in forensic

14    pathology, the term "anatomic position" is a fictional position

13:25    15    depicting a human being standing on a level plain with their

16    arms down at their sides, palms facing forward?

17          You agree with that; correct?

18          A.   Well, you need to qualify that.   Not just an

19    anatomic position, but a universal anatomic position.

13:26    20          Q.   With that modification, you agree that that is the

21    definition of the term?

22          A.   Yes, sir.

23          Q.   When forensic pathologists such as yourself use the

24    term "universal" or "anatomic position," they're referring to

13:26    25    that reference position for the decedent; they're not referring

                                                                     29

1    to how the decedent was positioned out in the real world;

2    correct?

3         A.   Yes.   It's a reference position, yes.

4         Q.   In general, when forensic pathologists use terms

13:26   5    like upward, downward, leftward, rightward to particularly

6    describe objects that travel into a body or to describe the

7    body's position, they're referring to the standard anatomic

8    position or the universal anatomic position; correct?

9         A.   Yes.

13:26   10         MR. DOUGLAS:  Abracadabra, Ms. Reporter.

11         MR. LACY:  He's just -- he's making a note for the

12    record.  "Abracadabra."  I think she got it.

13         MR. SAIN:  You'll hear that a lot.

14         THE WITNESS:  Come again?

13:27   15         MR. SAIN:  You'll hear that a lot from him.  It

16    doesn't mean anything.  Don't worry.

17         MR. DOUGLAS:  Well, it means a lot to me, sir.  I

18    beg to differ.  It means a lot to me sir.

19         MR. SAIN:  Q.  Doctor, the Merriam Webster medical

13:27   20    dictionary defines the term "prone" to be a person who has the

21    front or ventral surface of the body facing downward, lying

22    with the chest and stomach positioned downward.

23         Do you agree with that?

24         A.   Could I see the definition first before I'll agree

13:27   25    with it?

30

1      Q.   Okay.  And all the same conditions.  There might be

2   occasions where part of the body was facing upward and part was

3   not, but you would still say "supine" or that part of the body

4   was "supine," depending on the circumstances; right?

13:35   5      A.   Yes.

6      Q.   Okay.  Are you familiar with the Safe Restraints

7   WRAP device?

8      A.   I'm not familiar with that in that I've not used

9   it.  I'm not a police officer, but I know it's a restraint

13:35   10  device.

11      Q.   Okay.  So you've never received any specific

12   training on the WRAP device?

13      A.   Not on how to use it, but I've received training on

14   the medical aspects of all forms of restraint devices.

13:36   15      Q.   I'm sorry.  I didn't hear that word you used.

16      A.   I said I've not been trained on how to use it, but

17   I've been trained on the mechanisms of affixation of all forms

18   of restraint devices.

19      Q.   Thank you.  I appreciate the enunciation, sir.

13:36   20          Have you, yourself, ever been placed in a WRAP

21   device?

22      A.   No.

23      Q.   Are you familiar with the spit hood or spit sock?

24      A.   Spit sock.  Not on how to use it, but I know the

13:36   25   medical aspects of the asphyxial mechanisms of a spit sock and

37

1    that, although, as a forensic pathologist, you would like to

2    have the history of the decedent when you're making your

3    determination of cause of death or mechanism of death, it is

4    not necessary to have that history in order for you to do your

13:38    5    job; is that correct?

6         A.   I wouldn't say that.  I would say in the real life

7    practice, you take each case as it is, which I've said always.

8    You take each patient as it is.  If you have a history, good.

9    It will help you to determine the prevailing forensic scenario

13:39    10    but not to determine the cause of death.  If you don't have

11    history, good; you could still determine the cause and manner

12    of death.  And in a good number of cases in forensic pathology,

13    we don't have any history.  A man is found dead by the side of

14    road with trauma to his body.  Nobody knows what happened.  But

13:39    15    as a true forensic pathologist, I could come, analyze the case,

16    apply my thoughts science, and I'll tell you what happened to a

17    reasonable degree medical certainty based on patterns of trauma

18    analysis.

19         Q.   Would you agree that in order to determine the

13:39    20    facts and circumstances that resulted in a cause of death, one

21    of the data points that you would expect the pathologist to

22    evaluate is the data collected from the autopsy exam?

23         A.   Yes, it is.

24         Q.   In terms of the forensic pathological process, one

13:39    25    of the fundamental data points a forensic pathologist uses to

39

1    determine things like cause of death, manner of death, and

2    mechanism of death is the medical evidence collected during the

3    autopsy exam; correct?

4         A.   Yes.

13:40    5         Q.   In your experience, for medical examiners and

6    forensic pathologists who conduct autopsies, 90 percent of the

7    time all of the injuries, wounds, defects or abnormalities that

8    were observed during the autopsy exam are documented either in

9    the autopsy report or in the autopsy photographs; true?

13:40   10         A.   I don't know where the word 90 percent came -- the

11   number 90 percent.  I'm not typically that exact.

12         Q.   You were.

13         A.   I might have said about -- about, or over.  I

14   wouldn't -- I couldn't have said 90 percent, no.

13:40   15         Q.   I'll reask it.

16              In your experience, for medical examiners and

17   medical pathologists who conduct autopsies, over 90 percent of

18   the time, all of the injuries, wounds, defects, or

19   abnormalities that were observed during the autopsy exam are

13:40   20   documented either in the examiner's autopsy report or the

21   autopsy photographs; true?

22         A.   Yes, sir.  You just confirmed what I said.  I

23   couldn't have said 90 percent, no; over 90 percent.  That's

24   more scientific.

13:41   25         Q.   You agree that the more reliable method for a

40

1          A.   I would believe so reasonably, yes, sir.

2          Q.   Okay.  And among those things that you reviewed,

3     that include the deposition of Medical Examiner Stabley;

4     correct?

13:45  5          A.   Yes, sir.

6          Q.   They include the body-worn camera videos from Agent

7     Linney, Officer Padilla, Office Olsen, Officer Rivers, Officer

8     Salvador; correct?

9          A.   Yes.

13:45  10         Q.   They include the deposition testimony from each the

11    officers:  Linney, Padilla, Olsen, River, Salvador; correct?

12         A.   Yes.

13         Q.   That included the deposition testimony from the

14    civilian witnesses:  Kimone Nunis, Barry Studwood, Paramedic

13:45  15    Osorio, Paramedic -- or, excuse me -- EMT Riles; is that

16    correct?

17         A.   Yes.

18         Q.   Is there any evidence that you felt that you needed

19    in order to do your forensic pathology work in this case that

13:46  20    you did not have?

21         A.   Yes, sir.  I did not have tissue slides.  The ones

22    supplied to me by the medical examiner, in my opinion, was

23    inadequate and insufficient.  So I put in a request to,

24    basically, the San Diego Medical Examiner's Office to take

13:46  25    sufficient numbers of samples of tissues in order to better

44

1    that was of any significant forensic consequence that would

2    have undermined my opinion in this case.

3         Q.   Thank you.

4              We're going to round through some obvious

13:48  5    questions, then we're going to take our first break.  Things

6    are moving along very well.

7              You were never at the scene of this incident;

8    correct?

9         A.   Physically, no, sir.

13:48  10        Q.   Okay.  So you never in person personally witnessed

11   any of the acts of Mr. Nunis or any of the involved officers on

12   or about March 13, 2020; correct?

13        A.   I wouldn't say I did not personally witness.  I

14   witnessed it from videographic documentations of the event.

13:48  15             Was I physically present?  No.

16        Q.   My question was, you never in person witnessed any

17   of the acts of Mr. Nunis or any of the involved officers on the

18   incident date of March 13, 2020; correct?

19        A.   At the time of the event, no.

13:48  20        Q.   Have you ever conducted any inspection of the

21   incident location, any site visit?

22        A.   Not of the scene, no, sir.  I have not performed

23   any physical site visit, but I've performed a videographic site

24   visit.

13:49  25        Q.   And my question right now is about in person.

46

1    Okay?

2                  Did you, yourself, ever conduct any in-person

3    physical autopsy exam of Mr. Nunis?

4                  A.   In person, I did a tissue dissection at the San

13:49    5    Diego Medical Examiner's Office.  So an autopsy also includes

6    tissue dissection.  So I, in person, performed tissue

7    dissections at the coroner's office.

8                  Q.   Explain that process to me.

9                  A.   So when you use the word "autopsy," it is a complex

13:49    10   term that involves many parts.  And one of those parts is the

11   actual physical examination and dissection of the tissues of

12   the body.  We call them archival tissues.  And that is the

13   purpose of retaining archival tissues, so that another

14   pathologist like myself can come in and perform a dissection.

13:50    15                  But did I perform the prosection of the body?  No.

16                  Q.   So you examined tissue slides that were taken from

17   Mr. Nunis; is that correct?

18                  A.   No, sir.  In addition to examining tissue slides, I

19   also examined the tissues themselves.

13:50    20                  Q.   Okay.

21                  A.   And took additional sections myself.

22                  Q.   You took sections of tissue from Mr. Nunis' body?

23                  A.   Yes, sir.

24                  Q.   Okay.  So other than taking tissue samples from

13:50    25   Mr. Nunis' body, did you ever perform any in-person autopsy

47

```
        1    exam of his body?

        2          A.   Yes.  I personally examined the tissue histology

        3    slides.

        4          Q.   Not my question.

13:50   5          A.   That's one of the outcomes.  Again, like I said

        6    earlier, the word "autopsy" is very complex.

        7          Q.   My question's a little bit narrower than that.

        8    Please listen to my question.

        9               Other than taking tissue samples from Mr. Nunis'

13:51  10    body and examining those slides, did you perform any in-person

       11    autopsy exam of Mr. Nunis?

       12          A.   No, sir.

       13          Q.   Okay.  What specific tissue samples did you

       14    collect?

13:51  15          A.   All -- all the tissue samples that were available

       16    of all major tissues and organs as listed in my report on

       17    page -- on pages 7 --

       18          Q.   If you would please, just tell me what -- what

       19    tissues or organs or biological samples you collected and/or

13:52  20    examined from Mr. Nunis.

       21          A.   Sections of the brain.

       22          Q.   Okay.

       23          A.   Different parts of the brain, sections of the

       24    heart.

13:52  25          Q.   Okay.
```

48

1    So I'm gonna try it, and if I get it wrong, Doc, you tell me.

2              A.   Can we take a break?  Can we take a break, please?

3              Q.   All right.  First, let me try this real quick,

4    cause if I get it wrong, we're gonna take a break.

13:58    5              So this is what I think, and you tell me if I'm

6    wrong or right.

7              A.   Yes, sir.

8              Q.   Would an accurate summary of the opinions you've

9    stated, you formed in this case, if we boiled it down to the

13:58    10   core issues, it seems to me that there are three:  One, that

11   the cause of death of Oral Nunis was restraint asphyxia,

12   mechanical position asphyxia due to officer restraint in the

13   prone position in the WRAP device and in the spit hood; number

14   two, that the manner of death in this case is homicide; and

13:58    15   number three, that Mr. Nunis suffered conscious pain during his

16   interaction with the police.  If I were boiling down all of

17   these pages, 'cause it's a lot of them, down to the -- really

18   the core of your opinion, would that be a fairly accurate

19   summary?

13:58    20             A.   No, that is inaccurate.  You missed the blunt force

21   trauma.

22             Q.   Okay.

23             A.   And you also missed the type 2 myocardial

24   infarction.

13:58    25             Q.   Okay.

53

1       A.   And you also missed that Mr. Nunis did not die from

2    cardiac arrest and did not die from -- just a minute -- did not

3    die from cardiac arrest, and that the manner of death is a

4    homicide.

13:59   5       Q.   I did say that.   I didn't miss that.

6       A.   Oh, okay.   Okay.

7       Q.   So with those additions that you just said plus

8    what I said, is that a fair summary -- if you want the details,

9    we'll go to the report and we'll ask you questions -- is that a

13:59   10   fair summary with those revisions you just made?

11      A.   I would say yes.

12      Q.   Okay.

13           MR. SAIN:   First time for everything.   Let's take

14   our first break.

13:59   15           MR. LACY:   All right.   Look at that.

16           THE VIDEOGRAPHER:   This is the end of Media No. 2.

17   Off the record at 2:00 p.m.

18                              (Recess taken.)

19           THE VIDEOGRAPHER:   This marks the beginning of

14:14   20   Media No. 3.   The time is 2:14 p.m.

21           MR. SAIN:   Q.   All right.   So, Doctor, I want to go

22   through just some facts that you stated in your report or that

23   you identified as being significant to your opinions.   I just

24   want to make sure I understand those facts.

14:14   25           Based on your review of the evidence, you agree

54

1           At any point in any of the videos that you

2    reviewed, do you recall Mr. Nunis being on his back while

3    talking?

4           A.   As I sit here, again, I did not review the videos

14:17  5    to come for trial.  My major interest was the total duration of

6    cumulative restraint.  There's a scientific index.  I wasn't

7    interested in studying the minutia of what happened in the

8    individual videos.  We can play them to confirm.  I don't know.

9           Q.   Okay.  When you reviewed the body-worn camera

14:18  10   videos, you saw the officers applying the WRAP device to

11   Mr. Nunis; correct?

12          A.   I believe so, yes.

13          Q.   Would you agree that the application of the WRAP

14   device, placing him in the WRAP restraint took about four

14:18  15   minutes?

16          A.   I believe so.

17          Q.   Would you agree that based on the video, once

18   Mr. Nunis was fully in the WRAP device, he was no longer in a

19   prone position, instead he was in a seated position?

14:18  20          Is that correct?

21          A.   I believe so.

22          Q.   Are you familiar with the term "recovery position"?

23          A.   In what context?

24          Q.   When it comes to persons being restrained or

14:19  25   interaction with law enforcement, have you ever heard of that

57

1    that they don't aspirate rather than having them seated up.

2              Is that what you're saying?

3         A.   Yes.

4         Q.   Okay.

14:27  5         A.   No.   Wait, wait.   I will qualify it further.

6              So any human being who is suffering any form of

7    trauma, injury, any form of emergency, you keep them flat.   You

8    make sure the brain is either at the same level with the heart

9    or lower than the heart so that blood -- there is gravitational

14:27  10   pulling of blood from the heart to the brain.   So sitting up

11   Mr. Nunis increased his risk of asphyxial brain injury.

12   Because like I said in my report, many times before you

13   actually suffer an injury, you think of respiration, airways.

14   No.   Asphyxial brain injury is a vascular injury.

14:27  15             And so sitting him up after he had suffered

16   physical compression of his trunk, being pressed down on the

17   ground, and you place him in a WRAP, a physical restraint, and

18   you sit him up, no, no, that is wrong.

19             MR. DOUGLAS:   Abracadabra.

14:28  20             MR. SAIN:   Q.   Let's talk about some of the medical

21   facts in your report.

22             According to the incident date emergency room lab

23   results for Mr. Nunis, they showed him with a hemoglobin of

24   9.4; is that correct?

14:28  25        A.   Yes, sir.

63

1          Q.   Anemia is a condition in which the blood is

2     deficient in red blood cells; is that correct?

3          A.   Yes, sir.

4          Q.   Anemia is a preexisting condition; correct?

14:28   5          A.   What do you mean?  In terms of what?

6          Q.   Someone can't cause you to have anemia; right?  I

7     can't do anything that's going to give you anemia right now;

8     right?

9          A.   No.  A patient who is in a state of traumatic shock

14:29  10     can develop anemia.  That person -- in fact, in the emergency

11     room, many people who have suffered trauma are more likely to

12     have abnormalities of their red blood cells and white blood

13     cells.  Say, again, like I have said repeatedly, we should be

14     very careful of generalizations -- you take each person as they

14:29  15     are.  And one of the causes of lowered red blood cell levels

16     are artifactual.  And that is why you should not base a

17     diagnosis of anemia on just one measurement of the red blood

18     cells, especially in a patient like Mr. Nunis who could have

19     been in some form of traumatic shock.

14:29  20          Q.   Mr. Nunis -- strike that.

21               Mr. Nunis' ER lab results are consistent with him

22     having anemia; correct?

23          A.   I wouldn't -- all you could just say is that he had

24     a low hemoglobin level.  I wouldn't immediately make a

14:30  25     diagnosis of anemia.  You need to work him up further, take a

64

1    the incident date; correct?

2            A.   Yes.

3            Q.   Okay.   And you also found that Mr. Nunis had

4    elevated lactic acid levels at 26, measured at 26; correct?

14:33   5            A.   Yes.   Which is diagnostic of his asphyxial brain

6    injury.  It shows -- all these laboratory indices are

7    confirming that this human being has suffered significant

8    bodily injury.

9            MR. SAIN:  Move to strike everything after "Yes."

14:33  10    I'm just asking about numbers right now, Doc.

11            Q.   What was Mr. Nunis' pH measurement in the ER after

12    the incident with the police?

13            A.   I don't remember.  If I could refer to my report if

14    I may --

14:33  15            Q.   Go ahead.

16            A.   -- find it.

17            MR. LACY:  Could you restate the question, Madam

18    Court Reporter?

19                                    (Record read.)

14:33  20            MR. SAIN:  Thank you.

21            THE WITNESS:  I don't have the absolute value, but

22    I expect his pH to be low because his lactic acid is -- it's

23    high.  Lactic acid is an acid, so in other words, he becomes

24    acidotic.

14:34  25            MR. SAIN:  Q.  So you don't know Mr. Nunis'

67

```
 1                    MR. DOUGLAS:  Story of my life.  Story of my life.
 2                    MR. SAIN:  Q.  According to your report, Mr. Nunis
 3       suffered from hypertension; true?
 4              A.  Yes.
 5              Q.  Hypertension essentially means high blood pressure;
 6       yes?
 7              A.  Yes.
 8              Q.  Based on your review of the evidence in this case,
 9       the first in-person autopsy exam of Mr. Nunis was conducted by
10       Dr. Robert Stabley; correct?
11              A.  Yes.
12              Q.  Except for rib fractures to the sternum, Dr.
13       Stabley -- which Dr. Stabley found to be consistent with CPR
14       resuscitation, Dr. Stabley found no fractures of any bones
15       anywhere on Mr. Nunis' body; true?
16              A.  I believe so.
17              Q.  So, in terms of Mr. Nunis, his neck was never
18       broken; true?
19              A.  No, sir.
20              Q.  What I said is true?
21              A.  Sorry?
22              Q.  So was Mr. Nunis' neck ever broken?
23              A.  And I said, "No, sir."
24              Q.  Okay.  Mr. Nunis had no skull fractures; true?
25              A.  No, sir.
```

14:37

14:38

14:38

14:38

14:38

14:38

72

```
 1          Q.  I have to ask it a different way, because you're

 2  saying -- when I'm saying "true," you're saying "No," that

 3  means, no, it's not true.  So I'll ask it a different way.

 4          A.  No, no.  That is not true.  In Queen's English,

14:38   5  when you ask a question, and if the answer is negative, I said

 6  no.

 7          Q.  Yeah.  But that wasn't the question I asked.  So

 8  I'll reword it, so we don't get confused.

 9              Did Mr. Nunis have any skull fractures?

14:38  10          A.  No.

11          Q.  Thank you.

12              Did Mr. Nunis have any hemorrhages anywhere on his

13  scalp?

14          A.  Uh, no.

14:39  15          Q.  Did Mr. Nunis have any epidural hemorrhages?

16          A.  No.

17          Q.  Did Mr. Nunis have any epidural exudates?

18          A.  No.

19          Q.  What is an exudate?

14:39  20          A.  An exudate is a sign of an infection.

21          Q.  There was no bleeding or leakage around Mr. Nunis'

22  spine; true?

23          A.  I don't think so.

24          Q.  So what I said is true.

14:39  25              Was there any subdural hemorrhages or subdural
```

73

```
 1   exudate for Mr. Nunis?

 2           A.   Just a minute.  You're asking me --

 3           Q.   It's on page 5 of your report, if that helps.

 4           A.   Could you repeat the question again?  Sorry.

 5           Q.   Sure.  If you look at page 5.

 6                Was there any subdural hemorrhage or subdural

 7   exudate for Mr. Nunis?

 8           A.   No.  You asked that.  I said "No."

 9           Q.   Okay.  Was there any subarachnoid hemorrhage or

10   exudate from Mr. Nunis?

11           A.   No.

12           Q.   So if we put that in plain English, that basically

13   means that there was no bleeding or leakage around his brain or

14   spinal cord; correct?

15           A.   No.

16                Again, I say, in Queen's English, when you ask a

17   question and you say "correct" -- go check this out -- if the

18   answer is negative, I should say "no."

19           Q.   So, basically, you're saying that you agree that

20   there was no bleeding or leakage around his brain --

21           A.   Yes.

22           Q.   -- or spinal cord?

23           A.   Yes.

24           Q.   Okay.  According to your report regarding

25   Mr. Nunis' brain, there was no parenchymal hemorrhage and no
```

14:39 (line 5)
14:40 (line 10)
14:40 (line 15)
14:40 (line 20)
14:40 (line 25)

74

1   necrosis; is that correct?

2          A.   It's correct.   Let me change my answer.

3          Q.   Okay.   So the autopsy revealed that there was no

4   bleeding in Mr. Nunis' brain; correct?

14:40   5          A.   There was no bleeding in his brain, yes.

6          Q.   Okay.   And you conducted your own exam of

7   Mr. Nunis' brain tissues; correct?

8          A.   Yes.

9          Q.   And your own brain tissue exam found that there

14:41  10   were no hemorrhages or brain damage; correct?

11          A.   No, sir.

12          Q.   What I said is correct?

13          A.   Yes.

14          Q.   Okay.

14:41  15          A.   What you said is correct.

16          Q.   Your own findings showed that there was nothing

17   abnormal in Mr. Nunis' brain; true?

18          A.   I wouldn't use the word "nothing abnormal," no.

19   His brain revealed abnormalities.

14:41  20          Q.   But there was no damage?

21          A.   Abnormalities are damage.   Asphyxial brain injury

22   is damage.   He suffered cerebral damage.

23          Q.   Did you find any excitotic [sic] injuries in

24   Mr. Nunis' brain?

14:41  25          A.   Yes.

75

```
 1              MR. LACY:  You get to finish your answer, Dr.
 2      Omalu.  Please.
 3              THE WITNESS:  Can you repeat your question?  Did
 4      she use the phrase "excitotoxic"?
 5              MR. SAIN:  Q.  Did she ever use the phrase
 6      "excitotoxic injury" in her report, the neuropathologist who
 7      performed the exam that you were citing to?
 8              A.  The phrase or the word?
 9              Q.  Yes.
10              A.  No.  Nobody would.
11              Q.  In your report, in terms of the blunt force trauma
12      injuries found on Mr. Nunis' head, torso upper extremities and
13      lower extremities, those were all abrasions; true?
14              A.  I believe so.  Yes, sir.
15              Q.  An abrasion is a scrape; yes?
16              A.  I don't know.  I don't use -- an abrasion, as a
17      physician, is an abrasion.  It's a manifestation of blunt force
18      trauma.  I don't know what a scrape or a scratch is.  Abrasions
19      are contusions and lacerations.
20              Q.  You don't know what a scrape or a scratch is?
21              A.  I try to stay away from words that are not
22      scientific terminology.  An abrasion is an abrasion.
23              Q.  You understand that a jury will probably have zero
24      doctors or scientists on it; right?
25              MR. LACY:  Objection.  Argumentative.
```

81

```
 1   capillaries with just one layer of cells in their walls, they
 2   rupture easily.  So they -- when they rupture, because of the
 3   small sizes, they form pinpoint hemorrhages, which are called
 4   petechial hemorrhages.  It could be on the skin; it could be on
14:58  5   any tissue.  It could be on the eyes.  It could be in the
 6   brain.  It could be anywhere.
 7        Q.   Based on his autopsy exam, Dr. Stabley found no
 8   petechiae anywhere on Mr. Nunis' body; true?
 9        A.   Yes.  No petechiae, yes.  You don't expect to find
14:58  10   petechiae.
11        Q.   So there was no petechiae in his eyes; true?
12        A.   Yes, sir.
13        Q.   No petechiae in his neck; true?
14        A.   Yes, sir.
14:58  15        Q.   There were no conjunctival petechial hemorrhages
16   for Mr. Nunis; correct?
17        A.   No, sir.
18        Q.   What I said is correct?
19        A.   Sorry?
14:59  20        Q.   What I said is correct?
21        A.   Oh, I will go back to the --
22        Q.   Were there any --
23        A.   -- Queen's English.
24        Q.   -- were there any conjunctival petechial
14:59  25   hemorrhages for Mr. Nunis?
```

86

1              MR. SAIN:  I have no further questions.

2              MR. DOUGLAS:  No questions.

3              According to Code.  I'd like a copy, please.

4              THE REPORTER:  Thank you.

16:09   5      MR. LACY:  Same for us.

6              THE VIDEOGRAPHER:  This concludes today's

7    deposition of Dr. Bennet Omalu on January 6th, 2023.  We are

8    off the record at 4:10 p.m.

9              (Whereupon, the proceedings adjourned at 4:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

```
1                        DECLARATION

2          I hereby declare that I am the deponent in the within

3    entitled matter; that I have read the foregoing deposition and

4    know the contents thereof, and I declare that the same is true

5    of my knowledge.

6          I declare under the penalties of perjury of the State of

7    California that the foregoing is true and correct.

8          Executed on the____day of_____,

9    in the year_____, at_____.

10

11

12

13

14

15

16

17

18

19

20                              _____

21                              BENNET OMALU, M.D.

22

23

24

25
```

136

1                    REPORTER'S CERTIFICATE

2

3         I, Jo Dillingham Brewer, a Certified Shorthand

4    Reporter for the State of California, do hereby certify;

5         That prior to being examined, BENNET OMALU, M.D., the

6    witness named in the foregoing deposition, was placed under

7    oath to tell the truth, the whole truth and nothing but the

8    truth pursuant to Section No. 2094 of the Code of Civil

9    Procedure;

10        That said deposition was taken before me pursuant to

11   notice, at the time and place therein set forth, and was taken

12   down by me stenographically and thereafter transcribed;

13        I further certify that I am neither counsel for, nor

14   related to, any party to said action, nor in anyway interested

15   in the outcome thereof.

16        In witness whereof, I have hereunto subscribed my

17   name this 11th day of January 2023.

18

19

20

21   _____
     JO DILLINGHAM BREWER
22   CSR NO. 9707

23

24

25

137

NORMAN SCHALL & ASSOCIATES
(800) 734-8838

# EXHIBIT E

# Estate of Oral W. Nunis, Sr., et al. v. City of Chula Vista, et al.

## William Harmening
## November 14, 2022

All depositions & exhibits are available for downloading at
<www.brookscourtreporting.com>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

                    IN THE UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF CALIFORNIA

     ESTATE OF ORAL W. NUNIS, SR., by)
     and through, ROXIE A. NUNIS,    )
     Individually, and Administratrix)
     of the ESTATE; and NAOMI NUNIS, )
     Individually; and WILLIE MAE    )
     KIRKLAND, as Guardian ad Litem   )
     for J.C.N., Kimone Nunis, Oral  )
     W. Nunis, Andre Nunis, and      )
     Ludecea Nunis, as Successors-in-)
     Interest to Decedent, Oral W.   )
     Nunis,                          )
             Plaintiffs,             )
                                     )
     vs.                             )21-CV-1627AJBDEB
                                     )
     CITY OF CHULA VISTA; DAVID      )
     ARCE, BRIAN OLSEN, DAVID KREMER,)
     EVAN LINNEY, DAVID RIVERS,      )
     MANUAL PADILLA, JORDAN SALVADOR,)
     KENNETH HICKS, and DOES 1-90,   )
     Inclusive,                      )
             Defendants.             )
     -------------------------------------------------------

               Deposition of William M. Harmening

                     November 14, 2022

     -------------------------------------------------------




               Reported by:  Linda A. Wells, LCR, CCR

William Harmening 11/14/2022

```
 1                    I N D E X                        Page
 2   Direct Examination by Mr. Sain . . . . . . . . . .   5
     Cross Examination by Mr. Douglas . . . . . . . . 259
 3   Redirect Examination by Mr. Sain . . . . . . . . 281
 4                  E X H I B I T S
 5   No.  1 - Notice of Depo/Request for Production . .   6
     No.  2 - Plf's witness designation . . . . . . . .   6
 6   No.  3 - Report dated 9/29/2022. . . . . . . . .     7
     No.  4 - Curriculum Vitae. . . . . . . . . . . .     7
 7   No. 5A - Updated Curriculum Vitae. . . . . . . . 168
     No. 5B - Wrap manual . . . . . . . . . . . . . . 169
 8   No. 5C - POST Learning Domain 37 . . . . . . . . 169
     No. 5D - POST Learning Domain 33 . . . . . . . . 169
 9   No. 5E - Article by Reay . . . . . . . . . . . . 169
     No. 5F - Article by Morrison & Sadler. . . . . . 170
10   No. 5G - Article by Williams . . . . . . . . . . 170
     No. 5H - Invoice . . . . . . . . . . . . . . . . 170
11   No. 5I - Expert Report . . . . . . . . . . . . . 170
     No.  6 - Photograph. . . . . . . . . . . . . . . 183
12   No.  7 - Photograph. . . . . . . . . . . . . . . 191
     No.  8 - Photograph. . . . . . . . . . . . . . . 201
13   No.  9 - Photograph. . . . . . . . . . . . . . . 208
     No. 10 - Photograph. . . . . . . . . . . . . . . 216
14   No. 11 - Photograph. . . . . . . . . . . . . . . 239
15
16
17
18
19
20
21
22
23
24
25
```

William Harmening 11/14/2022

```
 1    APPEARANCES:
        FOR THE PLAINTIFFS (via Zoom):
 2          Hon. Carl E. Douglas
            Attorney at Law
 3
            Hon. Julia N. Quesada
 4          Attorney at Law
 5    FOR THE DEFENDANTS:
            Hon. Tony M. Sain
 6          Attorney at Law
 7    ALSO PRESENT (via Zoom):
            Ms. Roxie Nunis
 8          Ms. Noel Arreola
            Ms. Lena Andrews
 9          "Cameron's iPhone"
            Schall Court Reporters
10
      --------------------------------------------------------
11
12          The deposition of William M. Harmening, a
13    witness called at the instance of the Defendants
14    pursuant to the Federal Rules of Civil Procedure,
15    taken by Agreement on November 11, 2022, beginning at
16    approximately 12 o'clock p.m. CDT, in the offices
17    located at Lewis Brisbois Bisgaard & Smith, LLP,
18    3102 West End Avenue, Suite 400, Nashville, Tennessee
19    37203 before Linda A. Wells, Notary Public, pursuant
20    to the stipulation of counsel.
21
22
23
24
25
```

William Harmening 11/14/2022

```
 1
 2                    S T I P U L A T I O N
 3
 4              It is agreed that Linda A. Wells, Notary
 5    Public and Licensed and Certified Court Reporter, may
 6    swear the witness, take the deposition on the
 7    Stenograph Shorthand Machine and afterwards reduce the
 8    same typewritten when the deposition may be used on
 9    the hearing of the above-entitled cause.  All
10    objections, except as to the form of the questions,
11    are reserved to on or before the hearing.
12              It is further agreed that all formalities
13    as to notice, caption, certificate, filing,
14    transmission, et cetera, including the reading of the
15    completed deposition by the witness, are waived.
16              (All proper names, unless furnished by
17    Counsel to this Reporter, represent the best phonetic
18    approximation of the name.)
19    -------------------------------------------------------
20
21
22
23
24
25
```

William Harmening 11/14/2022

```
 1                    *   *   *
 2                 WILLIAM M. HARMENING,
 3   was called as a witness, having been previously sworn,
 4   and testified as follows:
 5
 6                  DIRECT EXAMINATION
 7   QUESTIONS BY MR. SAIN:
 8            Q.   Good morning, sir.  Would you please
 9   state and spell your full name for the record?
10            A.   My name is William Harmening.  It's
11   H-A-R-M-E-N-I-N-G.
12            MR. DOUGLAS:  Mr. Sain, excuse me.
13   For the record, this is Carl Douglas from
14   Douglas/Hicks Law.  Also on is Noel Arreola and
15   Roxie Nunis on behalf of the Plaintiffs.  We are in
16   Los Angeles.  We are also in Antica, California.
17   Thank you.
18            MR. SAIN:  Actually, I was about to
19   take appearances, counsel, but thank you for jumping
20   the gun.
21            All right.  Would all people please state
22   their appearances on the record?
23            MS. QUESADA:  Julia Quesada for
24   Kimone Nunis, Plaintiffs.
25
```

William Harmening 11/14/2022

```
 1                    Q.   Would you agree that just because two
 2   different officers or two different witnesses have
 3   different recollections of certain incident details,
 4   that does not automatically mean that one of those
 5   witnesses is lying?
 6                    MR. DOUGLAS:  Objection.  That calls
 7   for speculation.  No foundation and that is an
 8   incomplete hypothetical.
 9                    THE WITNESS:  Certainly, it's a
10   subject I have taught.  I would agree that they can
11   have different perceptions of the same incident, yes.
12   BY MR. SAIN:
13                    Q.   Would you agree that it's possible for
14   one officer or witness to see one set of facts that
15   another officer or witness at that same scene does not
16   perceive?
17                    MR. DOUGLAS:  Same objection.  And
18   anything is possible so it's argumentative on that
19   level, and it calls for an incomplete hypothetical but
20   you can answer if you understand the question.
21                    THE WITNESS:  Yeah.  It's -- I agree
22   that's a broad question.  Anything is possible with
23   human perception, yes.
24   BY MR. SAIN:
25                    Q.   As an expert witness in this case, is
```

William Harmening 11/14/2022

1    it your job to determine which witness' version of

2    events is more credible?

3                    A.    No.

4                    Q.    Would you agree that determining the

5    facts of the case is a function that is clearly within

6    the purview of the jury here?

7                    MR. DOUGLAS:  That may call for a

8    legal conclusion.  Beyond the scope of his designation

9    or expertise.  No foundation.  Calls for speculation

10   and that is also an incomplete hypothetical.

11                   THE WITNESS:  Yeah.  And I honestly

12   don't know the answer to that question.

13                   MR. SAIN:  That's a fair answer, sir.

14   BY MR. SAIN:

15                   Q.    So since determining which witnesses'

16   versions of events is more credible is not part of

17   your job, any opinions you might have on witness

18   credibility would be irrelevant, correct?

19                   MR. DOUGLAS:  That's argumentative.

20   That's the province of a judge.  Beyond the scope of

21   his expertise.  Beyond the scope of his training.

22   Beyond his qualifications.  That's beyond the scope of

23   his designation.

24                   That question is clearly argumentative, and

25   there's no foundation for him to provide an answer

William Harmening 11/14/2022

```
 1              A.   No.

 2              Q.   You never reviewed the deposition

 3    testimony of Officer Rivers?

 4              A.   No.

 5              Q.   You never reviewed the deposition

 6    testimony of Officer Salvador?

 7              A.   No.

 8              Q.   Okay.

 9                   MR. DOUGLAS:  Need a break, please.

10                   MR. SAIN:  Counsel, it's only been

11    about 15 minutes.

12                   MR. DOUGLAS:  I'd like to take a

13    break, please.

14                   MR. SAIN:  That's really unreasonable,

15    but we'll take a break.  Five minutes.

16                   MR. DOUGLAS:  I'd like eight, please.

17                   MR. SAIN:  Fine, counsel, but then

18    we're powering through.  Let's go off the record.

19                   (Short break.)

20    BY MR. SAIN:

21              Q.   Turning back to the list of materials

22    that you reviewed on page 7, it says:  All body-cam

23    footage from officers on-scene, including Linney and

24    Padilla; is that correct?

25              A.   Yes.
```

William Harmening 11/14/2022

```
 1    that retained you with an incomplete picture,

 2    incomplete account of the evidence in this case, is it

 3    your testimony that that would not affect the

 4    reliability of the opinions you've formed?

 5              A.    In this case, that is -- that is my

 6    opinion.  It would not affect me.

 7              Q.    Were you present at the scene of the

 8    incident on the incident date of March 13th, 2020?

 9              A.    No.

10              Q.    Would it be accurate to say that when

11    it comes to the incident of March 13th, 2020 involving

12    Mr. Oral Nunis and officers of the Chula Vista Police

13    Department, would it be accurate to say that you were

14    never a contemporaneous incident witness to those

15    events?

16              A.    Correct.

17              Q.    Have you ever done any site inspection

18    or in-person visit to the Kimone Nunis house in

19    Chula Vista, the scene of the incident?

20              A.    No.

21              Q.    Have you, yourself, ever done any

22    in-person physical or autopsy examination of Mr. Oral

23    Nunis, Sr.'s body?

24              A.    No.

25
```

William Harmening 11/14/2022

```
 1                  Q.   Would it be accurate to say that none
 2   of the opinions that you've formed in this case rest
 3   on any examination of Mr. Nunis that you, yourself,
 4   conducted?
 5                  A.   (Respite.)
 6                  Q.   Is that accurate?
 7                  A.   (Respite.)  Examination of Mr. Nunis,
 8   only what's present on video.  Not any personal
 9   examination I did of -- of his body, no.  That is
10   correct.
11                  Q.   Okay.  Did you ever in person -- so
12   we're just talking about you, in person, physically
13   inspecting stuff.  Did you ever conduct any in-person
14   inspection of any biological or physical evidence such
15   as any restraint devices, handcuffs, Wraps, spit
16   socks, anything like that?
17                  A.   No.
18                  Q.   You never examined any -- strike that.
19                  You never examined, in person, any
20   biological specimen such as tissue slides, blood
21   specimens, DNA, anything like that?
22                  A.   No.
23                  Q.   For any of the opinions that you've
24   formed in this case, do any of them rely upon any
25   direct scientific testing or in-person scientific
```

William Harmening 11/14/2022

```
 1              But, Mr. Harmening, you may answer if you
 2    understand the question.
 3                    THE WITNESS:  No.  That's -- that
 4    would not be my position.  Should I go through each of
 5    those?
 6                    MR. SAIN:  Sure.
 7    BY MR. SAIN:
 8         Q.    Why don't you please, for the record,
 9    state all the opinions you've formed in connection
10    with this case as it pertains to Mr. Nunis --
11         A.    Okay.
12         Q.    -- or the law enforcement officers.
13         A.    Okay.
14                    MR. DOUGLAS:  Wait a minute.  Wait a
15    minute.  Again, that's another compound question, but
16    you can now answer that question, breaking it down as
17    vague, ambiguous.  Calls for speculation, and it is
18    also an incomplete hypothetical, but you can answer.
19                    THE WITNESS:  Opinion number one is
20    regarding Linney's use of the handcuffs, initially.  I
21    don't call that excessive force.  I call it
22    inappropriate force, given the nature of the call, and
23    given his CIT training; given what we know about
24    mental illness.  The use -- or the display of the
25    handcuffs and the putting on of hands only exacerbated
```

William Harmening 11/14/2022

```
 1    the situation and escalated him.  That's my opinion.
 2    Not that it's excessive.  It's -- I view those as two
 3    completely different things:  Excessive versus
 4    inappropriate.
 5              Opinion number two, the cuffing at the top
 6    of the stairs, I don't offer an opinion on that 'cause
 7    I have no idea what happened at the top of the stairs.
 8    I then jumped to the handcuffing process on the
 9    pavement.
10              So opinion number one:  Inappropriate use
11    of the handcuffs, initially.
12              Opinion number two:  Inappropriate use of
13    physical force, pinning Mr. Nunis to the ground after
14    a struggle.
15              Given what we know about mental illness,
16    given what we know about what police officers know
17    about what we call excited delirium, sudden-death
18    syndrome, I believe the weight of those officers
19    pinning him to the ground, yes, that was excessive.
20              Opinion number three:  I believe the Wrap
21    was entirely inappropriate to use in this situation.
22    I believe -- my opinion is all it did was prolong
23    medical treatment by about four minutes.  I don't
24    believe they even knew how to properly put the thing
25    on quickly, so that was inappropriate.
```

William Harmening 11/14/2022

```
 1                    The spit mask, I believe, was
 2     inappropriate.
 3                    And then I think I had one more opinion.  I
 4     want to look at my report here.  (Reviews documents.)
 5                    MR. DOUGLAS:  Abracadabra.
 6                    THE WITNESS:  No.  That's -- that's
 7     it.
 8                    So my three opinions are:  It was entirely
 9     inappropriate for Linney to pull out his handcuffs and
10     grab Mr. Nunis by the arm, given what he knew at that
11     time and given his training.
12                    It was inappropriate -- number two, it was
13     inappropriate for the officers to pin him to the
14     pavement in their efforts to handcuff him without
15     trying to deescalate the situation; given what they
16     know about mental illness, excited delirium,
17     sudden-death syndrome, and after a prolonged struggle.
18                    And then, number three, I believe it was
19     entirely inappropriate to use the Wrap at a time when
20     he was not resisting.  There was no need to do it.
21     They were going to put him on a gurney with soft
22     restraints.  The only thing the Wrap did, I believe,
23     was, again, prolong medical attention for at least
24     four minutes.
25
```

William Harmening 11/14/2022

1              And the spit hood, I believe that was

2    inappropriate.

3              Aside from the fact that it's seriously

4    dehumanizing, the other problem with the spit hood, as

5    I've seen many times with mental illness, can lead --

6    and I'm not offering a medical opinion, but I know

7    that it can lead to a claustrophobic-type feeling,

8    anxiety, shallow and rapid breathing, and

9    hyperventilation.

10             The spit mask can be seriously dangerous, I

11   believe, when it's -- along with the Wrap when it's

12   combined with things like mental illness and age, so

13   those are my three opinions.

14                  MR. DOUGLAS:  Abracadabra.

15                  THE WITNESS:  I include the spit mask

16   with the Wrap.

17   BY MR. SAIN:

18        Q.   Other than what's stated here on the

19   record, have you formed any other opinions in

20   connection with this case?

21        A.   (Respite.)  No, I believe those are my

22   three.  I just want to verify.

23        Q.   Sure.

24        A.   (Reviews documents.)  No, that's it.

25

William Harmening 11/14/2022

```
 1              A.    Okay.
 2              Q.    Next question:  Under standard police
 3    practices, are you familiar with the phrase "active
 4    resistance?"
 5              A.    Yes.
 6              Q.    Would you agree that active resistance
 7    is defined under standard police practices as
 8    physically evasive movements to defeat an officer's
 9    attempt at control, including bracing, tensing,
10    running away, or verbally signaling an intention to
11    avoid or prevent being taken into custody or being
12    retained in custody?
13                    MR. DOUGLAS:  Objection.  Compound.
14                    THE WITNESS:  That is one of those
15    issues that will vary across the country, and there's
16    a lot of variance in how jurisdictions define active
17    resistance.  I believe that is the definition used by
18    California P.O.S.T., the definition you just gave.
19                    In many other jurisdictions, they call that
20    passive resistance.  California separates it between
21    active and assaultive resistance.
22                    Many jurisdictions just include all of that
23    as active, but I agree with you that is the California
24    P.O.S.T. definition.
25                    MR. SAIN:  Thank you.
```

William Harmening 11/14/2022

```
 1                    THE WITNESS:  Well, it's a very broad
 2   question.  I would not agree with -- with that.  An
 3   example being, the California definition of active
 4   resistance would include someone, again, who is just
 5   bracing or refusing to give their arms to be
 6   handcuffed.  You cannot use a taser in that situation
 7   for compliance.
 8             So I -- it's going to get into a legal
 9   conclusion, but there is some inconsistency between
10   cases that I'm aware of, 9th Circuit cases that I'm
11   aware of, that define when a taser can be used and
12   California P.O.S.T. when they say you can use...
13             I'm not sure if they even say you can use
14   it.  They will talk about intermediate force but
15   that's a broad question that I'm not sure I can answer
16   succinctly.
17                    MR. SAIN:  Fair enough.
18                    THE WITNESS:  Yeah.
19   BY MR. SAIN:
20        Q.   Are you familiar with the term
21   "personal weapons?"
22        A.   Yes.
23        Q.   In standard police practices in
24   California, would you agree that the term "personal
25   weapons" refers to the officer's hands and feet?
```

William Harmening 11/14/2022

```
 1              A.    Yes.
 2              Q.    So, for example, in California the use
 3    of the term "personal weapons" includes things like an
 4    officer punching or delivering empty-handed strikes
 5    against a subject; is that correct?
 6              A.    It includes that, yes.
 7              Q.    In California standard police
 8    practices when police practices refer to devices to
 9    secure compliance, they are referring to devices that
10    are designed to cause pain compliance such as the
11    baton, pepper spray, or taser; is that correct?
12                    MR. DOUGLAS:  Objection.  Compound.
13    Calls for speculation.  No foundation.  Beyond the
14    scope.  Beyond the scope of his expertise, but you can
15    answer if you understand the question, sir.
16                    THE WITNESS:  Well, again, that's --
17    that's a big area of inconsistency in California.  I
18    would not agree with that with regard to the taser.
19              I don't -- I don't agree that a taser can
20    be used for mere compliance with a passively resistant
21    individual, or even an actively resistant individual,
22    as California defines it, unless they are assaulting
23    the officer or there is a threat to the officer.
24                    MR. SAIN:  Okay.
25
```

William Harmening 11/14/2022

```
 1    and it's an incomplete hypothetical, as well.
 2                    THE WITNESS:  I agree with that, but I
 3    would also suggest that that and restraint can be one
 4    in the same thing in some cases.
 5    BY MR. SAIN:
 6                    Q.   In terms of the term "assaultive" in
 7    California, are you familiar with the California
 8    definition for assaultive under standard police
 9    practices?
10                    A.   Yes.
11                    Q.   Would you agree then in California
12    under police practices, the term assaultive is defined
13    as someone who is being aggressive or combative,
14    someone who is attempting to assault the officer or
15    another person, or is threatening to assault the
16    officer or another person?
17                    A.   Yes.
18                    Q.   Under standard police practices in
19    California, would assaultive behavior include when a
20    subject punches at or strikes an officer with his
21    hands or tries to do so?
22                    A.   Yes.
23                    Q.   Under standard police practices, would
24    assaultive behavior include when a subject kicks at or
25    stomps an officer with the subject's feet or tries to
```

William Harmening 11/14/2022

```
 1    do so?
 2              A.    Yes.
 3              Q.    Under standard police practices in
 4    California, would assaultive behavior include when a
 5    subject head butts an officer or tries to do so?
 6              A.    Yes.
 7              Q.    Under standard police practices, would
 8    assaultive behavior include when a subject grapples
 9    with, bear hugs, or headlocks an officer or tries to
10    do so?
11                    MR. DOUGLAS:  Objection.  Compound.
12    You can answer the question.
13                    Incomplete hypothetical, but you can answer
14    the question.
15                    THE WITNESS:  Yes.
16    BY MR. SAIN:
17              Q.    Under standard police practices in
18    California, would assaultive behavior include when a
19    subject points a weapon like a knife or a gun at an
20    officer or tries to do so?
21              A.    (Respite.)  Yes.
22              Q.    In terms of the California general
23    standards for police practices, would you agree that,
24    in general, when it is objectively reasonable under
25    the totality of the circumstances to do so, the
```

William Harmening 11/14/2022

 1  appropriate force for an officer to address a

 2  subject's assaultive behavior includes, number one,

 3  use of devices and/or techniques to secure compliance

 4  and ultimately gain control of the subject; and,

 5  number two, use of personal body weapons in

 6  self-defense and to gain advantage over the subject?

 7            MR. DOUGLAS:  Objection.  Compound.

 8            MR. SAIN:  Is that the training?

 9            MR. DOUGLAS:  You can answer.

10  BY MR. SAIN:

11        Q.   Is that the training California

12  officers receive in terms of when it's appropriate to

13  use force against an assaultive subject?

14        A.   Yes.

15            MR. DOUGLAS:  Objection.  Compound.

16  Objection.  Compound.  You can answer.

17            THE WITNESS:  Yes.

18  BY MR. SAIN:

19        Q.   Under standard --

20            MR. DOUGLAS:  Let me object, sir.

21  BY MR. SAIN:

22        Q.   Under standard police practices in

23  California, the phrase "personal weapons" and

24  "personal body weapons" are essentially the same

25  thing, correct?

William Harmening 11/14/2022

```
 1              A.    Yes.
 2              Q.    Under standard police practices in
 3    California, the term "life threatening" is defined as
 4    any action that is likely to result in serious injury
 5    or death to the officer or another person; is that
 6    correct?
 7              A.    Yes.
 8              Q.    Under standard police practices in
 9    California in the context of life-threatening
10    situations, the term "serious injury" refers to an
11    injury likely to lead to death or likely to lead to
12    the permanent loss or permanent impairment of a bodily
13    member or organ; is that correct?
14                    MR. DOUGLAS:  That may call for a
15    legal conclusion.  Vague.  Ambiguous.  Incomplete
16    hypothetical and compound, but you can answer.
17                    THE WITNESS:  Yeah.  I honestly -- I
18    honestly don't know.  I think that's defined by the
19    Courts.  I don't know what the answer is.
20                    MR. DOUGLAS:  Abracadabra.
21    BY MR. SAIN:
22              Q.    According to your understanding of
23    standard police practices in California, would someone
24    receiving a scrape or abrasion be considered to be
25    someone who is receiving a life-threatening serious
```

William Harmening 11/14/2022

```
 1    injury?
 2                    MR. DOUGLAS:  That assumes facts not
 3    in evidence.  That is vague.  That is ambiguous.  That
 4    is compound and that is an incomplete hypothetical.
 5    You can answer.
 6                    THE WITNESS:  Yeah, it could be.
 7    Could maybe not be.  I'd have to know the other
 8    circumstances, how they got the abrasion or the -- or
 9    the scrape.
10                    MR. SAIN:  Sure.  Let me rephrase.
11    BY MR. SAIN:
12           Q.   In terms -- we're just trying to
13    figure out what the terms mean right now, so we're
14    just doing definitions.
15           A.   Okay.
16           Q.   Do you understand that?
17           A.   Yes.
18           Q.   Okay.  So right now I'm asking you
19    questions about terminology from California standard
20    police practices.
21                    What I'm trying to understand right now in
22    this question is, in terms of a life-threatening
23    injury or life-threatening serious injury, by itself,
24    is a scrape or abrasion considered to be a
25    life-threatening serious injury under California
```

William Harmening 11/14/2022

```
 1    standard police practices?
 2              A.    No.
 3              MR. DOUGLAS:  Spec -- wait.  No
 4    foundation.  Calls for speculation, but you can
 5    answer.
 6              THE WITNESS:  No.
 7              MR. SAIN:  Okay.
 8    BY MR. SAIN:
 9         Q.   The same question:  By itself in
10    California standard police practices, is a bruise or
11    contusion considered to be a life-threatening serious
12    injury?
13              MR. DOUGLAS:  Vague.  Ambiguous and
14    incomplete hypothetical, as it may be on the head as
15    opposed to the knee.
16              Beyond the scope.  You can answer if you
17    understand the question.
18              THE WITNESS:  I mean, I was going to
19    answer the same way.  It could be a bruise on the
20    heart, even.  I...
21              MR. DOUGLAS:  Right.
22              THE WITNESS:  I'm not sure how to
23    answer that.
24    BY MR. SAIN:
25         Q.   So you don't know --
```

William Harmening 11/14/2022

```
 1                    MR. SAIN:  Okay.

 2                    MR. DOUGLAS:  Abracadabra.

 3    BY MR. SAIN:

 4              Q.   Would you agree that in terms of

 5    California police standard practices if it appeared

 6    likely that someone was about to be stabbed or shot or

 7    have their head bashed in, or lose an arm or a leg or

 8    an eye, generally, officers are trained that that

 9    would be considered a life-threatening serious injury,

10    correct?

11                    MR. DOUGLAS:  Wait.  Objection.

12    That's vague.  It's ambiguous and it's compound, and

13    it's an incomplete hypothetical but -- is

14    argumentative, but I get the point.

15              You can answer the question if you

16    understand the question.

17                    THE WITNESS:  Generally, yes.

18                    MR. SAIN:  Thank you.

19    BY MR. SAIN:

20              Q.   In California under California

21    standard police practices, deadly force is essentially

22    the same thing as life-threatening force, correct?

23                    MR. DOUGLAS:  Vague.  Ambiguous.

24    Compound.  No foundation.  You can answer.

25
```

William Harmening 11/14/2022

```
 1                    THE WITNESS:  I don't know the term
 2    life-threatening force.  I know deadly force, lethal
 3    force, and a life-threatening -- well, I don't know
 4    that force is defined with those terms.
 5                    I guess generally I agree they're the same
 6    thing, yes.
 7                    MR. SAIN:  Okay.
 8    BY MR. SAIN:
 9                    Q.  According to how officers are trained
10    in California standard police practices, in general,
11    when it is objectively reasonable under the totality
12    of the circumstances, the appropriate force by an
13    officer to address a subject's life-threatening
14    actions includes using a firearm or using any other
15    available weapon or action in self-defense or defense
16    of others; is that correct?
17                    MR. DOUGLAS:  Objection.  No
18    foundation.  Vague.  Ambiguous, and it's also compound
19    and it's an incomplete hypothetical, but you can
20    answer the question.
21                    THE WITNESS:  Yes.  They can use
22    absolutely anything if it's a lethal threat.
23    BY MR. SAIN:
24                    Q.  In terms of how officers are trained
25    in California under standard police practices,
```

William Harmening 11/14/2022

```
 1              Q.   Okay.  So I'm just trying to
 2   understand what probable cause means from
 3   police-practice perspective.
 4              So in California in terms of how officers
 5   are trained under standard police practices in terms
 6   of what probable cause is, probable cause occurs where
 7   an officer has concluded, based on their subjective
 8   observation of the facts, that a relevant event is
 9   more likely than not to have occurred; is that
10   correct?
11              A.   Yes.
12              Q.   Okay.  In terms of clarifying some of
13   our definitions here in California standard police
14   practices in terms of what deadly force is, when you
15   can use it, officers are trained in California that
16   deadly force is force that, at the time that it's
17   used, is substantially likely to cause death or great
18   bodily injury; is that correct?
19              A.   Yes.
20              Q.   In officer training, that great bodily
21   injury is an injury that is likely to result in death
22   or the permanent loss or impairment of a bodily member
23   or organ; is that correct?
24              A.   That's the one, I'm honest with you,
25   I'm not -- I'm not sure of.  Death, certainly.  To
```

William Harmening 11/14/2022

```
 1    what extent the injury has to be, I honestly don't
 2    know.
 3                Q.   Fair enough.  I appreciate that
 4    answer.
 5                MR. DOUGLAS:  Abracadabra.
 6    BY MR. SAIN:
 7                Q.   Would you agree that in terms of
 8    defining whether or not something is deadly force
 9    under California standard police practices, it doesn't
10    matter whether or not the target of the deadly force
11    dies or not, correct?
12                A.   Correct.
13                Q.   So if an officer shoots at someone and
14    misses, the subject lives, the officer still used
15    deadly force, correct?
16                A.   Correct.
17                Q.   On the other hand, if the officer
18    threw a spit wad at someone using non-deadly force but
19    the subject somehow magically died, that wouldn't turn
20    the non-deadly force into deadly force, correct?
21                MR. DOUGLAS:  That may call for a
22    legal conclusion.  It's an incomplete hypothetical.
23    Speculation.  Beyond the scope of his expertise, and
24    it is an incomplete hypothetical, as phrased.
25
```

William Harmening 11/14/2022

```
 1    individual and others but that doesn't necessarily
 2    include restraining that individual if there's no
 3    danger at that point or no threat being demonstrated.
 4    That's where we may get some inconsistency between
 5    California P.O.S.T. and CIT training.  It's two
 6    different types of response.
 7                   MR. DOUGLAS:  Abracadabra.
 8    BY MR. SAIN:
 9          Q.    Would you agree that in a situation
10    according to California standard police practices in
11    terms of how officers are trained, in a situation
12    where a potentially mentally-ill subject is unsecure
13    and presenting a threat to the officers or others, the
14    priority of the officers at that point is not to
15    obtain medical help because the subject has not been
16    rendered safe?
17          A.    Well, the key word there is "threat,"
18    and I agree with that if there is -- if they are
19    demonstrating an active threat, yes.  You have to make
20    the situation safe before you do anything.
21          Q.    You agree that according to California
22    standard police practices that if a mentally-ill
23    subject poses an immediate threat of death or serious
24    bodily injury, great bodily injury to the officer or
25    others, peace officers are still permitted to use
```

William Harmening 11/14/2022

```
 1    lethal force even though the subject is mentally ill,
 2    true?
 3              A.    Yes.
 4              Q.    Do you agree that under California
 5    standard police practices if a mentally-ill subject is
 6    actively resisting a lawful detention or a lawful
 7    arrest, officers are authorized to use objectively,
 8    reasonable force from the perspective of a reasonable
 9    officer under the totality of the circumstances known
10    to those officers at the time in order to overcome
11    that resistance.  Do you agree with that?
12              A.    Yes.  If you're -- if you are
13    arresting them and they are resisting, absolutely.
14              Q.    You agree that even though a
15    mentally-ill subject -- strike that.
16              You agree that even though a subject is
17    mentally ill, if the mentally-ill subject engages in
18    conduct that under the totality of the circumstances
19    makes it objectively reasonable from the perspective
20    of a reasonable officer for that officer to use force,
21    do you agree that in such a circumstance the use of
22    force would not be excessive, correct?
23              A.    (Respite.)
24              MR. DOUGLAS:  Objection.  Vague.
25    Ambiguous.  Incomplete hypothetical.  Compound.  You
```

William Harmening 11/14/2022

```
 1                    MR. DOUGLAS:  So the answer is, Yes.
 2     Okay.  Fine, sir.
 3                    THE WITNESS:  May I add one thing to
 4     the question -- or to the answer?
 5     BY MR. SAIN:
 6              Q.   What question are you talking about?
 7              A.   Well, you mentioned Guevarra.
 8              Q.   Yes.
 9              A.   Can I add something about that?
10              Q.   About Guevarra?
11              A.   He had a knife in his hand.  I just
12     want to point that out.  That certainly plays into the
13     threat.
14              Q.   Sure.
15                    MR. DOUGLAS:  Abracadabra.
16     BY MR. SAIN:
17              Q.   Under standard police practices, in
18     general, if a mentally-ill subject is actively
19     resisting or is assaultive, officers are trained that
20     they are authorized to restrain that subject, true?
21                    MR. DOUGLAS:  Objection.  Incomplete
22     hypothetical.  No foundation.  Vague.  Ambiguous.
23     Calls for speculation.  You can answer.
24                    THE WITNESS:  They are -- yes.  They
25     are trained they can use their discretion to -- to
```

William Harmening 11/14/2022

```
 1   restrain that individual, yes.
 2   BY MR. SAIN:
 3           Q.   Crises involving the mentally ill are
 4   often considered among the most dangerous to which a
 5   police officer can respond according to standard
 6   police practices, correct?
 7           A.   Yes.
 8           Q.   You mentioned the term "CIT."  CIT
 9   refers to a crisis intervention team; is that correct?
10           A.   Yes.
11           Q.   You've testified that in your
12   experience there have been many cases where the CIT
13   officer just made the situation worse by how they
14   tried to negotiate with the subject, correct?
15           A.   Yes.
16           Q.   In all encounters between an officer
17   and a mentally-ill subject, the subject always has the
18   option of peacefully surrendering, true?
19                MR. DOUGLAS:  Vague.  Ambiguous.  That
20   may call for a medical or a psychological --
21                UNIDENTIFIED FEMALE SPEAKER:
22   (Unintelligible.)
23                MR. DOUGLAS:  Sorry?
24           Beyond the scope of his expertise, and it
25   is an incomplete hypothetical.
```

William Harmening 11/14/2022

```
 1   is also ambiguous, and it is an incomplete
 2   hypothetical.  You can answer.
 3                THE WITNESS:  Yes.  But it's certainly
 4   not a fatal level to them.  It would certainly be
 5   fatal to other people.
 6   BY MR. SAIN:
 7        Q.   You've testified that the use of drugs
 8   like meth causes irritability, aggression, poor
 9   impulse control, and violent behavior; is that
10   correct?
11        A.   Yes.
12                MR. DOUGLAS:  Objection.  Irrelevant.
13   Not a meth case.  You can answer.
14                THE WITNESS:  Yes.
15   BY MR. SAIN:
16        Q.   In terms of police practices, you've
17   testified that officers should try to deescalate the
18   situation with a suspect who is believed to be
19   potentially mentally ill; is that correct?
20        A.   Yes.
21        Q.   The focus is on making the situation
22   calmer; is that correct?
23        A.   Yes.
24        Q.   Under standard police practices,
25   officers are trained that in order for deescalation to
```

William Harmening 11/14/2022

```
 1   be successful, the subject must cooperate, true?
 2              A.   No.
 3              Q.   Okay.  Under standard police
 4   practices, officers are trained that deescalation is
 5   not a priority when the subject is engaging in active
 6   resistance, assaultive, or life-threatening behavior;
 7   is that true?
 8                   MR. DOUGLAS:  Objection.  Compound.
 9   Calls for speculation.  No foundation.  Incomplete
10   hypothetical.  You can answer.
11                   THE WITNESS:  Yes, that's a different
12   situation.  That would be true.
13   BY MR. SAIN:
14              Q.   According to standard police
15   practices, giving commands to a suspect can be a form
16   of deescalation, true?
17              A.   True.
18              Q.   Under standard police practices, an
19   officer explaining to a subject what the officer's
20   trying to do and why he is doing it can be a form of
21   deescalation, true?
22              A.   Yes.
23              Q.   Under standard police practices if an
24   officer was moving in to restrain a subject and then
25   backed away from the subject instead and shifted to
```

William Harmening 11/14/2022

```
 1    talking, that could be considered a form of
 2    deescalation, true?
 3              A.   (Respite.)  Well, that depends.  I
 4    mean, if you move in to do what you're going to do and
 5    you only escalate the individual, again, with an
 6    understanding of mental illness, they're probably not
 7    going to be deescalated at that point with certain
 8    types of mental illness.
 9              So to answer your question, if they back
10    off and -- in the proper way and explain themselves,
11    they can certainly attempt to deescalate at that
12    point, but the mistake is already made.
13              Q.   So if they moved in to restrain
14    someone then recognize that that moving in has caused
15    a problem and they back off and switch to talking, the
16    backing off and switching to talking could be
17    considered a form of deescalation?
18              A.   Yes.
19              Q.   Okay.  Under standard police
20    practices, officers are trained that, in general, when
21    a suspect fails to comply with multiple officer
22    commands, the threat posed by that suspect is
23    elevated, true?
24              MR. DOUGLAS:  Objection.  That may
25    call for -- that may call for a psychological
```

William Harmening 11/14/2022

```
 1   conclusion.  That's an incomplete hypothetical.  You

 2   can answer.

 3                  THE WITNESS:  I don't believe that's

 4   necessarily true.  They just -- I mean, an individual

 5   can be laying on the ground refusing to give up their

 6   arms and -- after multiple commands.  The risk hasn't

 7   changed any so it could be true.  It could not be

 8   true.  It just depends.

 9   BY MR. SAIN:

10             Q.   According to your understanding of

11   standard police practices if an officer issues lawful

12   commands to a subject and the subject fails to comply

13   with those commands, the subject may have violated

14   California law, correct?

15                  MR. DOUGLAS:  That's an incomplete

16   hypothetical.  It's vague.  Ambiguous.  Calls for

17   speculation, but you can answer.

18                  THE WITNESS:  They may have committed

19   a crime, yes.

20   BY MR. SAIN:

21             Q.   That person could be violating

22   Penal Code 148 for resisting or obstructing a police

23   officer, correct?

24                  MR. DOUGLAS:  Same objections.

25
```

William Harmening 11/14/2022

```
 1                    THE WITNESS:  Yeah, same answer.  It's
 2    possible, yes.
 3    BY MR. SAIN:
 4            Q.    Resisting or obstructing an officer
 5    could be a crime, true?
 6            A.    Yes.
 7            Q.    Are you familiar with Penal Code
 8    Section 834(a) and/or 836.5(b) of the California Penal
 9    Code?
10                    MR. DOUGLAS:  Vague.
11                    THE WITNESS:  Yeah, I don't know the
12    numbers.  If you can tell me the titles.
13                    MR. SAIN:  That's okay.  I'll ask it a
14    different way.
15    BY MR. SAIN:
16            Q.    In your understanding of standard
17    police practices in California, officers are trained
18    that under the California Penal Code citizens have a
19    legal duty to refrain from resisting arrest or evading
20    detention by a peace officer, true?
21                    MR. DOUGLAS:  That may call --
22    objection.  That may call for a legal conclusion.
23    Beyond the scope of his designation or expertise.
24    That's also an incomplete hypothetical.
25
```

William Harmening 11/14/2022

```
 1                         THE WITNESS:   Yeah.   I think it's a --
 2    if it's a lawful command that they're giving, in most
 3    cases I agree with you, yes.
 4                         MR. SAIN:   Okay.
 5                         MR. DOUGLAS:   Abracadabra.
 6    BY MR. SAIN:
 7              Q.   Do you agree that despite an officer's
 8    best efforts and use of his training, sometimes a
 9    subject will still fail to surrender when confronted
10    by a law enforcement officer, true?
11              A.   True.
12              Q.   Do you agree that between the subject
13    and the officer, the subject has the better ability to
14    decide the outcome of an incident than the officer,
15    true?
16              A.   No.  I --
17                         MR. DOUGLAS:   Objection.  Vague.
18    Calls for speculation.  No foundation.  Ambiguous.
19    Argumentative.  Beyond the scope, and it is an
20    incomplete hypothetical, as well.
21                         THE WITNESS:   No, I greatly disagree
22    with that.  That's what deescalation and CIT training
23    is all about.
24    BY MR. SAIN:
25              Q.   So this is from Gonzalez.  Your
```

William Harmening 11/14/2022

```
 1   compound, as phrased, and vague and ambiguous.

 2                THE WITNESS:  No.  I don't agree with

 3   that if they're -- maybe I misunderstood you.  But if

 4   there is a reasonable suspicion of a crime and they're

 5   conducting an investigation, no, they can't grab them

 6   or even restrain them unless there is a threat or a --

 7   the individual attempts to escape.

 8                MR. DOUGLAS:  Abracadabra.

 9   BY MR. SAIN:

10        Q.   Under standard police practices,

11   officers are trained on a reasonable suspicion of

12   someone engaging in a crime, the officer may detain

13   the subject, correct?

14        A.   Yes.

15        Q.   In your experience as a law

16   enforcement officer, isn't it possible that a subject

17   whose hands appear to be empty at one moment could

18   still produce a weapon at another moment?

19                MR. DOUGLAS:  Objection.  That's

20   argumentative because anything is possible.  That's

21   vague.  That is ambiguous.  That is an incomplete

22   hypothetical that calls for speculation, and there's

23   no foundation but it's really argumentative because

24   anything is possible.  You can answer.

25                THE WITNESS:  Yes.
```

William Harmening 11/14/2022

```
 1                      MR. DOUGLAS:  -- making --

 2                      MR. SAIN:  The fact that I'm pointing

 3   it out --

 4                      MR. DOUGLAS:  I'm making lawful

 5   objection to the question.

 6                      MR. SAIN:  The fact that I'm pointing

 7   it out is just me pointing out the obvious.

 8                      MR. DOUGLAS:  I'm making lawful

 9   objections to the questions based on my assessment

10   that they are flawed.

11                      MR. SAIN:  And you've made objections

12   to questions I haven't even asked at times.

13                      MR. DOUGLAS:  I'm making lawful

14   objections, sir.  I'm not attacking you personally.

15   Please, stop attacking me.

16                      MR. SAIN:  I'm not attacking you

17   personally.  I'm pointing out for the record what you

18   have done in this case, which is improper, period.

19   These are facts.

20                      MR. DOUGLAS:  Next question, please.

21   BY MR. SAIN:

22        Q.    Next question is:  According to your

23   understanding of standard police practices, in

24   general, if a person tries to cause bodily harm to an

25   on-duty law enforcement officer when that officer is
```

William Harmening 11/14/2022

```
 1   conducting a detention or investigation, that person
 2   may have committed a crime, true?
 3                    MR. DOUGLAS:  Vague.  Ambiguous.
 4   Calls for speculation, and it's an incomplete
 5   hypothetical again.
 6                    THE WITNESS:  Yes.
 7                    MR. DOUGLAS:  You can answer the
 8   question.
 9                    THE WITNESS:  Yes.
10   BY MR. SAIN:
11          Q.   In that circumstance, that could be a
12   violation of California Penal Code 243 for attempted
13   battery on a peace officer, true?
14          A.   True.
15          Q.   In terms of California standard police
16   practices officers are trained that, in general, when
17   the officer's facing a subject and the officer is the
18   sole or only officer at the scene, any threat posed by
19   the subject is elevated, correct?
20                    MR. DOUGLAS:  Vague.  Ambiguous.
21   Calls for speculation.  No foundation.  It's an
22   incomplete hypothetical.
23                    THE WITNESS:  No, I don't think the
24   threat changes.  I just think the ability to respond
25   to the threat is more difficult with one officer.  The
```

William Harmening 11/14/2022

```
 1    threat remains the same.
 2                 MR. SAIN:  Fair enough.
 3    BY MR. SAIN:
 4            Q.   In terms of California standard police
 5    practices if an officer has a reasonable belief that a
 6    subject is about to harm another person including the
 7    officer, the officer need not wait until the other
 8    person is actually harmed before the officer can use
 9    force on the subject presenting the apparent threat,
10    true?
11            A.   True.
12            Q.   Do you agree that under standard
13    police practices officers are trained that the
14    subjective intent of the officer has no bearing on
15    whether or not there's been a lawful detention, lawful
16    use of force, or lawful arrest, correct?
17                 THE WITNESS:  (Respite.)  If I
18    understood that correctly, it may have a bearing on
19    the lawful use of -- or it would relate only to the
20    use of force whether or not the use of force was
21    lawful.  It would not --
22                 MR. DOUGLAS:  That question was -- I'm
23    sorry.
24                 THE WITNESS:  Yeah.  It wouldn't
25    affect the detention or the arrest.
```

William Harmening 11/14/2022

```
 1                    MR. DOUGLAS:  That question was vague
 2    and ambiguous.
 3    BY MR. SAIN:
 4           Q.   So is it your testimony that the
 5    subjective intent of the officer may affect the
 6    reasonableness of an officer's use of force according
 7    to standard California police practices and training?
 8                    MR. DOUGLAS:  Vague.  Calls for a
 9    legal conclusion.  No foundation.  You may answer.
10                    THE WITNESS:  I have --
11                    MR. DOUGLAS:  Incomplete hypothetical,
12    as well.
13                    THE WITNESS:  Yeah.  I'm having a hard
14    time with that one.
15    BY MR. SAIN:
16           Q.   So is it basically you're not
17    understanding the question?
18           A.   I'm not understanding the question.
19           Q.   That's okay.  That's not your fault.
20    Let's move.
21                You've testified that every peace officer
22    has a right to self-defense, true?
23           A.   True.
24           Q.   Under standard police practices in
25    California officers are trained that, in general, in
```

William Harmening 11/14/2022

```
 1   order to take a subject into custody, the safest
 2   method of doing so is to handcuff the subject behind
 3   their back, correct?
 4                    MR. DOUGLAS:  Vague.  Incomplete
 5   hypothetical.  No foundation, but it's incomplete.
 6                    THE WITNESS:  Yes.  To take them into
 7   custody, yes.
 8   BY MR. SAIN:
 9             Q.   Under standard police practices in
10   California, officers are trained that, in general, in
11   order to handcuff a resistive subject, the safest
12   method of doing so is to get the subject into a prone
13   position on the ground, correct?
14                    MR. DOUGLAS:  Vague.  Incomplete
15   hypothetical.  No foundation.
16                    THE WITNESS:  Sometimes.  Policy will
17   also point out -- in effect, Chula Vista's policy
18   points out, that if it becomes too difficult to do it
19   on the ground, stand them up and take a strategic
20   position while standing and do it that way.
21             So it's -- they're trained to do it, you
22   know, the most effective way, whatever that way may
23   be, given the circumstances.
24   BY MR. SAIN:
25             Q.   So under standard police practices, in
```

William Harmening 11/14/2022

```
 1    general, in California, officers are trained that in
 2    order to handcuff a resistive subject, the safest
 3    method of doing so is to either get the subject into a
 4    prone position on the ground or to use whatever
 5    technique or tactic is most effective at getting that
 6    subject into restraint?
 7              A.    Yes.  (Respite.)  And that includes
 8    the safety of the person being restrained.
 9              Q.    In terms of the word "prone" in law
10    enforcement, officers are trained that the term
11    "prone" refers to a person who has the front surface
12    of their body facing downward lying with their chest
13    and stomach positioned flat downward; is that correct?
14              A.    (Respite.)  I -- yes, I believe so.
15              Q.    And then in terms of officer training,
16    officers are trained that the opposite of that would
17    be supine, where they're lying on the back with their
18    face upward, correct?
19              A.    Yes.
20              Q.    Under standard police practices
21    officers are trained that, in general, restraining a
22    subject in the prone position can provide a tactical
23    advantage to the officer, correct?
24              A.    Yes.
25              Q.    What is that tactical advantage?
```

William Harmening 11/14/2022

```
 1              A.    Well, if they do it correctly, they
 2    control the individual.   They can control their
 3    movement.   They can prevent them from getting up and
 4    that's the advantage.   They're controlling their
 5    movement.
 6              Q.    Under standard police practices, what
 7    is the tactical advantage of preventing a subject from
 8    getting up?
 9              A.    Well, if a subject is being
10    assaultive, you do not want them to get up.   Depending
11    on -- depending on the subject, that can certainly
12    give them the tactical advantage in terms of a
13    physical altercation.
14              But, yeah, if you have an assaultive
15    individual, you're best to control them on the ground
16    in a prone position.
17              Q.    Under standard police practices in
18    California, officers are trained that, in general,
19    restraining a resistive or assaultive subject in a
20    prone position provides a tactical advantage to the
21    officer because a prone-restrained subject is less
22    likely to be able to stand, fight, or flee; is that
23    correct?
24              A.    Yes.
25
```

William Harmening 11/14/2022

```
 1                Q.   Under standard police practices in
 2    California, officers are trained that even if a
 3    subject is handcuffed behind the back, in some cases
 4    an upright handcuffed subject can still assault the
 5    officer or others by head butting, kicking, slipping
 6    their cuffs to the front, or other unusual methods; is
 7    that correct?
 8                MR. DOUGLAS:  Objection.  Compound.
 9    Calls for speculation.  No foundation.  Incomplete
10    hypothetical.
11                THE WITNESS:  Yes.  They can always
12    use their -- they can attack in any number of ways.
13    BY MR. SAIN:
14                Q.   Under standard police practices,
15    officers are trained that for a handcuffed resistive
16    subject who is not already contained in a cell or
17    police vehicle, the safest place to keep that subject
18    is in a prone position, correct?
19                A.   No.
20                Q.   Okay.  Under standard police
21    practices, officers are trained that at all times,
22    even for a handcuffed resistive subject restrained in
23    the prone position, officers have a duty to monitor
24    the breathing of the subject so as to watch out for
25    any life-threatening medical problems, true?
```

William Harmening 11/14/2022

```
 1              A.    Well, they -- they do have that duty.
 2     But to the prior question, they also have a duty to
 3     get them out of a prone position and put them in a
 4     recovery position.
 5              Q.    At what point?
 6              A.    As soon as they have them restrained.
 7     As quickly as possible.  Roll them to their side, set
 8     them up, stand them up; any of those, depending on the
 9     subject, just to be able to allow them to recover
10     normal breathing.
11              Q.    Under standard police practices then,
12     officers are trained that when feasible under the
13     circumstances and as quickly as the circumstances
14     allow, a subject who is restrained in the prone
15     position should be moved into a, quote, recovery
16     position, end quote; is that correct?
17              A.    Yes.
18              Q.    Under standard police practices in
19     California, officers are trained that common recovery
20     positions include moving the subject into a supine, or
21     on-the-back position; moving the subject into a seated
22     position; or moving the subject into an on-their-side
23     position, correct?
24              A.    Yes.
25
```

William Harmening 11/14/2022

```
 1    quote, a one-week history of intermittent chest pain
 2    and some anxiety, end quote.  And that Mr. Nunis,
 3    quote, had been increasingly paranoid, end quote.
 4              A.   I -- I vaguely remember that, yes.
 5              Q.   Okay.  Based on your review of the
 6    evidence, you agree that on the incident date before
 7    any police involvement, Mr. Nunis had become agitated
 8    and attempted to jump off a second-story building.
 9              You agree with that, right?
10              A.   Yes.
11              Q.   Based on your review of the evidence,
12    you agree that on the incident date when Mr. Nunis
13    tried to jump out of the second-story window,
14    Mr. Studwick restrained Mr. Nunis to keep Mr. Nunis in
15    the house, correct?
16              A.   Yes.
17              Q.   Are you aware that according to
18    Kimone Nunis' deposition testimony in this case,
19    Mr. Nunis resisted Mr. Studwick's restraint?
20              A.   I believe I recall that from her
21    interview, not her deposition.
22              Q.   Just for record of completeness,
23    that's at deposition page 55, line 15; through 57,
24    line 19.
25              According to -- strike that.
```

William Harmening 11/14/2022

```
 1              A.   I only saw him from the side as he's
 2  sitting in the doorway.  I don't think I -- no.  I
 3  didn't have a full-on view of him and, even then,
 4  Linney backs up.  So the next time I see him is on, I
 5  believe, Padilla's body cam where they're already on
 6  the ground outside.
 7              MR. DOUGLAS:  And for the record, that
 8  question assumes facts not in evidence.  Misstates the
 9  actual video.  Calls for speculation.  No foundation
10  and, therefore, might call for speculation.  You can
11  answer if you understand.
12  BY MR. SAIN:
13              Q.   If the testimony in this case is that
14  before any officer touched Mr. Nunis his t-shirt was
15  already ripped, are you aware of any evidence to
16  dispute such testimony?
17              A.   No.  Except the fact that I -- I don't
18  see it on the video.
19              MR. DOUGLAS:  And vague as to the word
20  "ripped" or "torn," or whatever -- or something like
21  that.  Vague as to that term.
22  BY MR. SAIN:
23              Q.   Based on your review of the evidence,
24  you agree that Officer -- excuse me, Agent Linney
25  made -- first made verbal contact with Mr. Nunis at
```

William Harmening 11/14/2022

```
 1    the top of the stairs inside the Nunis residence,

 2    correct?

 3              A.   Yes.

 4              Q.   Agent Linney testified that he saw

 5    Mr. Nunis' ripped shirt as a sign that there had been

 6    violence earlier that evening.  You're aware of that,

 7    correct?

 8              A.   I don't recall that --

 9              MR. DOUGLAS:  That may assume facts

10    not in evidence.  No foundation.  Therefore, it calls

11    for speculation, and there's no -- incomplete

12    hypothetical, I'm sorry.

13              THE WITNESS:  I don't recall that from

14    his interview.

15    BY MR. SAIN:

16              Q.   And you never read the deposition with

17    that statement in it?

18              A.   That's correct.

19              Q.   Okay.  Just for record clarity, that's

20    at Linney's deposition page 9, line -- excuse me.

21    Linney's deposition page 19, lines 9 through 13, as

22    well as page 224, lines 3 through 14.

23              Would you agree that officers who are

24    trained according to California standard police

25    practices could perceive a ripped t-shirt, combined
```

William Harmening 11/14/2022

1                    THE WITNESS:  I would agree based on
2     the video that he certainly pulled his arm away, yes.
3     BY MR. SAIN:
4            Q.  You would agree that based on the
5     video, that Agent Linney told Mr. Nunis that Mr. Nunis
6     was not in any trouble.  That the handcuffs were for
7     safety reasons.
8            You would agree that that's what the video
9     shows, right?
10           A.  Yes.
11                   MR. DOUGLAS:  Objection.  Compound.
12    Calls for -- assumes facts not in evidence.  You can
13    answer.
14                   THE WITNESS:  Yes.
15    BY MR. SAIN:
16           Q.  You would agree that at that point,
17    Agent Linney then instructed Mr. Nunis to stay seated,
18    correct?
19           A.  (Respite.)  I believe he -- I believe
20    so, yes.
21           Q.  How many times have you reviewed the
22    Linney or Padilla body-worn camera videos?
23           A.  Maybe -- maybe half a dozen times.
24           Q.  Okay.  Isn't it true that at about the
25    run time 4 minutes and 20 seconds into the Linney

William Harmening 11/14/2022

```
 1    video, after Officer Linney told Mr. Nunis to stay
 2    seated that we can see Officer Linney stepping back
 3    away from Mr. Nunis?
 4                    MR. DOUGLAS:  That assumes facts not
 5    in evidence.  Vague.  Ambiguous.  Argumentative.
 6    Calls for speculation.
 7                    Without showing the video referencing a
 8    certain time, there's no foundation for the accuracy
 9    of that statement, and it's compound and it's an
10    incomplete hypothetical.
11                    THE WITNESS:  Yes, I seen him step
12    back.
13    BY MR. SAIN:
14            Q.  So at that point in the sequence of
15    events, Mr. Nunis -- strike that.
16                    At that point in the sequence of events,
17    Agent Linney withdrew from trying to cuff Mr. Nunis
18    for a period of time, correct?
19                    MR. DOUGLAS:  Same objections.
20                    THE WITNESS:  Yeah.  I don't know
21    because then the camera goes dead.  I don't know what
22    happened after that.
23                    I believe in his interview Agent Linney
24    said he didn't recall what happened after that.  So
25    I -- again, I don't now.
```

William Harmening 11/14/2022

```
 1              My opinion -- my conclusion and opinion is
 2    based on those -- that -- those few minutes where his
 3    camera's working and how he approaches.
 4    BY MR. SAIN:
 5              Q.   Based on your review of the video,
 6    isn't it true that at about 20 seconds after
 7    Agent Linney told Mr. Nunis to stay seated, Mr. Nunis
 8    got up from a seated position onto his knees?
 9              A.   (Respite.)
10              MR. DOUGLAS:  Same objections.
11              THE WITNESS:  I believe he did.  There
12    was some movement.  As I'm sitting here today, I don't
13    exactly recall if it was on both knees or one knee
14    or...  I don't recall.
15    BY MR. SAIN:
16              Q.   At that point, according to the video,
17    both Agent Linney and Kimone Nunis told Oral Nunis to
18    stay seated, correct?
19              A.   (Respite.)  Yes.
20              MR. DOUGLAS:  Same objections.
21              THE WITNESS:  She told him but at the
22    same time she was asking him not to handcuff him, yes.
23    BY MR. SAIN:
24              Q.   At that point after both Agent Linny
25    and Kimone Nunis told Mr. Nunis to stay seated,
```

William Harmening 11/14/2022

```
 1                    MR. DOUGLAS:  Answer the question,
 2   sir.
 3                    THE WITNESS:  Yes.
 4                    MR. SAIN:  Thank you, Mr. Harmening.
 5   I have no further questions.
 6                    MR. DOUGLAS:  Okay.  It's 3:24.  I
 7   think I had ten minutes of questions; ten minutes of
 8   questions maybe at the most, but...
 9                    MR. SAIN:  And two hours --
10                    MR. DOUGLAS:  ...but you do what you
11   want --
12                    MR. SAIN:  And two hours of poppycock
13   on the record, but...
14                    MR. DOUGLAS:  Sir, I -- sir, that's
15   offensive, but I'll deal with it later.  Thank you so
16   much.
17                    MR. SAIN:  I'm a professional --
18                    MR. DOUGLAS:  -- copy, please.  I want
19   a copy for the record, please.
20                    MR. SAIN:  -- yourself.  That's what's
21   offensive.
22                    MS. QUESADA:  Just for the record,
23   counsel, I have no questions for this witness and we
24   would like a pdf copy, please.  Thank you.
25                    MR. SAIN:  We can go off the record.
```

William Harmening 11/14/2022

```
 1                    FURTHER DEPONENT SAITH NOT.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

William Harmening 11/14/2022

```
 1                C E R T I F I C A T E

 2

 3

 4    STATE OF TENNESSEE

 5    COUNTY OF MONTGOMERY

 6            I, Linda A. Wells, Licensed and Certified

 7    Court Reporter, with offices in Nashville and

 8    Clarksville, Tennessee, hereby certify that I reported

 9    the foregoing deposition of William M. Harmening by

10    machine shorthand to the best of my skills and

11    abilities, and thereafter the same was reduced to

12    typewritten form by me.

13            I further certify that I am not related to

14    any of the parties named herein, nor their counsel,

15    and have no interest, financial or otherwise, in the

16    outcome of the proceedings.

17

18

19

20                    _____

21                    LINDA A. WELLS, LCR #546, CCR

22                    Notary Public at Large

23                    State of Tennessee

24

25                    My Commission Expires:  6/12/23.
```

# EXHIBIT F

United States District Court

Southern District of California

Estate of Oral W. Nunis, Sr.     )
By and Through, Roxie A.        )
Nunis, Individually, and as    )
Successor In Interest to the   )
Estate, Naomi Nunis,          )
Individually, and as Willie Mae )
Kirkland as Guardian ad Litem  )
For Abigail Tabitha Nunis and  )
Jabez Caleb Nunis,           )
                             )
        Plaintiff(s),     )
                             )
      Vs.             ) Case No.21 cv 1627 AJB
                          ) DEB
City of Chula Vista, and Does  )
1 through 40, inclusive,     )
                             )
         Defendant(s).

DEPOSITION OF ROGER CLARK

Taken on

Tuesday, January 10, 2023

Elena Schall, CSR No. 7638

```
 1                    United States District Court

 2                   Southern District of California

 3

 4   State of Oral W. Nunis, Sr. By    )
     And Through, Roxie A. Nunis,      )
 5   Individually, and as Successor    )
     In Interest to the Estate,        )
 6   Naomi Nunis, Individually, and    )
     Willie Mae Kirkland as            )
 7   Guardian ad Litem for Abigail     )
     Tabitha Nunis and Jabez Caleb     )
 8   Nunis,                            )
                                       )
 9            Plaintiff(s),            )
                                       ) Case No. 21 cv 1627
10        vs.                          ) 01627-AJB-DEB
                                       )
11   City of Chula Vista, and Does     )
     1 through 40, inclusive,          )
12                                     )
              Defendant(s).            )
13   ──────────────────────────────────

14

15            DEPOSITION OF ROGER CLARK, taken by the

16   Defendants, City of Chula Vista utilizing ZOOM Cloud

17   platform to host some participants from their respective

18   locations, commencing at 12:21 o'clock a.m., on Tuesday,

19   January 10, 2023, before Elena Schall, Certified Court

20   Reporter, License No. 7638, for the State of California,

21   pursuant to notice,

22

23                         ---oOo---

24

25
```

1    <u>APPEARANCES OF COUNSEL:</u>

2    For the Plaintiffs:

3                     Douglas/Hicks Law
                     By:  Carl Douglas, Esq.
4                     Noel Ariola
                     5120 West Goldleaf Circle, Suite 140
5                     Los Angeles, California  90056
                     Carl@douglashickslaw.com
6                     (Remote appearance)

7    For the Defendant:

8                     Lewis, Brisbois, Bisgaard & Smith, LLP
                     BY:  Tony M. Sain, Esq.
9                     633 W. 5th Street
                     Suite 4000
10                    Los Angeles, California  90071
                     Tony.Sain@lewisbisbois.com
11                    (In person appearance)

12   For the Plaintiffs Kimone Nunis, et al.:

13                    Law Offices of John L. Burris
                     By: DeWitt M. Lacy, Esq.
14                    Julia Quesada, Law Clerk
                     9701 Wilshire Boulevard, Suite 1000
15                    Beverly Hills, California  90212
                     Dewittlacy@johnburrislaw.com
16

17       Also Present:

18                    Roxie Nunis (Remote appearance)
                     Naomi Nunis (Remote appearance)
19

20

21

22

23

24

25

```
1                    I  N  D  E  X

2

3    WITNESS                 EXAMINATION            PAGE

4    Roger Clark            By Mr. Sain               5

5

6

7

8              QUESTIONS INSTRUCTED NOT TO ANSWER

9                         None

10             INFORMATION TO BE SUPPLIED

11                        None

12

13                   E X H I B I T S

14   Defendant's                      PAGE

15     1 -  Notice                      6

16     2 -  Disclosure of Expert Witnesses      6

17     3 - Report of Roger Clark          6

18     4 - Curriculum Vitae              7

19     5 - handwritten notes            16

20

21

22

23

24

25
```

```
 1                    San Diego, California
 2                 Tuesday, January 10, 2023
 3                   At 12:21 o'clock A.M.
 4                        ---oOo---
 5
 6                      ROGER CLARK,
 7          called as a witness by the Defendants,
 8          having been first duly sworn, testified
 9          as follows:
10
11                      EXAMINATION
12   BY MR. SAIN:
13       Q.   Good afternoon, sir.  Would you please state and
14   spell your full name for the record.
15       A.   Roger Alma Clark, R-o-g-e-r, A-l-m-a, C-l-a-r-k.
16       Q.   We are proceeding with this deposition in part
17   by Zoom pursuant to the party's stipulation.  At this time
18   I would ask all the parties to identify themselves for the
19   record.
20            MR. LACY:  DeWitt Lacy for the Kimone Nunis
21   plaintiffs.
22            MR. DOUGLAS:  Good afternoon.  Carl Douglas and
23   Noel Areola for the Roxie Nunis plaintiffs, and Naomi
24   Nunis as well.
25            MR. Sain:  Tony Sain on behalf of the defendants
```

1    officers?

2        A.    Only in conferences and seminars, such as the

3    convention a few months ago in Dallas.

4        Q.    Which convention?

5        A.    IACP.

6              MR. LACY:  Was that the International

7    Association of Chiefs of Police?

8              THE WITNESS:  It is.

9    BY MR. SAIN:

10       Q.    Since your retirement in 1993, have you ever

11   taught any class to any law enforcement officers on the

12   topic of police use of force?

13       A.    No.

14       Q.    Since your retirement in 1993 have you ever

15   taught any class to law enforcement officers on the topic

16   of police arrests or detention tactics?

17       A.    No.

18       Q.    You would agree that just because two different

19   officers or witnesses have different recollections of

20   certain incident details, that does not automatically mean

21   that one of those witnesses is lying; correct?

22       A.    I would agree.

23       Q.    It is possible for one officer or witness to see

24   one set of facts that another officer or witness at the

25   same scene is unable to see; correct?

1     A.    That is possible.

2     Q.    As an expert witness in this case, is it your

3  job to determine which witness's version of events is more

4  credible?

5     A.    No.

6     Q.    You would agree that determining the facts of

7  the case is the function that is clearly in the purview of

8  the injury, yes?

9     A.    Yes.

10     Q.    You would agree that any opinions you might have

11  on witness credibility are irrelevant; true?

12     A.    They might be helpful if allowed to comment on

13  them in front of the jury, so I think there is relevance

14  in that regard.

15     Q.    At page one of your report, isn't it true that

16  you state "I do not make credibility determinations in

17  expressing my opinions"?

18     A.    Yes.

19     Q.    In your report you list at pages two through

20  four, a list of items that appears to be a list of

21  records, recordings, depositions, reports, photos, and

22  other evidence upon which you relied on in forming your

23  opinions; correct?

24     A.    Yes.

25     Q.    And does that list in your expert report that we

1          A.     No.

2          Q.     In terms of the evidence upon which you

3    reviewed, considered, or relied upon, did that include

4    deposition of medical examiner Robert Stabley?

5          A.     Yes.  It is item 3A in my report on page two.

6          Q.     In terms of the evidence upon which you relied

7    on in forming your opinions in this case, did that

8    evidence include the body worn camera videos of Agent

9    Linney, Officer Padilla, Officer Olson, Officer Rivers,

10   and Officer Salvador?

11         A.     Yes.

12         Q.     In terms of the evidence you reviewed in forming

13   your opinions in this case, did that include the

14   deposition testimony of Agent Linney, Officer Padilla,

15   Officer Olson, Officer Rivers, and Officer Salvador?

16         A.     Yes.

17         Q.     In terms of the evidence you relied on in

18   forming your opinion in this case, did that include the

19   deposition testimony of the civilian bystanders Kimone

20   Nunis, Barry Studwood, and Ludecea Nunis?

21         A.     Studwood is listed, Nunis is listed -- Ludecea

22   Nunis is listed, and what was the other name?

23         Q.     Kimone?

24         A.     Yes.  Kimone, yes.

25         Q.     In terms of the evidence that you reviewed prior

1        Q.    Was there any evidence that you believe that you

2   needed in order to form your opinions in this case that

3   you did not have prior to forming your opinions?

4            MR. LACY:  Objection.  Calls for speculation;

5   lacks foundation.

6            Lieutenant?

7            THE WITNESS:  Can you -- just -- I think I

8   understand the question, and there are two body worn

9   camera recordings that are noted as not present and for

10  the time period.  And I would certainly love to see those.

11  BY MR. SAIN:

12       Q.    Which two are you referring to?

13       A.    It was Linney, which stopped recording at 0140

14  hours, and Padilla, P-a-d-i-l-l-a, which stopped recording

15  at 0302 hours.

16       Q.    Other than that, is there any evidence that you

17  believe that you needed to form your opinions in this case

18  that you were unable to obtain?

19       A.    I was content.  I thought it was well

20  documented, and there is quite a bit of precision to it.

21       Q.    Were you personally present at the scene of the

22  incident on the incident date of March 13, 2020?

23       A.    No.

24       Q.    Would you agree you were not a witness to the

25  incident involving interaction between law enforcement

1   officers and Oral Nunis?

2       A.    Yes.

3       Q.    You said that you conducted an in-person site

4   inspection of the incident location; is that correct?

5       A.    Yes.

6       Q.    When did that occur?

7       A.    Sunday the 25th.  Just a few days before I wrote

8   the report.

9       Q.    So September 25, 2022?

10      A.    Correct, in the evening.

11      Q.    Did you take any photographs?

12      A.    No.

13      Q.    Did you make any video recordings?

14      A.    No.

15      Q.    Is there anything that you did to document the

16  nature or observations from your site inspection of the

17  incident location that you made on September 25, 2022?

18      A.    No, no measurement.  No.  I just wanted to get a

19  sense of the location.

20      Q.    Fair enough.  Did you ever conduct any in person

21  physical or in person autopsy exam of Mr. Oral Nunis?

22      A.    No.

23      Q.    Would it be accurate to say that none of your

24  opinions in this case rest on any examination that you

25  yourself conducted of Mr. Nunis?

```
 1      A.    Yes.
 2      Q.    Did you ever inspect any non biological physical
 3   evidence, such as any restraint devices, handcuffs, WRAP
 4   device, spit sock, or anything like that?
 5      A.    No.
 6      Q.    Did you ever conduct any in person inspection of
 7   any biological physical evidence such as any tissue
 8   slides, blood samples, DNA, or other bodily parts or other
 9   substances?
10      A.    No.
11      Q.    Let's take our first break.
12            (Recess taken.)
13            MR. SAIN:  Back on.
14      Q.    So we reached the portion of your deposition
15   where I would ask you to please state the opinions that
16   you formed in this case.  You can summarize them, you can
17   list them, whatever you feel is appropriate, as long as I
18   have the complete list of all the opinions you are
19   offering in this case..
20      A.    I think probably more just to summarize, with a
21   little bit of commentary just to set the stage, or create
22   the landscape.
23            This is a case of an individual with mental
24   anguish.  These are my terms.  This is the way I looked at
25   it.  I think I am accurate, that his daughter calls for
```

1   help and for an ambulance.  Police come.  And through the

2   conduct of the responding officer, force is inflicted, and

3   he is declared dead at the hospital just about an hour

4   later.

5           So with that in mind, I created a commentary as

6   the first opinion is always intended to throw a blanket

7   over all the other opinions.  I think I better read that

8   one in, and then we will just parse out the rest.

9           So I said, "From my review of the materials

10  provided, the use of force and restraint inflicted on Mr.

11  Nunis was inappropriate, excessive and unreasonable, and

12  violated POST and a reasonable officer's Standard Of Care,

13  including but not limited to forcefully taking Mr. Nunis

14  to the ground, placing body weight on Mr. Nunis while he

15  was in a prone position on the ground, and placing Mr.

16  Nunis in a WRAP restraint, while he was prone and

17  non-combative.

18          "Further, each and every defendant officer

19  integrally participated in the use of excessive and

20  unreasonable force on Mr. Nunis and failed to intervene

21  with each other and every other defendant officer's use of

22  excessive and unreasonable force."

23          So first, the use of force inflicted, next

24  failure to intervene, which is a federal requirement, and

25  then this comment.

1        "Across the nation for decades Law Enforcement

2    Agencies have trained their personnel on the proper

3    tactical responses, use of force options, use of restraint

4    options, and medical assessment and care of persons they

5    take into custody in order to avoid injuries and/or deaths

6    such as what occurred in this case.

7        "These methods are well known, and proven

8    effective for the safety and welfare of those officers and

9    the public.

10       "In my opinion, the officers in this case,

11   utterly failed to follow these standards and their

12   training in this incident.  Had they done so, Mr. Nunis,

13   who was emotionally distraught and suicidal, would not

14   have died during his encounter with the defendant

15   officers."

16       Now I parse out in four other opinions that are

17   really subheadings to this which are carefully drafted

18   out.  Use of force.  It is in my opinion, dreadful,

19   positional, asphyxia, restraint.  The tactical response

20   has to do with the responding officer's conduct when he

21   arrives on scene, and that is Linney, L-i-n-n-e-y.  I will

22   comment on that in a few minutes, and how that caused the

23   whole episode in my opinion to spin out of control which

24   resulted in death which I consider utterly unnecessary,

25   and that includes the mechanics of the restraint as well.

1        You want me to continue?  Okay.  I will pause

2   for it if you have a question. This is my moment.

3        So Linney is dispatched with Padilla.  The

4   reason for that, in Chula Vista, they dispatch sole police

5   cars.  And in the POST protocol which is cover officer,

6   contact officer, response.  This type of call requires the

7   cover officer, contact officer, dispatch, and that is why

8   there were two units dispatched, so there would be two

9   officers present.

10       Linney does not wait for his partner.  And the

11   urgency is there because they are assigned both of them to

12   roll Code 3.  Within two seconds, and I think I'm being

13   generous, Linney, when he approaches, knowing what the

14   situation is, and that this is a 5150, which is a mentally

15   ill person attempting suicide, brings out his handcuffs

16   and wants to handcuff Mr. Nunis.  Mr. Nunis is afraid and

17   begs actually don't do this.

18       That is a provocative, unnecessary lighting the

19   match to the gasoline rather than using water to put out

20   the anxiety, and in my opinion sets everything in motion

21   that results in him being restrained and being put in the

22   WRAP, et cetera, because they consider that he is in some

23   way or another dangerous.

24       Nevertheless, when Padilla gets there, there are

25   two on one.  Nunis is a very slight individual.  He is --

1    I have it written down, but he is like 140 pounds, just a
2    small guy, and yet they inflict considerable weight on him
3    as other officers arrive.  They put him in a WRAP which I
4    consider absolutely unnecessary, tortuous, actually, and
5    he dies.
6              So I wrote in one of the opinions, "Officers are
7    responsible for their tactical decision that result in the
8    use of lethal force."  And in this case lethal force
9    occurred, in my opinion, and that is one of the opinions
10   here.
11             In regards to what Linney should have done in
12   Learning Domain No. 3, which is tactical communications,
13   how you talk to someone to assuage their anxieties, to put
14   them at ease.  And incidentally, this actually occurred in
15   Kern County.  I don't have the report, but it is in the
16   record that he had this kind of an episode, and Kern
17   County absolutely took care of it by using the tactical
18   communications.
19             I already mentioned that Duty to Intervene is a
20   federal requirement taught by POST in Learning Domain No.
21   20, and -- I will wait for the question.
22             I think I have generally covered -- the timing
23   of the event is well documented, and I agree with the
24   Department's own commentary about when things happened,
25   and so as part of the totality stands.

1        Q.   Other than what you just stated on the record,

2   and other than what is listed in your report, Exhibit 3,

3   are there any other opinions that you formed in connection

4   with this case?

5        A.   So that is a -- I think a question that I would

6   have to sort of assume what is in your head.  My effort is

7   to be clear, and I think I have.  By reading that one

8   opinion in the record word for word is exactly the areas

9   of concern and opinions that are parsed out in the other

10  opinions.

11       Q.   Fair enough.  But my question is -- is that it?

12            So again, other than what you stated on the

13  record today, and other than what is listed in your

14  report, Exhibit 3, are there any other opinions that you

15  anticipate offering in this case?

16       A.   No.

17       Q.   Okay.  Page 11 of your report in this case, you

18  list some of the California Commissioner on Peace Officer

19  Training, or POST Standards for what types of force are

20  appropriate to use according to standard police practices;

21  correct?

22       A.   Yes, and they reflect force for criminal

23  suspects.

24       Q.   Under standard police practices, "Active

25  Resistance" is defined as "Physically evasive movements to

1  defeat an officer's attempt at control, including bracing,

2  tensing, running away, or verbally signaling an intention

3  to avoid or prevent being taken into or retained in

4  custody;" correct?

5       A.    Yes.

6       Q.    Under "Standard Police Practices, in general,

7  when an objectively reasonable -- strike that.

8              Under Standard Police Practices, in general,

9  when objectively reasonable under the totality of the

10 circumstances, the appropriate force by an officer to

11 address a subject's active resistance includes control

12 holds, and techniques to control the use of personal

13 weapons in self defence, and to gain advantage over the

14 subject and use of devices to secure compliance, and

15 ultimately gain control of the situation; true?

16      A.    It would not be true unless you used the word

17 reasonable, and reasonable application.  Then I would

18 agree.

19      Q.    Okay.  So that is, essentially, what you said on

20 page 11 of your report; right?

21             MR. LACY:  Objection.  Argumentative.

22             THE WITNESS:  That is a quote from POST.

23 BY MR. SAIN:

24      Q.    Okay.  According to the Standard Police

25 Practices, the term personal weapons means officer's hands

1    and feet, too?

2        A.    And other parts of his body. Personal weapons

3    are the elbow, foot, head, as well.

4        Q.    Thank you.  So use of personal weapons means

5    things like an officer punching a subject, or using empty

6    handed strikes on a subject, that sort of thing?

7        A.    Yes, when it is reasonable.

8        Q.    According to Standard Police Practices, the term

9    Devices to Secure Compliance includes pain compliance

10   devices, such as baton, pepper spray, or taser device;

11   true?

12       A.    That would be included.

13       Q.    That is a yes?

14       A.    Yes.

15       Q.    According to Standard Police Practices, the term

16   Devices to Secure Compliance could include restraint

17   devices; true?

18       A.    Yes.

19       Q.    In Standard Police Practices commonly accepted

20   restraint devices include handcuffs, WRAP devices, and Zip

21   ties; true?

22            MR. LACY:  Objection.  Calls for speculation;

23   lacks foundation; improper and incomplete hypothetical.

24            Lieutenant?

25            THE WITNESS:  I would agree with the handcuffs.

1    appropriately, the purpose of using a spit hood is to

2    preserve the health and sanitary conditions at the scene;

3    correct?

4              MR. LACY:  Incomplete and improper hypothetical;

5    lacks foundation; vague and ambiguous.

6              Lieutenant?

7              THE WITNESS:  As the name implies, yes.

8    BY MR. SAIN:

9         Q.   Under Standard Police Practices, the term

10   assaulted is defined as someone who is being aggressive or

11   combative, or attempting to assault the officer or another

12   person, or who is threatening to assault the officer or

13   another person; correct?

14        A.   I would agree.

15        Q.   Under Standard Police Practices, assaulted

16   behavior could include when a subject touches or strikes

17   an officer with his hands or tries to do so; correct?

18        A.   Fists, yes.

19        Q.   Under Standard Police Practices, assaulted

20   behavior is living proof when a subject kicks, or stomps

21   on an officer with subjects feet, or tries to do so;

22   correct?

23        A.   When it is deliberate, yes.

24        Q.   Under Standard Police Practices, assaulted

25   behavior could include when a subject head buts an officer

1    or tries to do so; correct?

2        A.    If deliberate, yes.

3        Q.    Under Standard Police Practices, assaulted

4    behavior could include a subject grapples, bear hugs, head

5    locks an officer, or tries to do so; correct?

6        A.    If deliberate, yes.

7        Q.    And according to Standard Police Practices, who

8    is the person who is to determine whether or not the

9    attempted punch, the attempted kick, the attempted head

10   butt, or the attempted grappling appears to be deliberate

11   by the subject?

12       A.    A reasonable officer.

13       Q.    Under Standard Police Practices, assaulted

14   behavior could include when a subject points a weapon, like

15   a knife or a gun at an officer or tries to do so; correct?

16       A.    Yes.

17       Q.    Under Standard Police Practices, in general, and

18   when objectively reasonable under the totality of the

19   circumstances, the appropriate force by an officer to

20   address a subject's assaulted behavior includes No. 1, use

21   of devices and/or techniques to secure compliance and

22   ultimately gain control of the situation; and No. 2, use

23   of personal body weapons in self-defense to gain advantage

24   over the subject; correct?

25       A.    When reasonable, yes.

1      Q.    Under Standard Police Practices personal weapons

2   and personal body weapons are essentially the same thing;

3   correct?

4      A.    I would agree.

5      Q.    Under Standard Police Practices, the term life

6   threatening is defined as any action likely to result in

7   serious injury or death to the officer or another person;

8   correct?

9      A.    Yes.

10      Q.    Under Standard Police Practices in the context

11   of a life threatening situation, the term serious injury

12   refers to an injury likely to lead to the death or the

13   permanent loss or impairment of a bodily member or organ;

14   correct?

15      A.    Yes.

16      Q.    For example, under Standard Police Practices,

17   someone receiving a scrape, abrasion, or a

18   bruise/contusion generally that would not be considered a

19   life threatening, serious injury under Standard Police

20   Practices; correct?

21           MR. LACY:  Objection.  Calls for speculation;

22   lacks foundation; calls for medical or expert opinion this

23   witness is not prepared for or offered to give; vague and

24   ambiguous.

25           Lieutenant?

1          THE WITNESS:   Yes.

2     BY MR. SAIN:

3          Q.    By contrast, according to Standard Police

4     Practices, if it appears likely that someone was about to

5     be stabbed or shot or have their head bashed in, or lose

6     an arm or leg or eye, generally, under Standard Police

7     Practices, that would be considered a life threatening

8     serious injury; correct?

9          A.    Yes.

10          Q.    Under Standard Police Practices deadly force is

11     essentially the same thing as life threatening force;

12     correct?

13          A.    Yes.

14          Q.    Under Standard Police Practices, in general, and

15     when objectively reasonable under the totality of

16     circumstances, the appropriate force by an officer to

17     address a subject's life threatening actions include using

18     a firearm, or any other available weapon or action in self

19     defense or defense of others; correct?

20          A.    Absent and obvious reasonable alternative, I

21     would agree.

22          Q.    That is essentially what you said on page 12 of

23     your report; right?

24          A.    Yes.

25          Q.    Under Standard Police Practices in general, and

1   when objectively reasonable under the totality of the

2   circumstances, the appropriate force by an officer to

3   address a subject, life threatening actions can include

4   deadly force; true?

5        A.   Absent and obvious reasonable alternative, yes.

6        Q.   Under Standard Police Practices, officers are

7   trained that deadly force is force that at the time that

8   it is used is substantially likely to cause death or great

9   bodily injury; true?

10        A.   Yes.

11        Q.   Under Standard Police Practices, whether or not

12   the target dies, has no bearing on whether the force used

13   was deadly force; true?

14        A.   As I understand the question, I would agree.

15        Q.   For example, an officer can shoot at somebody

16   and the subject can live, but the officer has still

17   deployed deadly force, correct?

18        A.   Exactly what I had in mind.

19        Q.   By contrast, if an officer used what a Standard

20   Police Practices constitutes or defines as non deadly

21   force, like normal manual restraints on a subject, just

22   because that subject didn't die, the force would not

23   necessarily be deadly force under Standard Police

24   Practices; correct?

25        A.   No. That wouldn't be correct.  If in the

1      Q.    According to your prior testimony under Standard

2   Police Practices, if the detention or arrest is justified,

3   and the subject deliberately physically resists while

4   placing the subject into handcuffs, that would be illegal

5   resistance to the officer's lawful authority; correct?

6      A.    For criminal activity, yes.

7      Q.    According to your prior testimony in certain

8   circumstances, if an officer was trying to handcuff a

9   subject and the subject grabbed the officer and tried to

10  pull the officer down, you would view the subject's

11  actions as a threat; true?

12          THE WITNESS:  Yes.

13  BY MR. SAIN:

14     Q.    Under Standard Police Practices officers are

15  trained that, in general, in order to take a subject into

16  custody, the safest method of doing so is to handcuff the

17  subject behind their back; true?

18          MR. LACY:  Objection.  Calls for speculation;

19  lacks foundation; incomplete and improper hypothetical.

20          THE WITNESS:  It is typically the safest.

21  BY MR. SAIN:

22     Q.    Under Standard Police Practices officers are

23  trained that, in general, in order to handcuff a resistant

24  subject, the safest method for doing so is to get the

25  subject into a prone position on the ground; true?

1      A.   That is typical, but it can be done other ways.

2      Q.   What I said is correct?

3      A.   Yeah, it is typical.

4      Q.   In law enforcement, the term "prone" describes a

5   person who has the front surface of their body facing

6   downward laying with the chest and stomach positioned flat

7   downward; correct?

8      A.   Yes.

9      Q.   In other words, when a person is laying flat on

10   their chest, they are prone as far as police practices are

11   concerned; right?

12      A.   Yes.

13      Q.   By contrast, in law enforcement describes supine

14   as a person lying on their back with their face upward;

15   correct?

16      A.   Yes.

17      Q.   Under Standard Police Practices, officers are

18   trained that, in general, restraining a subject in the

19   prone position provides a tactical advance to the police

20   officer; true?

21      A.   Yes.

22      Q.   Under Standard Police Practices, officers are

23   trained that, in general, restraining a subject in the

24   prone position provides tactical advantages to the officer

25   because a prone restrained and rear handcuff subject is

1    less likely to be able to stand, to fight, or to flee;

2    true?

3         A.    Yes.

4         Q.    Under Standard Police Practices, officers are

5    trained that even when a subject is handcuffed behind the

6    back, in some cases, an upright, handcuffed subject can

7    still assault the officer or others by head butting,

8    kicking, slipping their cuffs to the front, or other

9    unusual methods; correct?

10        A.    Yes, that can happen if officers are careless.

11        Q.    Under Standard Police Practices officers are

12   trained for a handcuffed, resistive subject who is not

13   already contained in a cell or police vehicle, the safest

14   place to keep that subject is in a prone position;

15   correct?

16        A.    No, that is not the safest.

17        Q.    What is the safest?

18        A.    He has to be set up so he can breathe.  Once

19   handcuffed, there is absolutely no justification to keep

20   him flat.

21        Q.    Even for a resistive subject?

22        A.    Oh, absolutely.  There are methods of tending to

23   a resistive subject.

24        Q.    Is it your testimony that according to Police

25   Practices, officers are trained that a handcuffed but

1        A.    Yes, generally indicates, and assuming the

2    officer is reasonable.

3        Q.    Under Standard Police Practices, officers are

4    trained that at all times, even for a handcuffed and

5    resistive subject, being restrained in the prone position,

6    officers have a duty so as to monitor the breathing of the

7    subject so as to watch out for any life threatening

8    medical problems; correct?

9        A.    Correct.

10       Q.    Under Standard Police Practices officers are

11   trained that when feasible under the circumstances, a

12   subject who is restrained and in the prone position should

13   be moved into a recovery position; correct?

14       A.    Yes.

15       Q.    Under Standard Police Practices, common recovery

16   position, includes the subject moving into a supine or on

17   the back position, the subject moving into a seated

18   position, or the subject moving into an on the side

19   position; correct?

20       A.    No. Side or sitting up.

21       Q.    So everything I just said except for supine?

22       A.    Yes.

23       Q.    Okay.  Under Standard Police Practices, officers

24   are trained that it is not feasible to move the subject

25   into the recovery position while the subject is still

1      A.    Yes.  And in that question, and here, that is

2    correct.

3      Q.    Okay.  According to Standard Police Practices,

4    after the suspect is secured in custody, the second

5    priority is to determine if there is a medical need;

6    correct?

7      A.    Correct.

8      Q.    You agree that an officer cannot help a mentally

9    ill suspect if that suspect is presenting a danger to that

10   officer or others; true?

11          MR. LACY:  Objection.  Calls for speculation;

12   lacks foundation; incomplete and improper hypothetical.

13          Lieutenant?

14          THE WITNESS:  Yes.

15   BY MR. SAIN:

16     Q.    Under Standard Police Practices, if a mentally

17   ill subject poses an immediate threat of death or serious

18   bodily injury to the officer or others, peace officers are

19   still permitted to use deadly force; true?

20     A.    Yes, if it is reasonable.

21     Q.    Under Standard Police Practices, if a mentally

22   ill subject is actively resisting a lawful detention or a

23   lawful arrest, officers are authorized to use objectively

24   reasonable force from the perspective of a reasonable

25   officer under the totality of the circumstances known to

1    those officers at the time in order to overcome that

2    resistance; true?

3         A.    Yes.

4         Q.    Even though a subject is mentally ill, if the

5    mentally ill subject engages in conduct that under the

6    totality of circumstances makes it objectively reasonable

7    from the perspective of a reasonable officer to use force,

8    the use of force would not be excessive; true?

9         A.    True.   I think you used the word reasonable.

10        Q.    Under Standard Police Practices, in general, if

11   a mentally ill subject is actively resisting or

12   assaultive, officers are trained that they are authorized

13   to restrain that subject; true?

14        A.    In an objectively reasonable way, yes.

15        Q.    Regarding deescalation, you have testified that

16   officers should try to deescalate situations with a

17   suspect who is believed to be potentially mentally ill; is

18   that correct?

19        A.    Yes.

20        Q.    The focus of such deescalation is on making the

21   situation calmer as best they can; correct?

22        A.    Yes.

23        Q.    Under Standard Police Practices officers are

24   trained that for deescalation to be successful, the

25   subject must cooperate; true?

1     A.    In that case in the discussion.

2     Q.    So yes?

3     A.    In the discussion, right.  In this case he can

4  be really excited, and you say and do things to calm him

5  down.

6     Q.    Under Standard Police Practices, an officer who

7  was trying to explain to the subject what the officer is

8  trying to do and why the officer is trying to do it, that

9  can be a form of deescalation; true?

10          MR. LACY:  Objection.  Calls for speculation;

11 lacks foundation; improper and incomplete hypothetical.

12          THE WITNESS: If it is done in the proper way.

13 BY MR. SAIN:

14    Q.    Is that a yes?

15    A.    Yes.

16    Q.    Under Standard Police Practices if an officer

17 was moving in to restrain a subject and backed away from

18 the subject instead and shifted to talking, that would be

19 a form of deescalation; true?

20    A.    Yes.

21    Q.    Officers are trained that in general when a

22 suspect fails to comply with multiple officers' commands,

23 the threat posed by that subject is elevated; true.

24          MR. LACY:  Objection. Calls for speculation;

25 lacks foundation; vague and ambiguous.

1           THE WITNESS:  The best way to be possible I

2      would have to know more about just failure to respond to

3      the commands.  There has to be more to it then that.

4           MR. LACY:  Incomplete and improper hypothetical.

5      BY MR. SAIN:

6           Q.   Didn't you testify in the Ngo case, N-g-o? Page

7      85, Line 8 through 12. Question: "Officers are trained

8      that in general when a suspect fails to comply with

9      multiple officers' commands, the threat posed by that

10     suspect is elevated; true?

11          Answer: "Generally, yes."

12          A.   Generally, yes.

13          Q.   Okay.  According to your understanding of

14     Standard Police Practices, if an officer issues lawful

15     commands to a subject, and the subject fails to comply,

16     the subject has violated California law; true?

17          A.   In general.

18          Q.   That is a yes?

19          A.   Yes, in general.

20          Q.   In such a circumstance, that person could be

21     violating Penal Code Section 148 for resisting or

22     obstructing a police officer; true?

23          A.   In a criminal matter, yes.

24          Q.   Resisting or obstructing an officer could be a

25     crime; true?

1      A.      It could be.

2      Q.      According to your understanding of Standard

3  Police Practices under California Penal Code, citizens

4  have a legal duty to refrain from resisting arrest or

5  evading detection by a peace officer; correct?

6      A.      If they are lucid, correct.

7      Q.      That duty is stated in Penal Code sections 834a

8  and 835b to your understanding, yes?

9      A.      Yes.

10      Q.      According to Standard Police Practices,

11  unreasonable suspicion, an officer can do a detention that

12  includes grabbing the suspect to restrain the suspect;

13  correct?

14      A.      Yes.

15      Q.      According to Standard Police practices, if a

16  subject does not have a visible weapon in his hands, you

17  would agree that it would be reasonable for the officer to

18  run up and grapple with the subject in trying to restrain

19  them, in general; true?

20          MR. LACY:  Objection.  Calls for speculation;

21  incomplete and improper hypothetical; vague and ambiguous.

22          Lieutenant?

23          THE WITNESS:  If there is no compliance to

24  officer presence in his verbal skills and is necessary, I

25  would agree.

1   BY MR. SAIN:

2        Q.    In your experience as a peace officer, isn't it

3   possible that a subject whose hands appear to be empty at

4   one moment, can still produce a weapon at another moment?

5        A.    It is somewhat possible; not typical.

6        Q.    According to your understanding of the Standard

7   Police Practices, in general, if a person tries to cause

8   bodily harm on a peace officer who is conducting a

9   detention or investigation, that person may have committed

10  a crime; true?

11       A.    Yes.

12       Q.    Such an event could be a violation of Penal Code

13  section 243 for attempted battery on a peace officer;

14  true?

15            MR. LACY:  Objection.  Calls for speculation;

16  lacks foundation.

17            Lieutenant?

18            THE WITNESS:  Yes.

19  BY MR. SAIN:

20       Q.    That could also be a violation of Penal Code

21  section 241c; true?

22            MR. LACY: Same objections.

23            THE WITNESS:  Yes.

24  BY MR. SAIN:

25       Q.    According to Standard Police Practices, officers

1  are trained that, in general, when the officer facing the

2  subject is the sole or only officer on the scene, a threat

3  posed by the subject is elevated; true?

4     A.   One more time for that one because I think this

5  is the heartbeat of cover officer, contact officer.

6     Q.   Sure.

7          (Record read.)

8          THE WITNESS:  Yes.

9  BY MR. SAIN:

10    Q.   In your understanding of Standard Police

11  Practices, if an officer has a reasonable belief that the

12  subject is about to harm another person, including another

13  officer, the officer need not wait until the other person

14  or officer is actually harmed before the first officer can

15  use force on the subject; true?

16    A.   True.

17    Q.   According to your understanding of Standard

18  Police Practices, isn't it true that the subjective intent

19  of the officer has no bearing on whether or not there has

20  been an unlawful detention, a lawful arrest, or use of

21  force; true?

22    A.   Yes.

23    Q.   You have testified that every law enforcement

24  officer has a right to self defense; true?

25    A.   Yes.

1    those occasions as using excessive force from your

2    perspective now?

3         A.    No.

4         Q.    Let's talk about some of the facts that you

5    reviewed in this case.

6              Based on the evidence that you reviewed, is it

7    your understanding on the incident date Mr. Nunis tried to

8    jump out of a two-story window?

9         A.    That was reported, and it looks like that is

10   what he was trying to do.

11        Q.    And based on your review of the evidence, is it

12   your understanding that Mr. Studwood then restrained Mr.

13   Nunis to keep Mr. Nunis in the house?

14        A.    Yes.

15        Q.    Based on your review of the evidence, is it your

16   understanding that Mr. Nunis then resisted Mr. Studwood's

17   restraint?

18        A.    Yes.

19        Q.    According to the body worn camera in the

20   testimony, Mr. Nunis's shirt got ripped by that struggle

21   with Mr. Studwood; true?

22        A.    Apparently.

23        Q.    Based on your review of the evidence in this

24   case, you agree that Officer Linney made verbal contact

25   with Mr. Nunis at the top of the stairs of the residence;

1    true?

2        A.    Yes.

3        Q.    And Agent Linney testified that he saw Mr.

4    Nunis's ripped shirt as a sign that there had been

5    violence earlier; true?

6        A.    It is in the interview in his deposition.

7        Q.    How many times did you watch the body worn

8    camera video of Agent Linney?

9        A.    At least eight times, I think.  Probably eight

10   times.

11       Q.    Okay.  Have you reviewed the composite video by

12   the defendants where all of the body worn cameras are

13   synchronized together?

14       A.    No.

15       Q.    You do recall reviewing in the Agent Linney

16   video, that shortly after Agent Linney produces handcuffs

17   and mentions why he wants to handcuff Mr. Nunis, the video

18   cuts out?

19       A.    Yes.

20       Q.    And you recall that just before the video cuts

21   out, we can see that in response to Mr. Nunis becoming

22   agitated, Agent Linney steps back and away from Mr. Nunis;

23   correct?

24       A.    Yes.

25       Q.    On the video before it cuts out, we can hear

1    Agent Linney telling Mr. Nunis to stay seated; correct?

2        A.    Yes.

3        Q.    After being given those commands, we can see Mr.

4    Nunis get up from a seated position onto his knees;

5    correct?

6        A.    Yes.

7        Q.    When you watched the incident video, and we

8    first see Mr. Nunis out in the street, the position that

9    he was on was on his right side; correct?

10       A.    Right side back, yes.

11       Q.    He was not prone at that time; correct?

12       A.    Correct.

13       Q.    At that point while Mr. Nunis is out on the

14   street with the officers trying to restrain him, we can

15   hear Mr. Nunis speaking; correct?

16       A.    It is in the record, and it is -- you are

17   correct.

18       Q.    Based on your review of the evidence, was there

19   any evidence you reviewed that indicated that any officer

20   used any force on Mr. Nunis other than manual restraint or

21   restraint device?

22       A.    As in grip -- firm grip, that would be manual

23   restraint.  So that is the way it looked to me.

24       Q.    So the only force that was used by any officers

25   in this incident on Mr. Nunis was manual restraint or

1      A.   Yes.

2      Q.   Isn't it true that since you retired from the

3  Sheriff's Department you have been criticizing police

4  officers from witness stands in various courtrooms for the

5  past 30 years?

6      A.   Yes.

7           MR. SAIN: No further questions.

8                Mr. Douglas?

9           MR. DOUGLAS:  No questions.  Copy please.  Thank

10  you, Miss Reporter.

11           MR. LACY:  No questions.

12           MR. SAIN: Per Code.

13           Off the record.

14           (Whereupon the proceedings was

15           concluded at 2:27 o'clock p.m.)

16                     ---o0o---

17

18

19

20

21

22

23

24

25

```
1    STATE OF CALIFORNIA        )

2                              )

3    COUNTY OF_____)

4

5

6              I, ROGER CLARK, say I have read or had

7    interpreted to me the foregoing deposition and declare

8    under penalty of perjury that my answers as indicated are

9    true and correct.

10

11   _____
                (Date)
12

13

14

15                          _____
                                     (Signature)
16

17

18

19

20

21

22

23

24

25
```

1                  <u>REPORTER'S CERTIFICATE</u>

2

3            I, Elena Schall, CSR No. 7638, Certified

4    Shorthand Reporter in the State of California, do hereby

5    certify:

6            That prior to being examined, the witness named

7    in the foregoing proceeding was by me duly sworn to

8    testify the truth, the whole truth, and nothing but the

9    truth;

10           That said proceeding was taken down by me in

11   stenotype to the best of my ability at the time and place

12   named herein and was thereafter reduced to computer-aided

13   transcription under my direction and supervision;

14           That foregoing deposition is a full, true, and

15   correct transcription of my original stenotype notes.

16           I further certify that I have no interest in the

17   outcome of the action.

18

19           Witness my hand this 14th day of February, 2023.

20

21   _____
     Elena Schall, CSR No. 7638
22   Certified Court Reporter in
     and for the State of California
23

24

25

                    Norman Schall & Associates
                       (800) 734-8838                    93